# Exhibit 2

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN BRADLEY,
       Plaintiff,
VS.                     Civil Action No.
TIMOTHY J. CRUZ (Individually),    1:13-cv-12927
MICHAEL HORAN (Individually),
FRANK J. MIDDLETON (Individually),
and OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,
       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF JOHN BRADLEY

March 24, 2015

10:22 a.m.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, Massachusetts

Susan A. Romano, RMR, CRR, CSR #119393

Page 2

1    APPEARANCES OF COUNSEL
2
3    ON BEHALF OF THE PLAINTIFF:
4        ROBERT SINSHEIMER, ESQUIRE
5        Sinsheimer & Associates
6        92 State Street
7        Boston, Massachusetts 02109
8        617.722.9954
9        rsinsheimer@sinsheimerlaw.com
10
11   ON BEHALF OF THE DEFENDANTS:
12       BRET A. COHEN, ESQUIRE
13       ROBERT SHERIDAN, ESQUIRE
14       Mintz, Levin, Cohn, Ferris, Glovsky and
15       Popeo, P.C.
16       One Financial Center
17       Boston, Massachusetts 02111
18       617.542.6000
19       bcohen@mintz.com
20       rsheridan@mintz.com
21
22   ALSO PRESENT:
23       Frank J. Middleton
24       Timothy J. Cruz (afternoon only)

Page 3

1              INDEX OF EXAMINATION
2    Deposition of: JOHN BRADLEY
3    EXAMINATION                    PAGE NO.
4    By Mr. Cohen                   4
5
6              MARKED QUESTIONS
7        PAGE NO.         LINE NO.
8           6               11
9
10             INDEX OF EXHIBITS
11   NO.        DESCRIPTION          PAGE NO.
12   1    Résumé                        9
13   2    Answers to Interrogatories    62
14   3    Requests for Production of    66
15        Documents
16   4    Responses to Requests for     71
17        Admission
18   5    Complaint and Jury Demand     76
19   6    Political Contributions       131
20   7    November 16, 2011 E-Mail      145
21   8    November 17, 2011 E-Mails     155
22
23
24       (Original exhibits retained by Mr. Cohen.)

Page 4

1                JOHN BRADLEY
2                March 24, 2015
3                PROCEEDINGS
4
5        JOHN BRADLEY, the deponent, having been
6    satisfactorily identified and duly sworn by the
7    Notary Public, was examined and testified as
8    follows:
9              EXAMINATION
10            BY MR. COHEN:
11   Q.   Good morning, Mr. Bradley.  How are you?
12   A.   Good morning.
13   Q.   Good morning.  We've met before, correct?
14   A.   Yes.
15   Q.   All right.  And so you know me as Bret
16   Cohen.  I represent the defendants in this case.  Is
17   that right?
18   A.   That's right.
19   Q.   All right.  And you're represented here
20   today by your counsel, Rob Sinsheimer.  Is that
21   correct?
22   A.   Yes.
23   Q.   By the way, you had previous counsel
24   before Mr. Sinsheimer.  Is that right?

1     MR. SINSHEIMER:  Move on.
2     BY MR. COHEN:
3     Q.  So have you ever had your deposition
4   taken before?
5     A.  No.
6     Q.  One thing that's important to make sure
7   that the transcript is clear is you need to wait for
8   me to finish asking a question before you answer.
9   All right?
10    A.  Sure.
11    Q.  And you need to speak clearly and
12  audibly.  And, again, that's to make her life much
13  more easier.  Okay?  Fair enough?
14    A.  Fair enough.
15    Q.  All right.  I'd like to just spend a
16  little bit of time on your background, not much.
17        MR. COHEN:  I'd liked to have this
18  marked as Bradley 1.
19        (Exhibit No. 1, Résumé, marked for
20  identification.)
21        BY MR. COHEN:
22    Q.  I just handed you what is marked as
23  Bradley 1.  Do you recognize that document?
24    A.  Yes.

1     Q.  Do you recognize this document as your
2   résumé?
3     A.  Yes.
4     Q.  When was the last time you saw this
5   document?
6     A.  I don't know.
7     Q.  Is there anything on this document that
8   you believe to be inaccurate?
9         MR. SINSHEIMER:  Do you want him to
10  read the whole thing?
11        MR. COHEN:  It's his résumé.  He's
12  welcome to take the time with it that he chooses.
13    A.  (Deponent viewing document.)  The only
14  thing I see that's inaccurate is that I wasn't
15  assigned district court 'til May of 1992.
16    Q.  And what part of your résumé are you
17  referencing, Mr. Bradley?
18    A.  The first page, the last item.
19    Q.  Okay.  Other than what you just testified
20  to, is everything else on this résumé accurate, as
21  far as you're concerned?
22    A.  Yes.
23    Q.  You are licensed to practice in
24  Massachusetts.  Is that correct?

1     A.  Yes.
2     Q.  All right.  Are you licensed to practice
3   in any other state other than Massachusetts?
4     A.  No.
5     Q.  And I understand that you took the bar
6   exam twice.
7     A.  Yes.
8     Q.  When was the first time you took the bar
9   exam?
10    A.  July of 1991.
11    Q.  And what was the result of that bar exam?
12    A.  I failed.
13    Q.  And then you took the bar exam again.
14  And when was that?
15    A.  February of 1992.
16    Q.  And what was the result of that bar exam?
17    A.  I passed.
18    Q.  At any point from the time that you
19  passed your bar exam in 1992 through the present,
20  has your license ever been suspended for any reason?
21    A.  No.
22    Q.  Has it ever been -- has your license in
23  Massachusetts to practice law ever been anything but
24  in good standing?

1     A.  No.
2     Q.  Okay.  If your license to practice law
3   was not in good standing, explain to me what the
4   circumstances surrounding that were.
5     A.  There were no circumstances.
6     Q.  Okay.  So I guess maybe I'm asking the
7   question wrongly.  Was there ever a point --
8   incorrectly.  Was there ever a point, Mr. Bradley,
9   in which you were not a properly registered attorney
10  under Massachusetts?
11    A.  No.
12    Q.  So it's your testimony there was never a
13  period of time when you were not a duly licensed
14  attorney authorized to practice in the Commonwealth
15  of Massachusetts.  Is that right?
16    A.  That's right.
17        MR. SINSHEIMER:  I think there was a
18  double negative in your earlier question.
19        MR. COHEN:  There probably was.
20        MR. SINSHEIMER:  That's all I have.
21  Sorry.
22        MR. COHEN:  No.  That would be a
23  proper objection to form, which I would readily
24  concede.

Page 13

1      BY MR. COHEN:
2          Q.  So let me ask the question a different
3      way.
4              Was there ever a time, Mr. Bradley, that
5      you did not have the right to practice law in the
6      Commonwealth of Massachusetts?
7          A.  From when I passed the bar?
8          Q.  Yes.
9          A.  No.
10         Q.  Was there ever a time, Mr. Bradley, that
11     you were not properly registered under the
12     Massachusetts rules to practice law here?
13         A.  No.
14         Q.  Okay.  After you started practicing --
15     strike that.
16             After you were sworn in to the bar, where
17     was your first job?
18         A.  With the Plymouth County District
19     Attorney's Office.
20         Q.  And in what year was that?
21         A.  I started there in October of 1991.
22         Q.  And who hired you there?
23         A.  William O'Malley, the district attorney.
24         Q.  And did you have a pre-existing

Page 14

1      relationship with Mr. O'Malley?
2          A.  No.
3          Q.  Did your family have a pre-existing
4      relationship with Mr. O'Malley?
5          A.  No.
6          Q.  Tell us how it was you became employed at
7      the Plymouth County District Attorney's Office after
8      you got sworn in to the bar.
9          A.  I applied, I went through a series of
10     interviews, and I was hired.
11         Q.  And what was your position at the
12     Plymouth County District Attorney's Office at that
13     time?
14         A.  I did appellate work before I was sworn
15     in as a member of the bar, and then I was assigned
16     to the district court.
17         Q.  And what were your duties and
18     responsibilities with respect to your work at the
19     Plymouth County District Attorney's Office when you
20     first became employed?
21         A.  I did appellate work.
22         Q.  You also mentioned that you were doing
23     work at the district court level.  Is that right?
24         A.  That's right.

Page 15

1          Q.  Okay.  So you did appellate work, and you
2      did work at the district court level.  Is that
3      right?
4          A.  That's right.
5          Q.  And with respect to the district court
6      work, tell us what you did with respect to your work
7      at the district court.
8          A.  You go into court every day with a stack
9      of files, and you attend to those cases.
10         Q.  And what kind of cases were they,
11     Mr. Bradley?
12         A.  Misdemeanors and less serious felonies.
13         Q.  And to whom did you report?
14         A.  Initially I was assigned to the Plymouth
15     County District Court, and my immediate supervisor
16     was a woman named Paula Miller.
17         Q.  And how long did you have those duties
18     that you just described?
19         A.  About six months.
20         Q.  Okay.  So after your first six months
21     with the Plymouth County District Attorney's Office,
22     what did you do next?
23         A.  I was moved to the Brockton District
24     Court.

Page 16

1          Q.  And did your duties change then?
2          A.  No.
3          Q.  And for how long were you in the Brockton
4      District Court?
5          A.  I'd say about three months.
6          Q.  What did you do next?
7          A.  I was assigned to a jury session at
8      Stoughton.
9          Q.  And what was the nature of your duties at
10     that time?
11         A.  The only difference was that it was a
12     jury session, so the cases that you had potentially
13     could have been heard by a jury.
14         Q.  All right.  And did your reporting
15     relationship change?
16         A.  It was a one-person operation in
17     Stoughton, so there was no immediate supervisor in
18     the courthouse with you.
19         Q.  Okay.  To whom did you report at that
20     time?
21         A.  The chief district court prosecutor, who
22     was a woman named Kathleen Reagan.
23         Q.  And did your duties change after that?
24         A.  After that I believe I went back to kind

1  District Attorney's Office?

2     A.  September 2001.

3     Q.  Okay.  So Mr. Sullivan, he is a democrat

4  or republican?

5     A.  Republican.

6     Q.  Did you ever contribute to any of

7  Mr. Sullivan's election efforts?

8     A.  No.

9     Q.  Did you ever contribute -- strike that.

10     Did you ever attend any of Mr. Sullivan's

11  events or fundraisers?

12     A.  Yes.

13     Q.  Approximately how many events or

14  fundraisers did you attend of Mr. Sullivan's?

15     A.  I would say anywhere from four to six.

16     Q.  And Mr. Sullivan left the District

17  Attorney's Office to become the U.S. attorney in

18  approximately September 2001?  Is that right?

19     A.  That's right.

20     Q.  So leading up to your return to the

21  District Attorney's Office, which we'll come back to

22  in a minute, you attended somewhere between four and

23  eight events for Mr. O'Malley and Mr. Sullivan.  Is

24  that correct?

1     A.  Approximately.

2     Q.  Fair enough.  I couldn't tell you what I

3  had for breakfast yesterday literally, so I don't

4  expect you to go back that far.  I just want to

5  understand generally.

6     Mr. Bradley, did you ever complain to

7  anybody about your attendance at any of the

8  fundraisers under either Mr. O'Malley or

9  Mr. Sullivan?

10     A.  Not that I recall.

11     Q.  As you sit here today, did you ever feel

12  forced to attend any of those fundraisers that you

13  attended for either Mr. O'Malley or Mr. Sullivan?

14     A.  No.

15     Q.  All right.  So in 2001, you leave the

16  District Attorney's Office and end up at the U.S.

17  Attorney's Office.  Is that right?

18     A.  Yes.

19     Q.  Tell me, if you would, the circumstances

20  under which that happened.

21     A.  Michael Sullivan asked me if I would be

22  interested in coming to the U.S. Attorney's Office

23  with him, and I indicated that I would.

24     Q.  And so you left.  And who took over the

1  District Attorney's Office when Mr. Sullivan left?

2     A.  Initially, as I recall, Joe Gaughen was

3  appointed as the acting or interim district

4  attorney.  And then Timothy Cruz was appointed by

5  the governor.

6     Q.  And when was it that Tim Cruz was

7  appointed by the governor to be the district

8  attorney for Plymouth County?

9     A.  Sometime in the fall of 2001.

10     Q.  So you left the Plymouth County District

11  Attorney's Office and joined Mr. Sullivan at the

12  U.S. Attorney's Office.  Is that right?

13     A.  Yes.

14     Q.  And what work did you perform at the U.S.

15  Attorney's Office when you first got there?

16     A.  I was assigned to the major crimes unit.

17     Q.  And tell us, if you would, what it means

18  to be a prosecuting attorney in the major crimes

19  unit.

20     A.  It's more of a general crimes unit is the

21  best way I can describe it.  You prosecute

22  immigration cases, bank robberies, armored car

23  robberies, arson cases, things of that nature.

24     Q.  And is that -- did you just describe

1  essentially what you did while you were at the U.S.

2  Attorney's Office?

3     A.  Yes.

4     Q.  And for how long were you at the U.S.

5  Attorney's Office?

6     A.  I was there until April of 2003.

7     Q.  So from the fall of 2001 until April

8  2003, you worked in the major crimes unit under

9  Mr. Sullivan in the U.S. Attorney's Office in

10  Boston.  Is that right?

11     A.  Yes.

12     Q.  Did the nature of your work at the U.S.

13  Attorney's Office change during that time period?

14     A.  No.

15     Q.  What happened in April 2003?

16     A.  In April 2003, I left the U.S. Attorney's

17  Office and came back to Plymouth County.

18     Q.  And why did you make that transition,

19  Mr. Bradley?

20     A.  I missed prosecuting the homicide cases.

21     Q.  Were you ever given any homicide cases at

22  the U.S. Attorney's Office?

23     A.  For the most part, they don't do homicide

24  cases.

Page 25

1    Q. I understand that. Could you -- so my
2   question, though, is were you ever actually given a
3   homicide case to try?
4    A. No.
5       MR. SINSHEIMER: You meant at the --
6       MR. COHEN: At the U.S. Attorney's
7   Office. Right.
8       BY MR. COHEN:
9    Q. Let's just stick with the U.S. Attorney's
10  Office for one second. You were never given a
11  homicide case to prosecute at the U.S. Attorney's
12  Office. Is that correct?
13   A. That's correct.
14   Q. You made efforts to be assigned homicide
15  cases. Is that right?
16   A. Where?
17   Q. At the U.S. Attorney's Office.
18   A. No.
19   Q. So it's your testimony that you did not
20  ever seek to be assigned a homicide case while you
21  were at the U.S. Attorney's Office?
22   A. That's correct.
23   Q. So you returned to the Plymouth County
24  District Attorney's Office in April 2003. Is that

Page 26

1   right?
2    A. Yes.
3    Q. And Timothy Cruz was then the Plymouth
4   County district attorney. Is that right?
5    A. Yes.
6    Q. Tell us how you became re-employed at the
7   Plymouth County District Attorney's Office.
8    A. I had an ongoing dialogue with, for the
9   most part, Michael Horan about coming back, and it
10  was a mutual thing, for lack of a better -- a better
11  way to describe it.
12   Q. When you say "mutual thing," what do you
13  mean by that, Mr. Bradley?
14   A. Well, they wanted me to come back, and I
15  wanted to come back.
16   Q. And who is Michael Horan to you?
17   A. Mike was a lawyer I had known since --
18  Brockton lawyer I had known since about 1992, and a
19  friend.
20   Q. And what was Mike Horan's position at the
21  Plymouth County District Attorney's Office in April
22  2003?
23   A. I think his position was chief of staff,
24  but I'm not positive about that.

Page 27

1       MR. SINSHEIMER: One second, please?
2       MR. COHEN: Sure.
3       (Counsel and deponent conferred.)
4       BY MR. COHEN:
5    Q. Did you interview again at the Plymouth
6   County District Attorney's Office in advance of you
7   being employed again in April of 2003?
8    A. No.
9    Q. So to the best of your knowledge, how was
10  it that you became re-employed at the Plymouth
11  County District Attorney's Office after having left
12  it for a little over two years?
13   A. Well, I knew Tim Cruz, and Mike, I had
14  known him for a long time, and we had talked -- Mike
15  and I had talked on a few different occasions during
16  the years 2002 and early 2003 about my coming back.
17  And it worked out.
18   Q. So -- and I'm not, in this instance,
19  trying to put words in your mouth. So you talked to
20  Mike Horan, you have a long friendship with him, and
21  you previously worked under Tim Cruz, and basically
22  you just left the U.S. Attorney's Office and joined
23  the District Attorney's Office at Plymouth County --
24  in Plymouth County in approximately April 2003. Is

Page 28

1   that right?
2    A. That's right.
3    Q. In April 2003, what were your
4   responsibilities at the Plymouth County District
5   Attorney's Office?
6    A. Just to try cases in superior court.
7    Q. Tell those of us who practice exclusively
8   civil litigation what that means from a district
9   attorney's perspective.
10   A. Serious felonies.
11   Q. And serious felonies would include what,
12  Mr. Bradley?
13   A. Murders, armed robberies, rapes, arsons.
14   Q. Let's stick for one moment with respect
15  to your relationship with Michael Horan. You
16  described Mr. Horan as a friend in April 2003. Is
17  that right?
18   A. Yes.
19   Q. And how was it that you became friends
20  with Michael Horan? And I'm speaking of the time
21  frame in advance of April 2003.
22   A. Mike had a small law firm with Tim Cruz
23  and Dave Sorrenti. They were a small, local law
24  firm who happened to do a lot of criminal work in

1     All right. Now let's move on to -- what
2 did you do between your termination and your
3 employment at the Worcester County District
4 Attorney's Office professionally?
5     A. Nothing.
6     Q. We'll come back to that gap later, but
7 you eventually became employed at the Worcester
8 County District Attorney's Office. Is that right?
9     A. Yes.
10     Q. And explain, if you would, how you became
11 employed at the Worcester County District Attorney's
12 Office.
13     A. I heard that they were looking for
14 someone to come in and try murder cases, and I
15 called the senior first assistant out there, Dan
16 Bennett. We had a conversation, and then we had a
17 follow-up meeting.
18     Q. In what time frame was this taking place?
19     A. This was in late February, early March of
20 2014.
21     Q. And when did you start at the Worcester
22 County DA's?
23     A. In April of 2014.
24     Q. How was it that you heard of the

1 opportunity at the Worcester County District
2 Attorney's Office?
3     A. I got a call from an attorney I know
4 named Kevin Reddington.
5     Q. And how do you know Kevin Reddington?
6     MR. SINSHEIMER: Everybody knows
7 Kevin Reddington.
8     A. I've had cases against Kevin over the
9 years.
10     MR. SINSHEIMER: Sorry. I couldn't
11 resist.
12     BY MR. COHEN:
13     Q. And what position were you offered in
14 2014?
15     A. I was offered a superior court position
16 with the idea that I was going to come in and try
17 murder cases.
18     Q. And to whom do you report at the
19 Worcester County DA's?
20     A. To the district attorney, Joe Early, and
21 the first assistant, Jeff Travers.
22     Q. What do you make at the -- what's your
23 compensation at the Worcester County District
24 Attorney's Office?

1     A. It's $110,000.
2     Q. And what was your compensation at the
3 Plymouth County District Attorney's Office?
4     A. I believe it was $121,000.
5     Q. Did you try to get compensation equal to
6 what you had at the Plymouth County District
7 Attorney's Office?
8     A. I wouldn't say I asked for that
9 specifically. When we discussed money, we discussed
10 a salary that was going to be above six figures.
11     Q. How are your duties different, if at all,
12 from those that had last at the Plymouth County
13 District Attorney's Office?
14     A. I don't have a title. I was the deputy
15 first assistant district attorney in Plymouth
16 County. And I am, for lack of a better way to put
17 it, a line prosecutor in Worcester County with a
18 specialty in trying homicide cases.
19     Q. When you were at the Plymouth County
20 District Attorney's Office before your termination,
21 how were your -- what did you do differently on a
22 day-to-day basis than what you do today?
23     A. Well, Plymouth County, one of the things
24 I did was -- for about six or seven years was

1 supervise the district courts.
2     Q. At some point you stopped supervising the
3 district courts. Is that right?
4     A. Right.
5     Q. But in the, say, six months or so leading
6 up to your last day of employment in the Plymouth
7 County District Attorney's Office, you no longer had
8 that responsibility. Is that right?
9     A. Right.
10     Q. Tell us, if you would -- since we're on
11 the subject matter, tell us, if you would, in your
12 opinion, why it was you no longer had the
13 supervisory role over district courts at the
14 Plymouth County DA's Office before you left.
15     A. I had fallen out of favor by then.
16     Q. Okay. So from what period of time to
17 what period of time was it that you had the
18 responsibilities over the district courts at the
19 Plymouth County District Attorney's Office?
20     A. I think I started in 2006, but it could
21 have been late 2005. I'm not sure. Up until right
22 around January 1st of 2012.
23     Q. So it's your testimony from approximately
24 2005, 2006 through 2012 you had the responsibilities

Page 41

1    of overseeing the district court in Plymouth County.
2    Is that right?
3        A.  Yes.
4        Q.  And tell us, in your opinion, why it is
5    that you no longer had the role as supervising
6    attorney over the district courts in Plymouth County
7    after the 2012 time frame.
8        A.  Fallout from my lack of participation in
9    the campaign.
10       Q.  And just relative to your no longer
11   having that responsibility over the district courts,
12   Mr. Bradley, state, if you would, the basis of your
13   belief that the reason why you no longer had the
14   responsibilities over the district court was because
15   of your decision not to participate in Timothy
16   Cruz's campaign.
17       A.  I'm sorry.  Could you --
18           MR. COHEN:  Do you mind just
19   repeating that back while I get some coffee, please.
20           MR. SINSHEIMER:  Can I chat with him
21   for one second?
22           MR. COHEN:  Not while the question is
23   pending.
24           MR. SINSHEIMER:  Not while the

Page 42

1    question is pending.  After it's over.
2            MR. COHEN:  Yeah.
3            MR. SINSHEIMER:  Thanks.
4            (Record read.)
5        A.  Just so I'm clear, are you asking me why
6    I believe that I no longer had the district court
7    responsibilities after 2012?
8        Q.  Yes, sir.  What I'm asking you
9    specifically, the basis of your belief that you no
10   longer having the district court responsibilities at
11   the Plymouth County District Attorney's Office was
12   due to your decision not to participate in Timothy
13   Cruz's election activities.
14       A.  Michael Horan had told me several times
15   that Frank and Bridget Middleton had talked to
16   Timothy Cruz about my not participating in the
17   campaign and trying to persuade Mr. Cruz to fire me.
18           MR. SINSHEIMER:  Can I talk to him
19   for one second?
20           MR. COHEN:  Just got to finish this
21   line of questioning, and then you can --
22           MR. SINSHEIMER:  I just need to talk
23   to him.  Go ahead.
24           BY MR. COHEN:

Page 43

1        Q.  Did you finish your answer?
2        A.  Yes.
3        Q.  Okay.  So the entire basis of your belief
4    that you were no longer responsible for the district
5    court in Plymouth County was premised upon
6    conversations that you had with Michael Horan that
7    Michael Horan had had with Frank and Bridget
8    Middleton.  Is that correct?
9        A.  No.
10       Q.  Other than those conversations, that is,
11   the conversations that were allegedly reported to
12   you by Mike Horan that he had had with Frank and
13   Bridget Middleton, what other bases do you have for
14   forming the belief that the reasons why you did not
15   have the district attorney's -- oversee the district
16   courts was because of your decision not to
17   participate in Timothy Cruz's election activities?
18       A.  I knew that employees' contributions were
19   very important to Tim Cruz, and I knew that
20   participation in campaign by employees was very
21   important to Mr. Cruz.
22           MR. SINSHEIMER:  I'm going to chat
23   with him for one second.
24           MR. COHEN:  Okay.

Page 44

1            MR. SINSHEIMER:  Come outside.
2            (Off the record at 11:08 a.m.)
3            (On the record at 11:16 a.m.)
4            BY MR. COHEN:
5        Q.  All right, Mr. Bradley.  We're back on
6    the record.  So the last question that I asked
7    you -- and we went back in time, and I apologize for
8    that, but I asked you why you were -- why your
9    district court responsibilities were eliminated
10   after you performed them from 2006 to 2012.  And it
11   was your testimony that the basis of your belief
12   that they were eliminated because of your lack of
13   contribution to Timothy Cruz's campaign was based
14   on, one, conversations you had with Michael Horan,
15   which were based on conversations he had with the
16   Middletons and, two, that you knew how important it
17   was to Timothy Cruz, the individual campaign
18   contributions.  Is that right?
19       A.  It's mostly right.  What I knew from
20   Mr. Horan was not necessarily based on conversations
21   that he had with the Middletons.  I believe it was
22   based on conversations that he either was present
23   for with Mr. Cruz or was told directly by Mr. Cruz.
24       Q.  Okay.  So now I think I understand the

Page 45

1  substance of your testimony.  There are really
2  essentially three bases in which you form the belief
3  that your position relative to district court
4  responsibilities was -- ended while you were at the
5  Plymouth County District Attorney's Office.  One was
6  based on conversations that Mike Horan had with both
7  the Middletons and with Timothy Cruz.  And the third
8  reason would be because you personally knew how
9  important individual contributions were to Tim Cruz.
10  Is that right?
11        MR. SINSHEIMER:  Object to the form.
12        You can answer.
13     A.  Yes.
14     Q.  So other than those three bases, that is,
15  conversations that you had with Mike Horan, which he
16  shared information with -- that he had from the
17  Middletons, number one; number two -- conversations
18  Mike Horan shared with you about conversations he
19  had with Timothy Cruz, number two; and, number
20  three, your personal knowledge of how important it
21  was to have -- to Timothy Cruz to have personal
22  contributions, is that it?
23     A.  Yes.
24     Q.  Okay.  What's the basis, Mr. Bradley, of

Page 46

1  your belief that individual contributions by
2  employees of the District Attorney's Office, such as
3  yourself, were important to Tim Cruz?
4     A.  Well, I was told on many occasions by
5  Mr. Horan that they were important to Mr. Cruz.  I
6  knew that decisions were made based on political
7  contributions such as who would get raises and how
8  big the raises would be.  And I had been told in one
9  instance to move a district court prosecutor to an
10  outlying court far from his home because he hadn't
11  been doing enough politically.
12     Q.  And which attorney was this?
13     A.  Rick Linehan.
14     Q.  Can you spell that last name for me?
15     A.  L-I-N-E-H-A-N.
16     Q.  Did Timothy Cruz ever tell you that
17  political contributions were important to his
18  campaign -- strike that -- to your employment at the
19  District Attorney's Office?
20     A.  No.
21     Q.  You also mentioned that you understood
22  that political contributions contributed to
23  decision-making as to who received what raises at
24  the Plymouth County District Attorney's Office.  Is

Page 47

1  that right?
2     A.  Yes.
3     Q.  What is the basis of your belief that
4  political contributions contributed to decisions
5  being made about raises at the Plymouth County
6  District Attorney's Office?
7     A.  I have been told many times by Mr. Horan.
8     Q.  Other than the fact that Mike Horan told
9  you that decisions were being made about raises at
10  the Plymouth County District Attorney's Office based
11  upon his or her political contribution to the
12  campaign of Timothy Cruz, do you have any other
13  basis for forming that belief?
14     A.  It was something that was talked about by
15  a number of employees, and there seemed to be some
16  support just based on who got substantial raises
17  versus who got insubstantial raises.
18     Q.  We'll come back to the talk amongst
19  employees in a minute.
20        Tell us how it was you became privy to
21  the compensation of the employees at the Plymouth
22  County District Attorney's Office.
23     A.  People just talked about it, and it was
24  also salaries of all state workers are posted

Page 48

1  online.
2     Q.  Did you actually look, Mr. Bradley, while
3  you were employed at the Plymouth County District
4  Attorney's Office, at the compensation of the
5  various employees at the District Attorney's Office?
6     A.  I think I did.  It wasn't something I
7  checked regularly, but I think I did once or twice.
8     Q.  Since your termination from the Plymouth
9  County District Attorney's Office, have you
10  looked --
11     A.  No.
12     Q.  -- at that list, at who makes what?
13     A.  No.
14     Q.  The political contributions that are made
15  by anyone in the Commonwealth of Massachusetts are a
16  matter of public record.  Is that right?
17     A.  Yes.
18     Q.  Did you ever undertake a review and
19  compare yourself the political contributions that
20  were made by employees of the Plymouth County
21  District Attorney's Office and their salaries to
22  make a determination as to whether or not there was
23  a correlation between the two?
24     A.  No.

Page 81

```
 1   of the question.
 2        You can answer.
 3        A.  Yes.
 4        Q.  So now I'm going to go back a little bit
 5   into the circumstances under which you believe you
 6   were terminated from and otherwise penalized in
 7   connection with your employment with the District
 8   Attorney's Office.
 9        So in your complaint, you allege, among
10   other things, that it was failure to contribute to
11   the Timothy Cruz campaign that led to your
12   termination as well as your failure to participate
13   in election activities was one of the reasons why
14   you were -- was the reason why you were terminated
15   from the Plymouth County District Attorney's Office.
16   Is that right?
17        A.  Yes.
18        Q.  You've been a trial lawyer, as I do the
19   math, for north of 20 years.  Is that right?
20        A.  Yes.
21        Q.  And I think you understand the difference
22   between direct and indirect evidence, right?
23        A.  Yes.
24        Q.  What I'm going to ask you is -- I want to
```

Page 82

```
 1   ask you whether or not -- a series of questions that
 2   relate to parsing those two concepts out.
 3        So with respect to that first bucket we
 4   talked about earlier on, that is, the political
 5   financial contributions to the Timothy Cruz campaign
 6   as well as participating in election activities, for
 7   purposes of this dialogue with you right now, I'd
 8   like to put those two together and call them
 9   election activities.  Fair enough?
10        MR. SINSHEIMER:  Object.
11        A.  Yes.
12        Q.  Okay.  So that when I ask the question
13   about something about election activities, I'm
14   talking about both the financial contribution as
15   well as participating in anything related to the
16   Timothy Cruz campaign.  Fair enough?
17        MR. SINSHEIMER:  Object.
18        A.  Yes.
19        Q.  All right.  At any time did you confront
20   Timothy Cruz about your belief that the decision to
21   take away the district court responsibilities away
22   from you was due to your failure to participate in
23   the election activities?
24        A.  No.
```

Page 83

```
 1        Q.  Do you have any writing from Timothy Cruz
 2   that would in any way tend to prove that your
 3   elimination of the district court activities had
 4   anything to do with your decision not to participate
 5   in election activities?
 6        MR. SINSHEIMER:  Object to the form
 7   of the question and particularly the phrase "tend to
 8   prove."  Knowing the irony that he is a trial
 9   lawyer, I'm going to let him answer the question.
10   But just for the record, that's not the witness's
11   responsibilities.  And I do object.
12        Go ahead, John.  You can answer.
13        A.  No.
14        Q.  Why is it, Mr. Bradley, that you never
15   asked Tim Cruz whether your elimination of district
16   court duties had anything to do with your decision
17   not to participate in the election activities?
18        MR. SINSHEIMER:  Again, you mean both
19   buckets, right?  The whole bucket?
20        MR. COHEN:  Election activities is
21   financial contributions and participation in any
22   election.
23        MR. SINSHEIMER:  All right.
24        MR. COHEN:  Activities --
```

Page 84

```
 1        MR. SINSHEIMER:  You didn't say how
 2   long that was going to go.  Is that for the whole
 3   deposition?
 4        MR. COHEN:  Until we agree otherwise.
 5        MR. SINSHEIMER:  That's good.  It
 6   makes it easier.
 7        A.  Why didn't I?
 8        Q.  Yes.
 9        A.  Because I knew he would never own up to
10   that.
11        Q.  Did you find Mr. Cruz to be a dishonest
12   person, by the way?
13        A.  By and large, no.
14        Q.  Did he ever lie to you, Mr. Bradley?
15        A.  I'd have to think long and hard about
16   that one.
17        Q.  As you sit here today --
18        A.  As I sit here right now?
19        Q.  Yes, sir.
20        -- can you think of a single instance
21   where Timothy Cruz lied to you?  And just so that
22   we're clear, I don't mean was wrong a lot.  I'm
23   saying that he actually looked you in the eye and
24   lied to you.
```

Page 85

1        MR. SINSHEIMER: You know, I didn't
2    object before, but now I object for just that
3    reason. I object.
4        Go ahead. Answer the best you can.
5        A.  Off the top of my head, no.
6        Q.  Okay. And tell us, if you would, where
7    Timothy Cruz's office was in relationship to yours
8    in the latter part of your career at the Plymouth
9    County District Attorney's Office.
10       A.  He was three doors down.
11       Q.  And in your opinion, the retaliation
12   against you for failing to participate in election
13   activities began in or around 2009. Is that right?
14       A.  2009, 2010.
15       Q.  Right. So you're a Plymouth County
16   district attorney working three doors down to
17   Timothy Cruz, 2009, 2010, 2011, and 2012. And you
18   believe that Timothy Cruz has retaliated against you
19   for failing to participate in election activities,
20   and you never once asked Mr. Cruz about that. Is
21   that right?
22       A.  I never talked to him about it directly.
23       Q.  Did you ever ask anyone on your behalf,
24   from 2009 through the time of your termination, to

Page 86

1    talk to Timothy Cruz about the fact that you
2    believed he was retaliating against you for failing
3    to participate in election activities?
4        A.  No. But to clarify, I didn't sense any
5    retaliation in 2009, 2010.
6        Q.  As I understand it from my notes, you
7    were removed from the District Attorney's --
8    responsibility for the district courts in 2010. Is
9    that right?
10       A.  No, that's not right.
11       Q.  Okay. What's the time that you were
12   removed from the district court?
13       A.  In January of 2012.
14       Q.  Ah, sorry. Right. 2012.
15       Was that the first time that you believed
16   you were retaliated against for your failure to
17   participate in the election activities, was in 2012
18   when you were removed from the district court?
19       A.  No.
20       Q.  Okay. When was the first time that you
21   can recall you were retaliated against based on your
22   failure to participate in election activities?
23       A.  It would have been, I believe, sometime
24   in late 2010, early 2011.

Page 87

1        Q.  And what were the circumstances?
2        A.  The superior court staff were instructed
3    that they could no longer come in to talk to me
4    about case dispositions and issues.
5        Q.  And what is the basis of your belief that
6    that instruction that superior court staff could not
7    come to you about case dispositions and issues was
8    because of your failure to participate in election
9    activities?
10       A.  Well, it was based on what Mr. Horan had
11   told me and based upon the timing.
12       Q.  Okay. So what Mr. Horan told you and
13   based on the timing. So what do you mean by
14   "timing"?
15       A.  It had happened either towards the tail
16   end of the campaign or following the campaign.
17       Q.  Okay. So if I understand your testimony
18   correctly, you believe that the fact these -- that
19   these certain professional responsibilities were
20   taken away from you was due to your failure to
21   participate in certain election activities. Is that
22   right?
23       A.  Yes.
24       Q.  And who was it that took away in the 2011

Page 88

1    time -- 2012 time frame the certain professional
2    responsibilities?
3        A.  I assume it was Mr. Cruz.
4        Q.  Okay. And what's the basis of your
5    assumption that Mr. Cruz was responsible for taking
6    away these duties in the 2011, '12 time frame?
7        A.  Because he's the only one that could have
8    made that decision.
9        MR. SINSHEIMER: I'm going to use the
10   head real quick, guys. Okay?
11       MR. COHEN: I was going to say we
12   could maybe take a break for lunch.
13       MR. SHERIDAN: Shall we?
14       THE DEPONENT: What time is it?
15       MR. SHERIDAN: 12:20.
16       MR. COHEN: We'll just break for
17   lunch.
18       (Off the record at 12:23 p.m.)
19       (Mr. Cruz joined the deposition.)
20       (On the record at 1:20 p.m.)
21       (Record read.)
22   BY MR. COHEN:
23       Q.  Mr. Bradley, did you actually ever
24   confront Mr. Cruz about the decision to take away

Page 89

1    these responsibilities from you in the 2011, 2012
2    time frame?
3        A.   No.
4        Q.   Is it fair to say that you never
5    confronted Tim Cruz about any of your concerns about
6    political activities and your stature in the office?
7    Is that right?
8        A.   Yes.
9        Q.   The first time that you confronted Tim
10   Cruz about -- directly about the allegations that
11   you believe that you were, in part, terminated from
12   or in any way disadvantaged in connection with your
13   employment at the District Attorney's Office was by
14   the filing of the complaint that we're here for
15   today, right?
16       A.   Yes.
17            MR. SINSHEIMER:  I'm going to move to
18   strike that.  There were letters back and forth.
19   You participated in those.  You meant publicly, I
20   think, right?
21            MR. COHEN:  The record is what it is.
22            BY MR. COHEN:
23       Q.   Let's put it another way.
24            MR. SINSHEIMER:  Do you agree to

Page 90

1    strike my question?
2            MR. COHEN:  No, I won't, but your
3    objection is noted.
4            BY MR. COHEN:
5        Q.   Can you and I agree, Mr. Bradley, that at
6    no time during the course of your employment did you
7    ever confront Tim Cruz about either your complaints
8    regarding your failure to participate in political
9    process on his behalf or with respect to your
10   concerns about the whistleblowing issues that you've
11   raised in your complaint?
12       A.   Yes.
13       Q.   Other than yourself, Mr. Bradley, who
14   else, other than Mr. Linehan, do you believe was
15   retaliated against for their failure to participate
16   in Timothy Cruz's election activities?
17            MR. SINSHEIMER:  Objection.  Asked
18   and answered.  I was just complimenting you on being
19   efficient.
20            BY MR. COHEN:
21       Q.   Go ahead.
22       A.   So far as I know, Karen O'Sullivan.
23       Q.   So other than Mr. O'Sullivan --
24   Ms. O'Sullivan -- excuse me -- Mr. Linehan, and

Page 91

1    yourself, you're aware of no other individuals that
2    were disadvantaged because of their failure to
3    participate in election activities.  Is that right?
4        A.   As far as I -- as far as I know for sure.
5        Q.   Okay.  Are there others that worked at
6    the Plymouth County District Attorney's Office that
7    you do believe were disadvantaged because of failure
8    to participate in Timothy Cruz's election
9    activities?
10       A.   I believe Robin Anapol may have been.
11       Q.   Robin -- I'm sorry?
12       A.   Robin Anapol, A-N-A-P-O-L.
13       Q.   What is the basis of your belief that
14   Robin Anapol was disadvantaged because of her
15   failure to participate in election activities?
16       A.   She was fired, and she didn't contribute
17   much, if at all, to his campaign.
18       Q.   How is it that you know what Robin
19   Anapol's contributions were to Timothy Cruz's
20   election campaign?
21       A.   She told my wife.
22       Q.   Other than the fact that Robin Anapol
23   told your wife who then told you that Robin Anapol
24   didn't contribute to Timothy Cruz's election

Page 92

1    campaign, do you have any other basis for forming
2    the belief that it was for that reason, that is, the
3    failure to contribute, that Ms. Anapol was
4    terminated?
5        A.   Just that the firing didn't make any
6    sense to me.  She was very qualified for what she
7    did.  She had, as far as I knew, done a very good
8    job.  And then when she was fired, Bridget
9    Middleton's niece was put in her position despite
10   the fact that she had nowhere near as much
11   experience in the field.
12       Q.   Any other reason?
13       A.   No.
14       Q.   Did you ever discuss your concern with
15   Robin Anapol?
16       A.   Yes.
17       Q.   Okay.  Tell us -- by the way, when did
18   this termination take place?
19       A.   It was -- I want to say it was about --
20   and I'm not going to get the exact year, but it was
21   around 2009.
22       Q.   And tell us, how many conversations did
23   you have with Robin Anapol?
24       A.   I've talked to her about it maybe two or

Page 93

1   three times since then.
2       Q.  At the time of her termination, did you
3   ever raise with Robin Anapol the fact that you
4   thought her termination was because of her failure
5   to contribute to Timothy Cruz's election campaign?
6       A.  No.  Not at the time of her termination.
7       Q.  When was it that you first learned or
8   appreciated that that, in your opinion, was a reason
9   why she was fired, that is, failure to participate
10  in Timothy Cruz's election campaign?
11      A.  I think the first time was after I had
12  been fired.
13      Q.  And what did you say to Robin and Robin
14  say to you?
15      A.  I don't remember the specifics of the
16  conversation.  I do remember that she told me that
17  she had retained counsel for a period of time and
18  that she had thought about filing a lawsuit.
19      Q.  And what did you say in response?
20      A.  Again, I don't remember exact words.  I
21  remember asking her something to the effect of "What
22  do you think happened?"  "Why do you think you were
23  fired?"
24      Q.  And what did she say in response?

Page 94

1       A.  Generally she thought she was fired
2   because of failure to contribute politically and
3   because of nepotism.
4       Q.  And did you ever look to see what Robin
5   Anapol's contributions were to Timothy Cruz's
6   campaign?
7       A.  I don't remember if I looked to see how
8   much she had contributed over the years.  I know she
9   told me that she had written, at most, one or two
10  checks.
11      Q.  Did anybody at the District Attorney's
12  Office ever tell you that Robin Anapol was
13  terminated due to her failure to participate in
14  Timothy Cruz's election activities?
15      A.  No.
16      Q.  Did you ever see any written documents
17  that would support your belief that Robin Anapol was
18  terminated due to her failure to participate in
19  Timothy Cruz's election activities?
20      A.  No.
21      Q.  To whom have you reported your belief
22  that Robin Anapol was terminated because she failed
23  to participate in Timothy Cruz's election
24  activities?

Page 95

1       A.  I haven't reported it to anybody.
2       Q.  At the time of Robin Anapol's
3   termination, did you confront anybody in the DA's
4   office about your suspicions around her termination?
5       A.  I wouldn't say I confronted anybody, no.
6       Q.  Did you discuss your belief that Robin
7   Anapol was terminated because she failed to
8   participate in Timothy Cruz's election activities
9   with anybody?
10      A.  No.
11      Q.  Okay.  Do you have any other information
12  that would form the basis of your belief that
13  Ms. Anapol was terminated from the Plymouth County
14  District Attorney's Office other than the suspicion
15  that she was, and nepotism, as you described it?
16      A.  Nothing that I haven't told you already.
17  I mean, at the time the firing didn't make any sense
18  to me because she was qualified for the job, and
19  from all I knew and had heard, she had done a good
20  job.
21      Q.  Did Robin Anapol report to you?
22      A.  No.
23      Q.  Did you ever actually see her perform in
24  court?

Page 96

1       A.  She wasn't somebody who went into court.
2       Q.  Okay.  What was her role there?
3       A.  She was head of the child advocacy
4   center.
5       Q.  Did you work with her directly in that
6   role?
7       A.  No.
8       Q.  So, in other words, your perception of
9   Robin Anapol's performance of her job is drawn from
10  what you were told by other people.  Is that right?
11      A.  In part.  But I had also worked with her
12  before during my prior stint with the office.
13      Q.  And what year was that that you worked
14  with Robin Anapol?
15      A.  During the late '90s.
16      Q.  Okay.  So you didn't work with her in the
17  year, say, 2004.  Is that right?
18      A.  That's correct.
19      Q.  So other than your previous working with
20  her in the early '90s and what other people have
21  told you, that forms the basis of your belief that
22  Robin Anapol was good at what she did.  Is that
23  right?
24      A.  Yes.

1    Q.  Did you ever -- who did Robin Anapol
2  report directly to?
3    A.  I believe she reported to Mr. Horan.
4    Q.  Did you ever tell -- did you ever ask
5  Mr. Horan why Robin Anapol was terminated?
6    A.  We had a conversation about it.
7    Q.  And what happened in that conversation?
8    A.  He came in and told me that either she
9  was going to be terminated or she had been
10 terminated.  I don't remember which.
11   Q.  And what did you say in response?
12   A.  I was surprised.  I asked him what was
13 going on.
14   Q.  And what did Mike Horan tell you?
15   A.  He never really gave me a specific
16 answer, as I recall.  He just said that things
17 were -- and, again, these aren't exact words, but
18 things were a mess over at the advocacy center or
19 something like that.
20   Q.  Did Mr. Horan tell you that Robin Anapol
21 was fired because she failed to participate in
22 election activities?
23   A.  No.
24   Q.  Did you ask Mike Horan whether or not

1  Robin Anapol was terminated in connection with her
2  failure to -- or decision not to participate in
3  Timothy Cruz's election activities?
4    A.  No.
5    Q.  Why not?
6    A.  At the time it didn't really occur to me
7  to ask.
8    Q.  And approximately what year is this?
9    A.  I believe it was 2009.
10   Q.  Did Robin Anapol ever tell you what the
11 basis of her belief was that she was fired from
12 Timothy Cruz's office because of her decision not to
13 participate in election activities?
14   A.  She just thought that -- she didn't get
15 specific.  She just thought it was because she
16 didn't contributed much, if at all, or participated
17 in the campaign.  And she also thought that she was
18 fired at least, in part, because of nepotism.
19   Q.  And what do you mean by "nepotism"?
20   A.  Specifically in this instance because
21 that -- because she was replaced by Bridget
22 Middleton's niece.
23   Q.  And you testified that Robin Anapol was
24 far more qualified than Bridget Middleton's niece.

1  Is that right?
2    A.  Yes.
3    Q.  And what's the basis of your belief that
4  Robin Anapol is far more qualified for this job than
5  Bridget Middleton's niece?
6    A.  Well, she had a master's degree from the
7  University of Pennsylvania.  She had done the job
8  for over a decade.  She had basically put the child
9  advocacy center together.  She had done the lion's
10 share of the work in putting that all together.  And
11 Bridget Middleton's niece was fairly new to the
12 office and didn't have a master's degree.
13   Q.  What degrees do you know that Bridget
14 Middleton's niece has?  Do you know?
15   A.  I know that she went to school for an
16 additional degree -- and I don't know what degree
17 that was -- while she was working in the office.
18 That was after Robin Anapol had been fired.
19   Q.  And what is Bridget Middleton's
20 experience before coming to the DA's office?
21   A.  Her niece, you mean?
22   Q.  Yes.  Strike that.  Let me ask you the
23 question again.
24       What was Bridget Middleton's niece's

1  professional experience before coming to the DA's
2  office?
3    A.  I don't know that she had any, but I'm
4  not sure.
5    Q.  Did you ever ask Bridget Middleton's
6  niece what her experience was before she came to the
7  office?
8    A.  No.
9    Q.  As you sit here today, have you asked
10 anybody what Bridget Middleton's niece's
11 professional experience was in advance of coming to
12 the DA's office?
13   A.  No.
14   Q.  Okay.  So, Mr. Bradley, there are four
15 people that you believe were targeted for failure to
16 participate in political activities, one, Robin
17 Anapol; two, Karen O'Sullivan; three, Linehan; and,
18 four, yourself.  Is that right?
19   A.  Yes.
20   Q.  Other than those four, as you sit here
21 today, can you point to any other individual at the
22 Plymouth County District Attorney's Office that you
23 believe was targeted for failure to participate in
24 election activities?

Page 101

1    A.  Not that I can think of right now.

2    Q.  Okay.  With respect to -- quick couple

3  follow-ups on Mr. Linehan.  When you were asked by

4  Mike Horan to move Mr. Linehan from Hingham to

5  Wareham -- and, according to your testimony, because

6  Mr. Linehan was not participating in the political

7  activities, and at the time you understood that that

8  was a crime -- did you at any point tell Mike Horan

9  that you were not going to participate in that?

10   A.  No.  And at the time I don't even know

11  that I thought of it as a crime.

12   Q.  And you at the time were friends with

13  Mr. Horan, right?

14   A.  Yes.

15   Q.  Did you think it was the right thing to

16  do, to move him from one district court to another

17  to retaliate against him for not participating in

18  the election activities?

19   A.  No.

20   Q.  By the way, have you ever told

21  Mr. Linehan that you believe that this move from one

22  district court to the next was retaliation for his

23  failure to participate in election activities?

24   A.  I don't think I ever told him, no.

Page 102

1    Q.  Okay.  Let's talk about Karen O'Sullivan

2  for a minute.  She provided an affidavit in

3  connection with your complaint, right?

4    A.  Yes.

5    Q.  Are you and Ms. O'Sullivan friends?

6    A.  Yes.

7    Q.  Do you socialize?

8    A.  On occasion.  Not often.

9    Q.  And it's your testimony that it is your

10  opinion that Karen O'Sullivan was in some way

11  disadvantaged at the District Attorney's Office

12  because of her failure to participate in Timothy

13  Cruz's election activities.  Is that right?

14   A.  Yes.

15   Q.  Tell us, if you would, the entire basis

16  of your belief that Karen O'Sullivan was in some way

17  disadvantaged in the District Attorney's Office

18  because of her failure to participate in Timothy

19  Cruz's election.

20   A.  Mr. Horan told me that he had been part

21  of a meeting at which raises for the superior court

22  staff were being discussed.  And they went through

23  the various prosecutors in the superior court.  And

24  when Ms. O'Sullivan's name came up, Mr. Middleton

Page 103

1  told Mr. Cruz that he didn't think she should get a

2  raise -- I don't know if it was get a raise or get a

3  bigger raise -- because she had not participated in

4  the campaign.

5    Q.  So what basis do you have, other than the

6  Mike Horan conversation with you about raises in

7  which Mike Horan heard from what was told by

8  Mr. Middleton that raises were somehow predicated

9  upon participation in election activities, do you

10  have to support your contention that Ms. O'Sullivan

11  was somehow disadvantaged at the DA's office?

12       MR. SINSHEIMER:  Object to the form.

13       You can answer.

14   A.  Well, I knew that that had come up before

15  at meetings about raises.  Michael O'Connell had

16  told me years prior that he had participated in a

17  meeting or meetings for the district court staff

18  where campaign contributions and activities were

19  factored into the raise equation.

20   Q.  Okay.  So let's just stick with

21  O'Sullivan for one second, if we could.

22       Specific to her, specific to

23  Ms. O'Sullivan, other than the conversation which

24  Mike Horan had with you in which he relayed a

Page 104

1  conversation he had with Frank Middleton, do you

2  have any other basis for believing that

3  Ms. O'Sullivan was disadvantaged at the DA's office

4  because of her decision not to participate in the

5  Timothy Cruz election activities?

6    A.  Well, I would also say that I had been

7  told several times by then, by Mr. Horan, that Frank

8  and Bridget Middleton had been trying to get me

9  fired because I hadn't participated in the 2010

10  election and hadn't written any checks.

11   Q.  Okay.  So I understand there are, then,

12  two bases for your belief that Ms. O'Sullivan was

13  disadvantaged.  The first is the conversation with

14  Mike Horan and yourself about a conversation Mike

15  Horan had with Mr. Middleton.  That's number one.

16  And the second piece of evidence that you have, or

17  basis, is that the repeated conversations you say

18  that you had with Mike Horan in which you were told

19  that you were going to be targeted yourself for

20  termination because of your decision not to

21  participate in Timothy Cruz's election campaign.  Is

22  that right?

23       MR. SINSHEIMER:  Objection to the

24  form.

1    You can answer.
2    A.  I would add a third basis, and that being
3  the prior conversations I had had with
4  Mr. O'Connell.
5    Q.  With Mr. -- who?
6    A.  O'Connell.
7    Q.  So you had conversations with
8  Mr. O'Connell.  And who's Mr. O'Connell?
9    A.  Michael O'Connell who filed an affidavit
10  in this case.
11    Q.  Okay.  All right.  And what did
12  Mr. O'Connell tell you that led you to believe that
13  Ms. O'Sullivan was being targeted?
14    A.  Well, he didn't tell me anything specific
15  to Ms. O'Sullivan.  He had told me previously that
16  at meetings he had attended with Mr. Cruz and
17  Mr. Horan about district court staff raises that
18  political activity had been factored into the raise
19  equation.
20    Q.  Anything else other than those three?
21    A.  Not that I can think of.
22    Q.  And so, Mr. Bradley, I understand the
23  basis of your belief that O'Sullivan had been
24  targeted because of her failure to participate in

1  Timothy Cruz's election activities are threefold,
2  first, the conversations you had with Mike Horan in
3  which he relayed conversations he had with
4  Mr. Middleton; second, the conversations that you
5  had had with Frank Middleton about your own position
6  at the District Attorney's Office being affected by
7  your decision not to participate in election
8  activities; and the third is the O'Connell
9  discussion that you had in which you were told that
10  district court raises were predicated, at least in
11  some part, on contribution to elections.  Is that
12  correct?
13    MR. SINSHEIMER:  Objection to the
14  form.
15    You can answer.
16    A.  No.  What's not correct is that my direct
17  conversations were with Mr. Horan, not
18  Mr. Middleton.  I think you might have just gotten
19  that part --
20    Q.  I probably maybe just misspoke.  Okay?
21  So thank you for correcting me on that.  That was
22  unintentional.
23    By the way, have you ever had any direct
24  conversations with Frank Middleton about your

1  concerns that you were being targeted because of
2  your decisions not to participate in the Timothy
3  Cruz election activities?
4    A.  No.
5    Q.  All right.  And because the record is not
6  clear -- I want to make sure that it is, because I
7  don't want your testimony to be skewed here.  The
8  entire basis of your belief that O'Sullivan was
9  targeted because of her failure to contribute to the
10  election activities of Timothy Cruz is, first, the
11  conversations that you had with Mike Horan in which
12  he told you information reported to Mike Horan from
13  Frank Middleton; number two, that you had had
14  conversations with -- over the years with Mike Horan
15  about your own personal circumstances; and then
16  number three is the conversations that you had with
17  O'Connell about district court compensation.  Is
18  that right?
19    MR. SINSHEIMER:  Objection to the
20  form of the question.
21    You can answer.
22    A.  Yes.
23    Q.  At some point, Mr. Bradley, you actually
24  participated directly in discussions about what

1  people's compensations were, right?
2    A.  Yes.
3    Q.  So tell us, if you would, what period of
4  time it was that you actually participated in the
5  discussions about what certain people -- certain
6  professionals at the DA's office, what their
7  compensation looked like.
8    A.  During the period of time that I
9  supervised the district courts, I had -- I don't
10  know -- two or three conversations with Mr. Horan
11  about district court staff raises.
12    Q.  And for what period of time was that?
13    A.  This would have been from 2006 through
14  December of 2011.
15    Q.  Okay.  And tell me, if you would, which
16  conversations was it that Mike Horan said to you
17  that -- words to the effect "I can't give somebody a
18  raise because they're not contributing to the
19  political campaign of Timothy Cruz."
20    A.  I don't remember that he ever said that
21  to me.
22    Q.  During that period of time in which you
23  had some input into the district court -- during the
24  period of time -- strike that.

Page 113

1  testifying to?
2      A.  It was either 2011 or 2012.
3      Q.  Why did Ms. O'Sullivan leave the District
4  Attorney's Office of Plymouth County?
5      A.  She wasn't happy.
6      Q.  Okay.  Why wasn't she happy?
7      A.  She was not getting along with the
8  Middletons.  She had brought her concerns to
9  Mr. Cruz at the behest of Mr. Horan, and Mr. Cruz
10  had not done anything to address those concerns, and
11  the morale in the office was very poor at the time.
12      Q.  Is that it?
13      A.  That is all I can think of right now.
14      Q.  So it's your understanding that
15  Ms. O'Sullivan confronted Mr. Cruz about her
16  concerns around the Middletons.  Is that right?
17      A.  Yes.
18      Q.  And did she report -- did Ms. O'Sullivan
19  report back to you about that conversation with
20  Mr. Cruz?
21      A.  It wasn't a conversation.  She was asked
22  to write a memorandum.
23      Q.  That detailed her concerns?
24      A.  Yes.

Page 114

1      Q.  All right.  Did you ever see that
2  memorandum?
3      A.  No.
4      Q.  So do you know whether or not
5  Ms. O'Sullivan confronted Mr. Cruz about her
6  concerns that she was being targeted for her failure
7  to contribute to the political activities of Tim
8  Cruz?
9      A.  I don't think she confronted him on that
10  issue directly.
11      Q.  Okay.  So it's your testimony that
12  Ms. O'Sullivan confronted Tim Cruz about the
13  Middletons but did not confront Mr. Cruz about her
14  failure to contribute to the political activities
15  and that impact on her career.  Is that right?
16      A.  I believe so.
17      Q.  All right.  So other than
18  Ms. O'Sullivan's compensation, which you believe was
19  reduced or not what it should have been based on her
20  failure to contribute to Timothy Cruz's political
21  activities, what other ways was Karen O'Sullivan
22  negatively impacted at the DA's office because of
23  her failure to contribute to Timothy Cruz's
24  political activities?

Page 115

1      A.  I'm sorry.  I don't want to ask you to
2  repeat it.  I just don't understand the question.
3          MR. COHEN:  Do you mind reading it
4  back and see if he understands it once we...
5          (Record read.)
6          MR. SINSHEIMER:  Object to the form.
7      You can answer.
8      A.  I don't know if there were other ways.
9      Q.  And what, in your opinion -- strike that.
10          What was Ms. O'Sullivan making when she
11  left the office?
12      A.  No idea.
13      Q.  Let me ask the question this way:  How
14  much more should Ms. O'Sullivan have been making but
15  for her failure to contribute to Timothy Cruz's
16  political campaign?
17          MR. SINSHEIMER:  Objection to the
18  form.
19      A.  I don't know.
20      Q.  Is it your testimony here today,
21  Mr. Bradley, that Ms. O'Sullivan should have been
22  making more money at the DA's office?
23      A.  I don't know.  I can't speak to that
24  issue.  I really didn't pay attention to who was

Page 116

1  making what.
2      Q.  So the only opinion that -- from which
3  you rely on your testimony today that Ms. O'Sullivan
4  wasn't making the right amount of money is
5  Ms. O'Sullivan.  Is that right?
6      A.  Yes.
7      Q.  Can you testify here as to any firsthand
8  knowledge of what Frank Middleton's participation
9  was in individuals' compensation at any point in
10  time?
11      A.  How much input he had?
12      Q.  Yes.  Do you have any firsthand
13  knowledge?
14      A.  I know he had a voice at meetings where
15  raises were discussed.  That's all I know.
16      Q.  And what's the basis of your opinion or
17  your testimony under oath here today that
18  Mr. Middleton had a voice in the meetings in which
19  raises were discussed?
20      A.  Well, what I have told you previously
21  about Mr. Horan, and I just knew that there were
22  meetings where superior court raises were discussed.
23      Q.  Okay.  So let's -- the question was what
24  firsthand knowledge you have.  So I'm asking,

Page 117

1  Mr. Bradley, were you ever present at a meeting in
2  which Frank Middleton discussed individuals'
3  compensation?
4      A.  No.
5      Q.  Were you ever a witness to Frank
6  Middleton tying someone's compensation to their
7  participation in Tim Cruz's election activities?
8      A.  No.
9      Q.  Were you ever a witness to Frank
10 Middleton making decisions about people's
11 professional careers in any way in which he tied it
12 in any way to Tim Cruz's election activities?
13     A.  No.
14     Q.  So it's fair to say, as you sit here
15 today, you have no firsthand knowledge of Frank
16 Middleton's participation in anyone's raises or what
17 anyone at the DA's office professional activities
18 would look like.  Is that right?
19     A.  That's right.
20     Q.  Other than the conversations that have
21 been reported to you that allegedly included Frank
22 Middleton, do you have any basis whatsoever for
23 believing that Frank Middleton played a role in
24 anyone's financial or professional future at the

Page 118

1  DA's office tied to his or her decision not to
2  participate in Timothy Cruz's election activities?
3      A.  No.  It's just what I've been told.
4         (Counsel and deponent conferred.)
5      Q.  You just conferred with counsel.  Do you
6  have anything to add, or can I go on to the next
7  question?
8      A.  Just my -- one thing I would add after
9  conferring with counsel is just my general knowledge
10 of his close relationship with Mr. Cruz.
11     Q.  Okay.  So -- I'll leave it there.
12        So you previously testified that there
13 was one instance in which you participated in the
14 retaliation of an employee -- this is Mr. Linehan --
15 in connection with his failure to participate in
16 Timothy Cruz's election activities.  And that was
17 the transfer of Mr. Linehan from the Hingham
18 District Court to the Wareham District Court.
19        Is there any other instance in which you
20 yourself were a participant in fulfilling what
21 you've described as the retaliation against a DA
22 employee for their failure to participate in Timothy
23 Cruz's election activities?
24        MR. SINSHEIMER:  Object to the form.

Page 119

1      You can answer.
2      A.  No.
3      Q.  I asked you a moment ago about your
4  having any firsthand knowledge about Mr. Middleton.
5  I'm going to do the same thing with Mr. Cruz, if I
6  could, who's now joined us and sitting here in this
7  conference room.
8         Did anybody ever tell you that Tim Cruz
9  told them to impact anyone's compensation at the
10 District Attorney's Office because of his or her
11 failure to contribute to Timothy Cruz's election
12 activities?
13     A.  No.
14     Q.  Did you ever witness firsthand Timothy
15 Cruz impacting somebody's compensation at the
16 District Attorney's Office because of his or her
17 failure to contribute to Mr. Cruz's election
18 activities?
19        MR. SINSHEIMER:  Object to the form.
20     You can answer.
21     A.  No.
22        MR. SINSHEIMER:  Take five?
23        MR. COHEN:  Sure.
24        MR. SINSHEIMER:  It's up to you --

Page 120

1         MR. COHEN:  No, it's great.  It's a
2  good spot.
3         (Off the record at 2:06 p.m.)
4         (On the record at 2:15 p.m.)
5         BY MR. COHEN:
6      Q.  List for me, Mr. Bradley, all the ways in
7  which your professional life at the Plymouth County
8  District Attorney's Office was negatively impacted
9  by your failure to contribute to the Timothy Cruz
10 election activities.
11     A.  I was fired, I had the district court
12 supervisor's position removed from me, and I was
13 marginalized prior to that.
14     Q.  What do you mean by "marginalized,"
15 Mr. Bradley?
16     A.  I was basically cut out of the loop, I
17 would say.
18     Q.  Give me some specifics, Mr. Bradley --
19        MR. SINSHEIMER:  Hold on.
20        Had you finished your answer?
21        THE DEPONENT:  Yeah.
22        MR. SINSHEIMER:  Okay.
23        BY MR. COHEN:
24     Q.  Tell me how it is, Mr. Bradley -- give me

Page 129

1    your opinion, as a consequence of your decision to
2    not participate in the Timothy Cruz election
3    activities.  Is that right?
4        A.  Yes.
5        Q.  And what's the basis of your belief that
6    the district court oversight was taken away from you
7    because of your decision not to participate in the
8    Timothy Cruz election activities?
9            MR. SINSHEIMER:  Objection.  Asked
10   and answered.  I don't mind him doing it again,
11   but --
12       A.  Same basis.
13       Q.  Which is?
14       A.  That I had been told by Mr. Horan that
15   the Middletons were trying to get me fired and the
16   timing of it.
17       Q.  Did you at any time confront either Frank
18   or Bridget Middleton about what you heard being
19   relayed to you by John Horan?
20       A.  Michael Horan.
21       Q.  Mike Horan.  Sorry.
22       A.  No.
23       Q.  Did anyone ever corroborate the
24   conversations that were being relayed to you by

Page 130

1    Michael Horan regarding Frank and Bridget Middleton
2    and Tim Cruz and the attempt to have you
3    marginalized and then eventually fired from the
4    Plymouth County DA?
5        A.  No.
6        Q.  You returned to the office -- the
7    Plymouth County DA's Office in 2003.  Is that right?
8        A.  Yes.
9        Q.  And you gave -- according to your own
10   testimony that you gave -- in your interrogatories,
11   you gave to the campaign 2003, 2004, 2005, 2006,
12   2007, 2008, and 2009.  Is that right?
13       A.  Yes.
14       Q.  Have you actually looked at the website
15   that would indicate what your contributions actually
16   were to Timothy Cruz's campaign?
17       A.  Yes.
18       Q.  And is it your testimony that you gave
19   each of the years that you just testified to, 2003
20   through 2009?
21       A.  Yes.
22       Q.  What firsthand knowledge do you have that
23   Timothy Cruz knew what you gave and when?
24       A.  I don't have any firsthand knowledge.

Page 131

1        Q.  Do you know whether it's true or not
2    whether you gave a political contribution to Timothy
3    Cruz in 2008?
4        A.  Yes.
5        Q.  And what is your testimony to that
6    effect?
7        A.  That I contributed.
8        Q.  And how much did you contribute?
9        A.  I think it was 500, but I'm not sure
10   right now.
11       Q.  So that's the maximum amount you can give
12   under Massachusetts law, correct?
13       A.  Yes.
14       Q.  Did you give the maximum amount each
15   year?
16       A.  Yes.  There were some years when my wife
17   would write a $500 check too.
18           MR. COHEN:  Can we have this marked
19   as Exhibit 6, please.
20           (Exhibit No. 6, Political
21   Contributions, marked for identification.)
22           BY MR. COHEN:
23       Q.  Do you see this exhibit?
24       A.  I see it.

Page 132

1        Q.  Okay.  It shows -- it's political
2    contributions right off the website, and it shows
3    that you gave in 2005, 2006, 2007, and 2009.  It
4    does not show that you contributed in 2008.  Do you
5    see that?
6        A.  I see what it says, yes.
7        Q.  Okay.  Is it possible that your memory of
8    your contribution is mistaken?
9        A.  It's possible, but I don't think it is.
10       Q.  In your complaint, you allege that Mike
11   Horan told you that DA Cruz closely monitors
12   contributions.  Is that right?
13       A.  Yes.
14       Q.  Other than that statement from Mike
15   Horan, do you have any other basis for forming your
16   belief that DA Cruz closely monitors political
17   contributions?
18       A.  That, and all that I've told you already.
19       Q.  As you sit here today, do you even know
20   whether or not Mr. Cruz knows who in the office
21   contributes?
22       A.  Do I know firsthand?
23       Q.  Yes.
24       A.  No.  Well, strike that.

Page 133

1    Q.  Okay.
2    A.  As we sit here now, I know that he no
3  longer accepts contributions from employees.
4    Q.  But when you were at the DA's office, did
5  you have any firsthand experience to know whether or
6  not he monitored what people gave or didn't give as
7  the case may be?
8    A.  No firsthand knowledge.
9    Q.  By the way, did you ever actually ask
10 Mr. Cruz whether he monitored individuals' --
11   A.  No.
12   Q.  -- political contributions?
13   A.  No.
14   Q.  When Mr. Horan reported to you that
15 Mr. Cruz monitored -- closely monitored political
16 contributions, to whom did you report this fact to?
17   A.  I didn't report it to anybody.
18   Q.  And when was this conversation?
19   A.  Years ago.  I can't even give you an
20 exact year when it happened.
21   Q.  Okay.  So at some point -- you don't know
22 when -- Mr. Horan, who's good friends with Timothy
23 Cruz, reports to you that Timothy Cruz closely
24 monitors political contributions of those in the

Page 134

1  DA's office.  Is that right?
2    A.  When we say "reports," it wasn't formal.
3  It was during a casual conversation.
4    Q.  Okay.  And you can't put that
5  conversation on a timeline.  Is that right?
6    A.  All I can tell you is it was earlier in
7  my second stint there as opposed to later.  It would
8  have been 2004, 2005, in that area.
9    Q.  By the way, why is it that you stopped
10 contributing to Timothy Cruz's election activities?
11   A.  I didn't like the direction the office
12 was going in.
13   Q.  And what do you mean by that?
14   A.  Morale was terrible.  People weren't
15 showing up for work.  Bad decisions were being made.
16   Q.  What bad decisions were being made,
17 Mr. Bradley?
18   A.  In my opinion, on informants --
19   Q.  On what?
20   A.  Informants on certain cases.
21   Q.  So we'll come back to informants in a
22 bit.  We know that is also something that forms the
23 basis of your complaint.  But some decisions on
24 certain cases, what do you mean by that?

Page 135

1    A.  Whether or not to accept pleas on certain
2  cases that were weak.  People's caseloads were
3  skyrocketing, and the workplace, as I saw it, was
4  becoming very dysfunctional.
5    Q.  Were you happy working at the District
6  Attorney's Office?
7    A.  I wasn't happy with the direction the
8  office was going in, but I still enjoyed the
9  substance of the work I did.
10   Q.  Did you apply anywhere to work in any
11 other DA's office to do the exact same work in a
12 different location before the time you were
13 terminated?
14   A.  No.
15   Q.  Why not?
16   A.  I was comfortable there.  I had a lot of
17 friends and coworkers that I had worked with for 18,
18 19 years, and I held out some hope that things might
19 change.
20   Q.  And what did you do to effectuate change
21 in the DA's office while you were there?
22   A.  I met with Mr. Cruz in 2009.
23   Q.  And what did you say to him and he say to
24 you?

Page 136

1    A.  Well, he didn't say a whole lot.  I spoke
2  about morale in the office being very low and that a
3  lot of people were unhappy.
4    Q.  And besides morale, what else did you
5  speak to DA Cruz about?
6    A.  I told him that I thought that there was
7  a lack of structure and leadership at the top, that
8  the fact that the top people in the office were
9  rarely in the office was creating a huge morale
10 problem among everybody else.
11   Q.  And what else did you speak to Mr. Cruz
12 about in that 2009 time frame?
13   A.  I told him that the superior court people
14 were coming in to talk to me a lot to complain that
15 Mr. Middleton was never around and that they
16 couldn't reach him.
17   Q.  And what else?
18   A.  That's all I can recall right now.
19   Q.  So, as I understand the subject matter of
20 your conversation with Mr. Cruz during this 2009
21 conversation -- by the way, where was this
22 conversation?
23   A.  In his office.
24   Q.  All right.  By the way, Mr. Cruz

Page 137

1  describes his office as having an open door policy.
2  Did you find that to be the case?
3      A. No.
4      Q. He's got a closed door policy? His door
5  is usually closed?
6      A. Well, I mean, physically you have to walk
7  past his administrative assistant to get into his
8  office. So that door is open, I suppose. If you're
9  talking literally or figuratively, I'm not sure.
10     Q. I'm talking figuratively.
11     A. I wouldn't describe it as an open door
12 policy, no.
13     Q. Okay. But you also had no problem -- you
14 also went into his office in 2009 to talk about
15 morale, structure and leadership, and superior court
16 complaints. Is that right? Is that right?
17     A. That is right, but I was reluctant to do
18 it. I was actually talked into it by Mr. Horan.
19     Q. And how did Mr. Cruz react to your
20 meeting with him?
21     A. He --
22     Q. Did he yell at you?
23     A. No. He appeared to listen, and he said
24 some words to the effect that "I'll look into it" or

Page 138

1  something like that.
2      Q. All right. And during the course of this
3  conversation, at what point did you raise the fact
4  that you believed that Timothy Cruz was retaliating
5  against you in any way for your lack of political
6  activity?
7      A. I don't understand what you mean by that.
8  At what point during this conversation?
9      Q. Yes. Yes. During this 2009
10 conversation. So you're in his office. You're in
11 Timothy Cruz's office in 2009. You're raising three
12 significant issues. There's poor office morale,
13 there's problems with the structure and leadership,
14 and that the superior court -- the lawyers who
15 practice there aren't happy.
16         At what point during that conversation
17 did you raise with Mr. Cruz the fact that you were
18 aware of Mr. Cruz's retaliation either against you
19 or others in the office for their lack of
20 contribution to the political activities?
21         MR. SINSHEIMER: Object to the form.
22     A. Well, I was still contributing in 2009,
23 so there was no retaliation against me.
24     Q. Okay. Did you raise your concerns at all

Page 139

1  with Mr. Cruz in this conversation about his
2  repeated retaliation against anybody because of
3  their lack of political contribution?
4      A. Not in 2009, no.
5      Q. Okay. So this conversation takes place
6  in 2009. At that point you don't believe you're
7  being retaliated against based on your lack of
8  political activity. Is that right?
9      A. That's right.
10     Q. And it was only after you stopped
11 contributing in 2009, according to your testimony,
12 or 2010, that you began to be retaliated against.
13 Is that right?
14     A. Yes.
15     Q. And what about others in the office?
16 Were there others that were retaliated against by
17 Timothy Cruz in advance of this 2009 meeting you had
18 with Mr. Cruz?
19     A. I don't know.
20     Q. At any point, again, did you find
21 yourself in Mr. Cruz's office to discuss concerns
22 you had about the Plymouth County DA's Office?
23     A. At any other time?
24     Q. After 2009.

Page 140

1      A. In 2011.
2      Q. All right. And tell us about that
3  meeting.
4      A. That was after the e-mail exchange we
5  had.
6      Q. We'll come back to that. But okay. Tell
7  us what you recall about that -- strike that.
8          What was the e-mail exchange to which you
9  refer?
10     A. Well, it's the one that's been documented
11 in discovery in November -- November of 2011 over
12 the OUI Globe Spotlight Series. And we had a
13 meeting in his office the following week, and we
14 discussed some of these similar issues.
15     Q. And that's the e-mail -- I don't have it
16 in front of me. I'll get it. But that's the e-mail
17 in which you told Timothy Cruz that you were not his
18 child. Is that right?
19     A. Yes.
20     Q. Is that, by the way, the way you
21 typically speak to your boss?
22     A. No.
23     Q. And tell us about that meeting in Timothy
24 Cruz's office.

Page 141

1      A.  It was maybe a half hour long.  I raised
2  some of the same issues I had raised in 2009.  And I
3  remember he told me it was too late to change
4  anything.
5      Q.  And this meeting is in 2011.  Is that
6  right?
7      A.  Yes.
8      Q.  What month?
9      A.  November.
10     Q.  So November 2011 you have another meeting
11 which you discuss morale, structure and leadership,
12 complaints of the superior court lawyers.  And what
13 else that you can recall?
14     A.  We discussed -- well, he asked me -- he
15 told me that I wasn't -- "You're obviously not happy
16 here."
17     Q.  And how did you respond to that?
18     A.  Pretty much the same way that I've
19 responded to your questions today.  I told him that
20 he was right in part, that I thought the office was
21 dysfunctional and morale was poor, but I still
22 enjoyed the substance of the work.
23     Q.  And what did he say in response to that?
24     A.  I don't remember what he said in

Page 142

1  response.
2      Q.  Do you remember Mr. Cruz telling you that
3  you should probably begin to wrap up your
4  responsibilities at the office?
5      A.  No.
6      Q.  Did you have any discussions with him
7  about your pending matters and trials?
8      A.  Yeah.  I told him that I wanted to finish
9  the two cases that I had and that I had a pension
10 vesting period coming up in the relatively near
11 future that I wanted to make sure I reached.
12     Q.  So why would you tell Mr. Cruz that you
13 had a couple trials you wanted to finish up?  What
14 relevance was that to the conversation?
15     A.  Because he said to me, "You're obviously
16 not happy here.  What are your plans?"
17     Q.  And how did you respond to that
18 specifically?
19     A.  Just as I said.  I said I wanted to try
20 these last two cases, and I wanted to at least get
21 to my pension vesting period.
22     Q.  And what did Mr. Cruz say in response?
23     A.  I remember him saying that he -- he
24 wanted me to try those two cases too.

Page 143

1      Q.  And what else did Mr. Cruz say?
2      A.  I don't remember.
3      Q.  Did Mr. Cruz ever say that he was going
4  to guarantee you could stay the next eight years
5  until your pension vested?
6      A.  It was eight months.
7      Q.  Eight months.  Excuse me.  Eight months?
8      A.  I don't believe so.
9      Q.  So now this is -- as I understand your
10 testimony, you began to believe that you were being
11 targeted for your failure to contribute to Timothy
12 Cruz's election activities in or around the 2009,
13 2010 time frame.  Is that right?
14     A.  No.  It would have been 2010, 2011.
15     Q.  Okay.  So in the 2010, 20011 time frame,
16 you believe that Timothy Cruz is targeting you for
17 failure to participate in the election activities
18 involving his November 2010 election.  Now we're
19 into November 2011, a year later.  You're sitting in
20 his office.  You've gone over morale issues,
21 structure and leadership issues, superior court
22 supervisory issues, and your own personal desire to
23 vest in another eight months.
24         Tell us, if you would, what Mr. Cruz's

Page 144

1  reaction was to you in that 2011 conversation in
2  which you raised that he was targeting you for
3  failure to participate in his election activities.
4      A.  I didn't mention that at the meeting.
5      Q.  You didn't mention that at the meeting at
6  all?
7      A.  No.
8      Q.  Do you think that might have been a
9  relevant thing to raise with Tim Cruz at that time?
10     A.  Well, it might have been relevant, but I
11 don't think it would have been very practical.
12     Q.  Okay.  And why is it that you didn't
13 think it would be practical?
14     A.  Because all he would do is deny it.
15     Q.  Okay.  All right.  After that November
16 2011 conversation with Tim Cruz you had in his
17 office, did you ever find yourself in Mr. Cruz's
18 office again before you ultimately left?
19     A.  No.
20     Q.  Did you believe that there was some part
21 of Timothy Cruz's conversation with you in that
22 November 2011 meeting in which he was retaliating
23 against you for failure to participate in his
24 election activities?

1     A.  Did I believe that it was a part of that
2  conversation in which it --
3     Q.  Yes.
4     A.  I believed I was being -- the retaliation
5  had started at that point, in my mind.
6     Q.  And what about that conversation led you
7  to believe that the retaliation had started in that
8  conversation?
9          MR. SINSHEIMER:  Objection to form.
10    A.  Just the fact that I had already had --
11  in my mind, I had already been marginalized to an
12  extent and just the feeling I had sitting there,
13  talking to him.
14         MR. COHEN:  No. 7, Susan.  Is that
15  right?
16         THE REPORTER:  Yes.
17         (Exhibit No. 7, November 16, 2011
18  E-Mail, marked for identification.)
19         BY MR. COHEN:
20    Q.  Do you see this e-mail marked as Exhibit
21  No. 7?
22    A.  Yes.
23    Q.  Do you recognize this e-mail?
24    A.  Yes.

1     Q.  Can you tell us what this e-mail is
2  about?
3     A.  It's about the OUI Spotlight Series and
4  the ramifications of what it was producing in OUI
5  cases.
6     Q.  So why don't you tell us a little bit
7  more about what you're speaking to relative to the
8  OUIs.  What was your concern that you were raising
9  with Tim Cruz?
10    A.  Well, we had been having an issue that
11  dated back to at least 2006 where we were losing
12  almost all of our jury-waived OUI cases.  And the
13  lion's share of our OUI cases were now going
14  jury-waived, which meant that we were losing almost
15  all of our jury-waived trials.  So I started keeping
16  track of how many we were losing, how many cases
17  were going jury-waived and which judges were finding
18  most defendants not guilty after jury-waived trials.
19    Q.  And in what form were you keeping track
20  of this information?
21    A.  Just handwritten statistics.
22    Q.  And where are those handwritten
23  statistics, Mr. Bradley?
24    A.  I don't have them anymore.

1     Q.  Where are they located?
2     A.  I don't know.  I don't have them anymore.
3     Q.  Why didn't you keep them?
4     A.  I didn't see any reason to keep them.
5     Q.  Who did you show these handwritten
6  statistics to?
7     A.  Originally, as I kept them at the end of
8  each calendar year, I would show them to Mr. Horan
9  and Mr. Cruz.
10    Q.  And do you know who has a copy of these
11  now, these statistics?
12    A.  I don't know if anyone has a copy.
13    Q.  Did you ever share these with -- these
14  statistics with anybody from The Globe or any other
15  publication?
16    A.  Some of them.
17    Q.  Did you actually give a copy to The
18  Globe?
19    A.  I don't remember if I gave a copy of our
20  statistics or not, because they had their own.
21    Q.  So tell me, if you would, Mr. Bradley,
22  how it was that you gathered these statistics.  What
23  was the effort that you did to keep track of the
24  various judges and the decisions and dispositions,

1  et cetera, of the OUI cases?
2     A.  Well, every case has a disposition sheet,
3  which tells us how the case ends and what caused the
4  case to end and whatever way it ended.  And the
5  district court supervisor in the office gets all of
6  those disposition sheets to look over.
7     Q.  And they were coming to you, Mr. Bradley?
8     A.  They were coming to me.
9     Q.  And you were gathering the information
10  off the disposition sheets and then making
11  handwritten notes that would track what decisions
12  were being made by what judges.  Is that right?
13    A.  What I would do is I would keep all of
14  the OUI disposition sheets for a calendar year in a
15  folder, and at the very end of the calendar year I
16  would sit down and make up a chart that showed which
17  judges were finding the most defendants not guilty
18  after jury-waived trials and the overall numbers for
19  the particular court.
20    Q.  And you would share these with Mr. Horan
21  and Mr. Cruz.
22    A.  Yes.
23    Q.  Did you continue to share these
24  statistics with Mr. Horan and Mr. Cruz after you

1  believed that Mr. Cruz was retaliating against you
2  because you weren't contributing to the election
3  process?
4      A.  Well, it kind of happened around the same
5  time, because 2011 was when The Globe started to
6  look into the issue.  And that happened to be the
7  last year that I was the district court supervisor.
8      Q.  Do you know what efforts Timothy Cruz
9  made to address the issues around the OUI conviction
10 rate separate and apart from your keeping track of
11 statistics?
12     A.  At one point he asked Mr. Horan and I to
13 go down to the Wareham District Court, which was
14 kind of the epicenter of this issue, to speak to the
15 presiding judge down there.
16     Q.  And did you?
17     A.  Yes.
18     Q.  And what was the purpose of you going to
19 the presiding judge in the Wareham District Court?
20     A.  Talk to her about the issue.
21     Q.  And when was this?
22     A.  It was either 2009 or 2010, I think.
23     Q.  Did you think that any of that, that is,
24 Timothy Cruz asking you to go to Wareham District

1  Court, was part and parcel of his efforts to
2  retaliate against you for failing to participate in
3  any election activities?
4      A.  No.
5      Q.  I just want to make sure I understand.
6  So the same time that Timothy Cruz is retaliating
7  against you for your participation, or lack thereof,
8  in election activities, he's also asking you to go
9  to the Wareham District Court to meet with the
10 presiding judge to deal with these OUI issues.  Is
11 that right?
12     A.  No.  I don't think so.
13     Q.  Okay.  So what's wrong about that
14 statement?
15     A.  I think we met with the judge prior to
16 the 2010 campaign.
17     Q.  I understand that.  All right.  So it's
18 before -- about when was it that you met with the
19 judge?
20     A.  Again, I don't remember.  It was either
21 2009 or early 2010, as best I can recall.
22     Q.  Okay.
23         MR. SINSHEIMER:  Two-minute restroom.
24         MR. COHEN:  Yeah, please.

1          MR. SINSHEIMER:  Do you want to
2  finish your chain?
3          MR. COHEN:  Go ahead.  That's fine.
4          MR. SINSHEIMER:  Sorry, guys.
5          (Off the record at 2:58 p.m.)
6          (On the record at 3:05 p.m.)
7      BY MR. COHEN:
8      Q.  So, Mr. Bradley, did you believe that
9  there was any part of Mr. Cruz's asking you to go
10 visit the presiding judge in Wareham District Court
11 that was in any way retaliating against you for your
12 lack of political activity --
13     A.  No.
14     Q.  -- on his behalf?
15     A.  No.
16         MR. SINSHEIMER:  "Political activity"
17 still means both --
18         MR. COHEN:  Financial and attending
19 any --
20         MR. SINSHEIMER:  You know why I'm
21 objecting.
22         MR. COHEN:  I know why.  It's
23 perfectly appropriate for me to combine the two for
24 purposes of this.  And if it turns out that, you

1  know, he doesn't believe that's true, he'll let me
2  know.
3      BY MR. COHEN:
4      Q.  When was the last time you attended a
5  fundraiser for Timothy Cruz?
6      A.  I don't remember.  I'd have to think
7  about that one for a while.
8      Q.  Fair to say it was probably around 2008?
9      A.  I don't know.
10     Q.  By the way, when I asked you earlier what
11 your basis was of your opinion that you've been
12 retaliated against by Timothy Cruz, one that was not
13 mentioned was your compensation, your personal
14 compensation, Mr. Bradley.
15         As you sit here today, do you have any
16 reason to believe that your personal compensation
17 was affected negatively because of your decision not
18 to participate in Timothy Cruz's election
19 activities?
20     A.  I'm not sure.  It could have been.  I
21 didn't get a raise for a while, but I -- I don't
22 know.
23     Q.  One of your claims in your complaint is
24 not that you were inappropriately compensated.  Is

1    that right?
2         MR. SINSHEIMER: Objection.
3    A.  That's not in the complaint, no.
4    Q.  Okay.  Mr. Bradley, if I represented to
5    you you were the third highest paid person in the
6    office, would you have a reason to dispute that?
7    A.  No.  I think that's true.
8    Q.  Okay.
9    A.  Well, fourth.
10   Q.  Okay.  Besides Timothy Cruz.
11   A.  Right.
12   Q.  Okay.  So besides Mr. Cruz.
13        And approximately how many employees were
14   there in the Plymouth County District Attorney's
15   Office?
16   A.  I don't know.  I'd be guessing.
17   Q.  I don't want you to guess, but would it
18   be fair to say that the number of employees in the
19   Plymouth County District Attorney's Office was north
20   of 200 total?
21        MR. SINSHEIMER: Jesus.
22   A.  I don't think it's that big, but I don't
23   know.
24        MR. SINSHEIMER: No.  Start again.

1    We're all being nice here.
2         BY MR. COHEN:
3    Q.  No, I'm just asking you.
4         MR. SINSHEIMER: Objection.
5         You can ask him all you want.
6    A.  I don't think it's that high.
7    Q.  North of a hundred?
8    A.  I'd say it was probably -- my best guess
9    would be right around a hundred.
10   Q.  Okay.  So is there anybody in that office
11   that you believed you should be paid more than --
12   that you -- strike that.
13        Is there anybody in the office that you
14   think was paid more than you that didn't deserve it?
15   A.  I think the way I'd answer that is to say
16   that I should have been closer to Mr. Middleton and
17   Mr. Horan's salary than I was.
18   Q.  But, as you sit here today, you have no
19   basis for believing that the discrepancy between the
20   two was because of your lack of contribution to the
21   political activity.  Is that right?
22   A.  I don't know.
23   Q.  You don't know.
24        Did anybody ever tell you that you were

1    underpaid because of your lack of political activity
2    on Timothy Cruz's behalf?
3    A.  No.
4    Q.  Okay.  Back to the events that lead up to
5    the November '11 meeting with Timothy Cruz.  You had
6    a series of e-mails with Mr. Cruz.  Is that right?
7    A.  I don't recall a series of e-mails.
8    Q.  Okay.
9         MR. COHEN: Let's have this next one
10   marked, please, as an exhibit.
11        (Exhibit No. 8, November 17, 2011
12   E-Mails, marked for identification.)
13        BY MR. COHEN:
14   Q.  Let me know when you've had a chance to
15   review that.
16   A.  Yes.
17   Q.  Do you have any reason to believe what
18   was marked as No. 8 is not a true and accurate copy
19   of e-mail correspondence that you had with Timothy
20   Cruz on November 17th of 2011?
21   A.  No.
22   Q.  All right.  So the first e-mail is you to
23   Mr. Cruz copying Mike Horan and Kendra about the OUI
24   issue that you've been discussing.  And you tell

1    Mr. Cruz that you have received a call from The
2    Globe.  Is that right?
3    A.  Right.
4    Q.  And you're seeking Tim Cruz's guidance as
5    to how to respond to The Globe.  Is that right?
6    A.  Two things.  How to respond to The Globe
7    and whether we wanted to ask these judges to recuse
8    themselves from OUI trials.
9    Q.  And Tim Cruz responds to you, according
10   to the e-mail traffic, six minutes later.  Do you
11   see that?
12   A.  I do, but there was another e-mail that I
13   had sent him, because I specifically remember -- I
14   didn't know he was out of town at the time, and I
15   remember waiting for a period of time, much longer
16   than six minutes, to get a response.
17   Q.  Okay.  Let's deal with this one first.
18   Okay?  At least as it pertains to this e-mail
19   between you and him, there were six minutes that
20   lapsed between your e-mail to him and his response
21   to you.
22        MR. SINSHEIMER: Object to the form
23   of the question.
24        BY MR. COHEN:

1  specific examples of how you were marginalized or
2  cut out of the loop, to quote you.
3      A.  The superior court prosecutors, at some
4  point in time, late 2010 or 2011, were told that
5  they could no longer come in to see me about case
6  issues.
7      Q.  What else, Mr. Bradley?
8      A.  I think that's it.
9      Q.  All right.  So the way in which you
10 describe you were marginalized because of your
11 failure to participate in superior court -- strike
12 that.  Let me begin again.
13     The way in which, Mr. Bradley, you
14 believe you were marginalized because of your
15 failure to participate in Timothy Cruz election
16 activities was because superior court prosecutors
17 were no longer to come to you to discuss certain
18 matters.  Is that right?
19     A.  Right.
20     Q.  So there are -- so there are three ways
21 in which you believe that you were negatively
22 impacted professionally by the DA's office because
23 of your failure to participate in Timothy Cruz's
24 election activities; one, of course, because you

1  were fired; two, the district court supervisory
2  function was removed; and, three, you were
3  marginalized, and specifically superior court
4  prosecutors were told not to come to you for certain
5  things.  Is that right?
6      A.  Yes.
7          MR. SINSHEIMER:  Object to the form
8  of the question.  Can I object to every one of these
9  closing argument questions to save time?  He kind of
10 answers fast.
11         MR. COHEN:  You can do what makes you
12 happy, Rob.
13         MR. SINSHEIMER:  No one's ever said
14 that to me before.  That's wonderful.
15         BY MR. COHEN:
16     Q.  All right.  Were you ever assigned the
17 responsibility for supervising the superior court
18 prosecutors?
19     A.  No.
20     Q.  So this superior court prosecutors coming
21 to you for certain things, what things were they no
22 longer supposed to come to you for?
23     A.  Any issue that involved their cases.
24     Q.  So were you ever given the authority,

1  Mr. Bradley, to instruct the superior court
2  prosecutors about what they should do on their
3  cases?
4      A.  Yes.
5      Q.  Okay.  Who had given you that authority?
6      A.  Mr. Cruz, Mr. Horan.
7      Q.  Okay.  And at some point they took that
8  away from you.  Is that right?
9      A.  Yes.
10     Q.  And when did they -- when did Mr. Horan
11 and Mr. Cruz eliminate your responsibilities
12 associated with the supervising capacity over the
13 superior court prosecutors?
14     A.  I don't know exactly.
15     Q.  When did they -- when did you actually
16 get that, Mr. Bradley, responsibility?
17     A.  Well, when I was given the title of
18 second assistant DA, the way it would work is that
19 when Mr. Middleton was unavailable, they would come
20 see me about their cases.
21     Q.  Okay.  And so, as I understand your
22 testimony, and I understand from speaking to my
23 clients as well, it was Mr. Middleton's
24 responsibilities to oversee the superior court

1  prosecutors.  Is that right?
2          MR. SINSHEIMER:  Object to the form.
3      You can answer.
4      A.  Yes.
5      Q.  And that the superior court prosecutors
6  would -- at some point would come to you when
7  Mr. Middleton wasn't available.  Is that right?
8      A.  Yes.
9      Q.  But it was not part of your regular
10 duties to supervise superior court prosecutors.
11 Isn't that right?
12     A.  That's right.
13     Q.  And it's your testimony that Mr. Horan
14 and Mr. Cruz at some point told you, Mr. Bradley,
15 that you would be the one who would fill in for
16 Mr. Middleton when he wasn't available.  Is that
17 right?
18     A.  I don't know if they ever formally told
19 me or if I was told by one or the other, "When
20 Frank's not around, they're going to come in and see
21 you."
22     Q.  And from what period of time was it that
23 you had this sort of informal oversight of the
24 superior court prosecutors?  From when to when?

1    A.   From some point in late 2003 until late
2  2010, early 2011.
3    Q.   All right.  And it is your testimony that
4  this decision to remove you from this informal
5  oversight on occasion of superior court prosecutors
6  was due to your failure to participate in Timothy
7  Cruz's election activities.  Is that right?
8    A.   I believe so.
9    Q.   And what is the basis of your belief,
10  Mr. Bradley, that this removal from your informal
11  position as oversight over the superior court
12  prosecutors when Mr. Middleton wasn't available was
13  due to your failure to participate in Timothy Cruz's
14  election activities?
15    A.   Well, as I've said, I knew from Mr. Horan
16  that the Middletons had been trying to persuade
17  Mr. Cruz to fire me as of that time, so I knew
18  that -- I drew the inference that that's why it
19  happened.
20    Q.   Did anyone ever tell you that the reason
21  why you were no longer going to have this informal
22  oversight over the superior court prosecutors when
23  Frank Middleton wasn't available was because of your
24  failure to participate in Timothy Cruz's election

1  activities?
2    A.   No.
3    Q.   Do you have any evidence whatsoever to
4  form the basis of your belief that the removal of
5  you from this informal supervisor of superior court
6  prosecutors when Mr. Middleton was not available was
7  due to your decision not to participate in Timothy
8  Cruz's election activities?
9          MR. SINSHEIMER:  Object to the form
10  of the question.
11          You can answer.
12    A.   Yes.
13    Q.   And what is that evidence?
14          MR. SINSHEIMER:  Object to the form
15  of the question.
16          You can answer.
17    A.   That Mr. Horan had told me several times
18  that Frank and Bridget Middleton were trying to
19  persuade Mr. Cruz to fire me.
20          MR. SINSHEIMER:  My objection is I
21  don't think witnesses, even trial lawyers, should
22  speak in terms of what evidence.  It's my choice
23  what evidence I put on and what isn't.  So it may be
24  a little technical, but he can tell you what the

1  facts are.  I can tell you what the evidence is.
2          BY MR. COHEN:
3    Q.   Did Mr. Horan ever tell you that the
4  Middletons wanted you terminated because of your
5  failure to participate in election activities?
6    A.   He told me that that's what they were
7  saying to Mr. Cruz.  That's the way he phrased it.
8    Q.   Tell me exactly what you recall Mike
9  Horan saying to you about what the Middletons told
10  Timothy Cruz.
11    A.   Told me that they were trying to get me
12  fired because I sat out of the campaign.
13    Q.   And did Mike Horan tell you that he
14  witnessed firsthand a conversation between the
15  Middletons and Tim Cruz in which the Middletons
16  said, "We want Bradley fired because he, quote, sat
17  out Timothy Cruz's campaign"?
18    A.   I don't recall whether he told me that he
19  personally overheard that conversation or not.
20    Q.   You know Tim Cruz and Mike Horan are good
21  friends, right?
22    A.   Yes.
23    Q.   You understand that to be the case,
24  right?

1          What was reported to you as Tim Cruz's
2  reaction to the Middletons saying, "Fire John
3  Bradley because he sat out the election"?
4    A.   The only thing I remember about a
5  reaction in any way is that at one point Mike told
6  me something like, "Well, Tim's not quite there yet,
7  but they're still working on it."
8    Q.   And when you mean "there yet," you mean
9  on firing John Bradley?
10    A.   That's what I took it to mean.
11    Q.   Mr. Bradley, what efforts are you aware
12  of that were made by the Middletons to fire anybody
13  who didn't participate in the Timothy Cruz election
14  campaign besides you?
15    A.   That's all I'm aware of.
16    Q.   And your entire awareness of the
17  Middletons' efforts to have you terminated for your
18  decision to sit out the 2010 election is by
19  conversations relayed to you by Mike Horan.  Is that
20  right?
21          MR. SINSHEIMER:  Objection.
22    A.   Yes.
23    Q.   Okay.  You also testified that the
24  district court oversight was taken away from you, in

Page 165

1    see that I was being marginalized in the office.
2        Q.  So what I'm legitimately trying to get
3    ahold of here, Mr. Bradley, is this idea that you
4    felt comfortable enough with your relationship with
5    Mr. Cruz to write the e-mail that you did that's the
6    November 17, 2011 correspondence that begins "I'm
7    not your child" and expected Mr. Cruz to take that
8    in the context of that friendship.
9            MR. SINSHEIMER:  Hold on a second.
10   Is that a question?
11           MR. COHEN:  I'm getting to it.
12           MR. SINSHEIMER:  It's a long comment.
13           MR. COHEN:  Well --
14           MR. SINSHEIMER:  I'm waiting for the
15   question, sir.
16       BY MR. COHEN:
17       Q.  And yet you never raised with Mr. Cruz,
18   in this 2011 time frame, your concerns about
19   confidential informants or retribution because of
20   your lack of political activity.  Is that right?
21           MR. SINSHEIMER:  Object to the form
22   of the question.
23       A.  The short answer is no, I never raised
24   it.  But just to correct one thing, I wouldn't say I

Page 166

1    sent that e-mail as a product of a comfortable
2    relationship I had with Mr. Cruz.  I would say that
3    I was frustrated when I sent the e-mail.  And what I
4    said previously is just that the e-mail ought to be
5    viewed in context of our overall relationship
6    historically.
7            MR. SINSHEIMER:  Can I have 30
8    seconds with -- no, 2 seconds with him?
9            MR. COHEN:  Why don't you step out,
10   because I want to talk to these guys for a second --
11           MR. SINSHEIMER:  Sure.
12           MR. COHEN:  -- if you don't mind.
13           MR. SINSHEIMER:  No, I don't.
14           (Off the record at 3:23 p.m.)
15           (On the record at 3:24 p.m.)
16           MR. COHEN:  Back on the record.
17       BY MR. COHEN:
18       Q.  So, Mr. Bradley, it was after this
19   exchange of communications with Mr. Cruz that you
20   eventually found yourself in his office.  Is that
21   right?
22       A.  Yes.
23       Q.  And what I'd like you to do -- you've
24   touched on this conversation earlier.  Explain how

Page 167

1    it was that you ended up in Mr. Cruz's office after
2    this exchange of communication.
3        A.  I believe Kendra Salvatore came into my
4    office and asked me if I would come down.
5        Q.  And how long after this communication,
6    that is, the one that is in Exhibit 8, did that take
7    place?
8        A.  It was the following week.  I want to say
9    about five or six days later.
10       Q.  And Timothy Cruz -- Tim Cruz had been
11   away between the time -- when this e-mail was sent
12   and roughly about the time he met with you.  Is that
13   right?
14       A.  He had been away.
15       Q.  And at some point he asked you, that is,
16   Tim Cruz asked you whether -- you said you weren't
17   happy in the office, right?
18       A.  He said, "It's obvious you're not happy
19   here."
20       Q.  And you've already told us about that
21   conversation.  And you had mentioned that you wanted
22   to finish up a couple of the cases that you were on.
23   Is that right?
24       A.  I said that I wanted to try the two

Page 168

1    remaining murder cases that I had and that I wanted
2    to reach my 20-year vesting period, which would have
3    been in June, I believe, of 2013.
4        Q.  Okay.  So, in other words, you wanted,
5    one, to try these two cases and, two, reach your
6    vesting period before you left the office.  Is that
7    right?
8        A.  Well, I wanted to get to those two points
9    before I even thought about leaving.
10       Q.  So tell me, Mr. Bradley, why are you
11   talking to him about wanting to try these two cases
12   and reach your vesting period?  What's going on in
13   this conversation?
14       A.  Well, he started it by saying, "It's
15   obvious you're not happy here."  So that kind of got
16   the ball rolling to the future.
17       Q.  What do you mean by that, Mr. Bradley?
18   What do you mean by "the ball rolling to the
19   future"?  What do you mean by that?
20       A.  I took that to mean "What are your future
21   plans?"  "How long do you think you're going to stay
22   here?"
23       Q.  And you told him in response you wanted
24   to try these couple cases.  Is that right?

Page 169

1     A.  Yes.
2     Q.  And what were the two murder cases that
3  you are speaking of?
4     A.  They were -- the last one was Winquist,
5  which was in September of 2012.  And the other one
6  was in December of 2011, the following month.  I'm
7  just drawing a blank, for whatever reason, on the
8  defendant's name.
9     Q.  And there were -- with respect to the
10 second trial, there was a number of continuances,
11 right?
12    A.  There were some continuances, and we also
13 pursued an interlocutory appeal.
14    Q.  And it eventually got tried in September
15 of 2012, right?
16    A.  That's right.
17       MR. SINSHEIMER:  Did you say
18 September?  Or was it --
19       THE DEPONENT:  September.
20       MR. SINSHEIMER:  Okay.
21       BY MR. COHEN:
22    Q.  And after that jury verdict was -- after
23 that trial was done, what happened next relative to
24 your employment?

Page 170

1     A.  I was terminated.
2     Q.  And by whom?
3     A.  Mr. Horan.
4     Q.  And what did Mr. Horan say to you and you
5  say to him?
6     A.  It was late -- relatively late on Friday
7  afternoon, and he asked me to come down to his
8  office.  And he closed the door.  And he said
9  something to the effect that "Well, Tim wasn't
10 initially going to do this, but he's softened up a
11 little, so if you resign, he'll try to help you get
12 a job in either Worcester or Essex Counties."  And I
13 said, "Well, I'm not going to resign."  So he said,
14 "You're fired."
15    Q.  And when was this?
16    A.  September 28th of 2012.
17    Q.  Did you document this conversation in any
18 way?
19    A.  No.
20    Q.  What else was said during that
21 conversation other than what you've testified to?
22    A.  I asked him if there was a reason for my
23 being fired, and he kind of shrugged his shoulders
24 and smirked and said, "Of course not."  I asked him

Page 171

1  if Tim was in the office next door, and he smiled
2  again and said, "No.  He's left the building."
3     Q.  So you're saying Mike Horan, who's been
4  your friend at this point, is smiling during the
5  course of his relaying to you that you've been
6  fired.  Is that right?
7     A.  Yeah.  But it wasn't -- it wasn't that he
8  was -- I didn't take it to mean that he was happy
9  about it.  It was more of a, you know, "did you
10 expect anything less" type of smile.
11    Q.  And at what point in this conversation
12 did Mike Horan tell you that you're being fired for
13 your failure to contribute to the political
14 activities of Timothy Cruz?
15    A.  He never gave me a reason when I asked
16 him why I was being fired.  He just said, "Of course
17 not."
18    Q.  Did you ever reach out to Timothy Cruz to
19 ask him why you're no longer going to be at the
20 office?
21    A.  No.
22    Q.  Did you ever reach out to anybody in the
23 office to find out why you were being let go at that
24 time?

Page 172

1     A.  Any employee in the office?
2     Q.  Yes, sir.
3     A.  No.
4     Q.  As you sit here today, have you come to
5  learn why it was that you were fired from the
6  Plymouth County DA's Office?
7     A.  Well, I listed the reasons in my
8  complaint.
9     Q.  Okay.  So I'm asking -- aside from the
10 reasons you listed in your complaint, have you come
11 to learn of anything else, other than the reasons
12 listed in your complaint, as to why you were fired?
13    A.  No.
14    Q.  Is it your testimony that the exchange
15 that you had with Timothy Cruz, your boss, in
16 November of 2011 had anything to do with the reason
17 why you're no longer with the Plymouth County DA's
18 Office?
19    A.  I don't believe so.
20    Q.  And what is the basis of your belief that
21 the exchange that you had with Timothy Cruz that
22 begins with "I'm not your child" had nothing to do
23 with your termination?
24       MR. SINSHEIMER:  Object to the form