# Exhibit 3

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN BRADLEY,
    Plaintiff,
VS.              Civil Action No.
TIMOTHY J. CRUZ (Individually),   1:13-cv-12927
MICHAEL HORAN (Individually),
FRANK J. MIDDLETON (Individually),
and OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,
    Defendants.

DEPOSITION OF THOMAS J. FLANAGAN, JR.

November 3, 2015

2:16 p.m.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, Massachusetts

Susan A. Romano, RMR, CRR, CSR #119393

Page 2

```
 1        APPEARANCES OF COUNSEL
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4      ROBERT SINSHEIMER, ESQUIRE
 5      WESLEY STOKER, ESQUIRE
 6      Sinsheimer & Associates
 7      92 State Street
 8      Boston, Massachusetts 02109
 9      617.722.9954
10      rsinsheimer@sinsheimerlaw.com
11      wstoker@sinsheimerlaw.com
12
13   ON BEHALF OF THE DEFENDANTS:
14      BRET A. COHEN, ESQUIRE
15      Mintz, Levin, Cohn, Ferris, Glovsky and
16      Popeo, P.C.
17      One Financial Center
18      Boston, Massachusetts 02111
19      617.542.6000
20      bcohen@mintz.com
21
22
23
24
```

Page 3

```
11   NO.     DESCRIPTION           PAGE NO.
12   4    March 23, 2012 Memorandum      31
13       Bates-Stamped PLYDA_0004916 through
14       PLYDA_0004930
15
16
17   (Original exhibit attached to original transcript.)
18
19
20
21
22
23
24
```

Page 4

```
 1            THOMAS J. FLANAGAN, JR.
 2              November 3, 2015
 3              PROCEEDINGS
 4
 5      MR. SINSHEIMER: Stips? Usual?
 6      MR. COHEN: Yes.
 7      MR. SINSHEIMER: Okay.
 8
 9      THOMAS J. FLANAGAN, JR., the deponent, having
10   been satisfactorily identified and duly sworn by the
11   Notary Public, was examined and testified as
12   follows:
13          EXAMINATION
14       BY MR. SINSHEIMER:
15   Q.  State your full name, please.
16   A.  Thomas J. Flanagan, Jr.
17   Q.  Mr. Flanagan, my name is Rob Sinsheimer.
18   I'm going to ask you some questions in a civil
19   lawsuit on behalf of my client John Bradley.
20       You know Mr. Bradley, correct?
21   A.  I do.
22   Q.  How well do you know Mr. Bradley?
23   A.  I knew him as a colleague and coworker
24   for a period of years in the DA's office.
```

Page 9

1  A. There had been conversations over the
2 years about John, some while he was still in the
3 office and then some after he had left the office.
4 So there was --
5  Q. How many times did you speak to Bridget
6 Middleton about John Bradley?
7  A. I wouldn't be able to put an exact number
8 on it, but it came up on occasion.
9  Q. On occasion?
10  A. On occasion.
11  Q. What would the topics be?
12  A. The topics would generally be the
13 relationship between Frank and John, the -- that
14 being the essential -- the central theme and
15 references that she would make or conversations that
16 were had.
17  Q. So she would approach you and talk about
18 the relationship between Frank and John?
19  A. Or it would come up in conversation while
20 I was standing -- standing there.
21  Q. Office scuttlebutt? Would that be fair
22 to say?
23  A. I guess you could characterize it like
24 that. I -- it's -- there were discussions. Nothing

Page 10

1 of -- no one in particular stands out to me but
2 conversations about the relationship within the
3 office and --
4  Q. What was your understanding of the
5 relationship between Frank and John during the last
6 years -- during the last year of John's tenure
7 there?
8  A. They did not have a good relationship.
9 They didn't speak was my understanding, that they
10 used to be very close friends, that they had a
11 falling-out and that it got to the point where two
12 people that used to be very close suddenly didn't
13 interact or speak anymore.
14  Q. What was your relationship with Bradley
15 during that period?
16  A. My relationship with John Bradley, I
17 felt, was limited. I felt that it was professional.
18 I felt that if I needed to speak to him on the rare
19 occasion I needed to speak to him about a case, that
20 I could do that. My conversations with John were
21 pretty limited. We didn't prosecute any cases
22 together. We didn't investigate any cases together.
23  I would talk to John Bradley about BC
24 football pretty regularly. If I was walking by his

Page 11

1 office and saw him sitting there, I would ask him if
2 he was going to the game or did he see the game from
3 the prior weekend, because he was a fellow BC
4 football fan.
5  Q. So you're a BC football fan?
6  A. Yes.
7  Q. And he was a BC football fan?
8  A. Yes.
9  Q. And you would -- if -- I told you there
10 would be colloquial language in this deposition.
11 You'd be shooting the breeze about BC football.
12  A. Yes.
13  Q. You wouldn't be talking too much about
14 the substance of the office. Is that your
15 testimony? I'm talking time frame the last year or
16 so that he was present in the office.
17  A. And that -- you know, during that time
18 frame I would say that our conversations by that
19 point were much more limited.
20  Q. Any particular reason?
21  A. By that point I felt that there were
22 tensions within the office. I felt there was --
23 things had certainly deteriorated. I knew that
24 between John and Frank. I just didn't stop by

Page 12

1 anymore.
2  Q. How about the relationship between Frank
3 and Mike Horan? Do you have any knowledge of any
4 tensions between them?
5  A. They worked -- for the most part, when
6 I -- to my personal knowledge, they were able to
7 work together to perform the duties of their
8 positions in the office, but I don't believe that
9 they had a close relationship. But I don't think
10 that it interfered in Frank doing his job or, from
11 what I know, to the limited extent that I did know,
12 Mike performing his duties.
13  Q. Did you know they wrote memos about each
14 other?
15  A. I am aware of that.
16  Q. Well, to be fair -- because I want to
17 respect the attorney-client privilege. That's why I
18 asked you. You met Cohen last week, right?
19  A. Yes.
20  Q. Did you become aware of the fact that
21 Frank and Mike had written memos about each other
22 before you met Mr. Cohen?
23  A. I recall being aware of a memo --
24 becoming aware of a memo by Mike regarding an ADA in

Page 21

1  A. Yes.
2  Q. What do you know?
3  A. What I know about that is there had been
4  an evening in which there had been inappropriate
5  behavior towards two female employees of the
6  Plymouth County District Attorney's Office.
7  Q. By Frank Middleton?
8  A. Correct.
9  Q. Did you know about that before he
10 resigned?
11 A. I did.
12 Q. Did you witness it?
13 A. I did not.
14 Q. Were you there that night, the MC --
15 whatever they call it. I'll get it right, the
16 initials -- the prosecutors convention, for lack of
17 a better phrase, or annual meeting?
18 A. I was there that night. I went in
19 specifically to see Sharon Donatelle get her award.
20 Q. Turned around and left?
21 A. And then after the dinner and the award
22 was presented, I walked across the street with some
23 of the people from the office, and several of our
24 alumni from the U.S. Attorney's Office had also come

Page 22

1  to the ceremony, and they also walked over to one of
2  the establishments across the street from the
3  Seaport. I had a beer with them, and I walked to
4  South Station, took the commuter rail home.
5  Q. I don't mean to pry, but what town do you
6  live in?
7  A. Mansfield, Mass. So I took the
8  Stoughton/Providence line.
9  Q. Are you married with kids?
10 A. I am.
11    So to answer your question, I wasn't
12 there for anything that happened later that night.
13 Q. Let me show you a document that's been
14 marked Exhibit Donatelle 1.
15    MR. COHEN: Before -- can we go off
16 the record, Rob, for just one second?
17    MR. SINSHEIMER: Always.
18    (Off the record at 2:35 p.m.)
19    (On the record at 2:36 p.m.)
20    BY MR. SINSHEIMER:
21 Q. So look at Exhibit 1 for me, please, sir.
22 My question only is, other than through Mr. Cohen's
23 office, have you ever seen that before today?
24 A. I don't recall ever seeing this.

Page 23

1  Q. Ever?
2  A. Before with Mr. Cohen.
3  Q. Mr. Cohen showed it to you last week when
4  he became your lawyer?
5  A. This was something that I had seen with
6  him last week.
7  Q. Okay.
8  A. I don't recall ever seeing this before
9  that.
10 Q. All right. Now, take a look at the first
11 page. You see there's a W1?
12 A. Yes.
13 Q. Do you understand that's supposed to be
14 you?
15 A. I understand that.
16 Q. Okay. And do you understand that Bridget
17 Middleton has attributed all the statements on the
18 W1 to you?
19    MR. COHEN: Other than what your
20 lawyers told you.
21    BY MR. SINSHEIMER:
22 Q. I'm going to go through it line by line.
23 Forget it. Withdraw the question.
24    Did you ever tell Bridget Middleton that

Page 24

1  there was a small group of dissenters led by John
2  Bradley?
3  A. Did I ever tell her that?
4  Q. Yeah.
5  A. I had a conversation with Bridget
6  Middleton about information that I had heard in the
7  office.
8  Q. Okay. So did you use that phrase, "a
9  small group of dissenters led by John Bradley"?
10 A. I used the phrase "small group of
11 dissenters" in describing what I had heard --
12 Q. From others.
13 A. The information -- the information that I
14 generally knew about this whole topic was second- or
15 thirdhand information because, for the most part, I
16 did not have a conversation with John Bradley about
17 these things or about -- or with Karen O'Sullivan
18 about the topics but information that I had heard in
19 the office second or thirdhand.
20 Q. Okay. When did you have this
21 conversation with Ms. Middleton?
22 A. Conversation would have been sometime, I
23 believe, around late -- approximately December 2010
24 is my recollection. Because I remember the time

Page 25

1 period when these issues arose.
2   Q. When you say "these issues," what issues
3 are you referring to?
4   A. Issues regarding people in the office
5 that reportedly intended to support John Bradley by
6 going to the district attorney to criticize Frank
7 Middleton and the policies of the office.
8   Q. So you felt that John Bradley was leading
9 a group against Frank Middleton?
10   A. That was the information that I was
11 receiving, and --
12   Q. From who?
13   A. -- considering all the information that I
14 had as to friendships in the office, observations,
15 the fact that over a period of time there was
16 clearly tension and a lack of good relationship
17 between Frank Middleton and John Bradley, and that,
18 in my view, what I was able to perceive was that
19 there appeared to become almost schism in the office
20 in which you had groups of people that were
21 supportive of one side or supportive of the other.
22 And there was kind of a -- for the most part,
23 unspoken tension between the two groups. That was
24 my observation.

Page 26

1   Q. Okay. I'm going to ask to follow up a
2 little bit. I want to ask you to name the people
3 that you believe were affiliated with one side or
4 the other of the schism, to use your word. So let's
5 call one side -- without in any way saying for sure
6 there even is such a schism. One side is the
7 Middleton group. Who's in that group? I'm going to
8 say of the superior court people too. I'm not
9 trying to get everybody out in Wareham. Just people
10 in Brockton. Go ahead. Who's in that group?
11   A. I can speak to the people that -- from my
12 observations or knowing them who I felt were
13 supportive --
14   Q. That's what I'm asking you to do.
15   A. Frank or the DA would have been myself,
16 Sharon Donatelle, Christine Kiggen, Kristen Freeman,
17 Bridget Middleton obviously. Those were -- Jeremy
18 Kusmin I felt was supportive of Frank Middleton and,
19 therefore, supportive of the DA.
20   There were others, but those are the ones
21 that come to my mind as some of the more experienced
22 people in the office that were part of that group.
23   And I knew that there were also people
24 that were more supportive of John or were critical

Page 27

1 of Frank.
2   Q. Okay. And who would that group be?
3   A. I think that group would be Karen
4 O'Sullivan -- this is my perception.
5   Q. I understand. The question is based
6 on -- I'm asking your perception.
7   A. My perception was at the time that Karen,
8 that -- Dan Hourihan was another person that I felt
9 was more closely aligned with John than Frank.
10 There were some other people that seemed to be more
11 neutral. Tim Shyne, Lew Armistead may have been
12 more sympathetic toward John Bradley and probably
13 was, now that I think about it, as part of that part
14 of it -- part of the office, if you will.
15   That's not to say that when I -- when I
16 speak of a schism, we were able to work together, we
17 were able to communicate on our cases, but I felt it
18 was -- that's how the office broke down. These are
19 just some of the names. Other people --
20   Q. I'm looking for the senior people. What
21 about Mike Horan?
22   A. It's my understanding that Mike was more
23 closely aligned with John than he was with Frank.
24 And, you know, when you asked me the question

Page 28

1 earlier, I don't -- as far as personal knowledge of
2 their interactions, the information that I was
3 getting -- from my observations and speaking with
4 people in the office, it seemed like Mike Horan was
5 supportive of John.
6   Q. Do you know whether -- I think I asked
7 you that already. As it is now, Mike Horan is still
8 in the office, correct?
9   A. Correct.
10   Q. What's his title?
11   A. He's legal counsel and chief of staff.
12   Q. What's your title, sir?
13   A. Deputy first assistant.
14   Q. You're the deputy? Are you trying
15 homicide cases?
16   A. I am, yeah.
17   Q. And --
18   A. I have a lot of different hats, but
19 ultimately in a supervisory capacity for the
20 district courts, I approve recos -- recommendations
21 on case dispositions. Things are set up so that the
22 three individuals that are in the titles of running
23 the office, the first assistant, the deputy first,
24 and the second, are sharing a lot of these

Page 77

1  Q. I can get the transcript, but --
2  A. My memory is that she stated that "We
3  don't" -- quote/unquote, "We don't get along." And
4  I asked her if that saying went for me, and she said
5  no.
6  Q. So you were the one that directed her --
7  cross-examined her?
8  A. Yes.
9  Q. And Ms. Scapicchio directed her?
10 A. Yes.
11 Q. Is that transcript sealed, or is that
12 part of the public record, if you know?
13 A. I believe it's part of the public record.
14 Q. Was this in front of the jury? She
15 testified --
16 A. There was a voir dire hearing.
17 Q. Yeah. I thought --
18 A. There was a voir dire hearing in which
19 essentially she was asked the questions about her
20 prosecution of the witness, her notes on her
21 disposition sheet, and then there was then her trial
22 testimony. So there were --
23 Q. So she actually testified in open court
24 in front of a jury.

Page 78

1  A. She did.
2  Q. Let me just ask a couple more -- just
3  some concluding questions, make sure we're in the
4  same place.
5     You don't personally have any actual
6  knowledge as to why John Bradley was fired, correct?
7  A. Do I have personal knowledge as to why
8  John Bradley was fired. I -- just what I've heard
9  from other people as to an e-mail that he sent to
10 the DA.
11 Q. All right. But --
12 A. And other issues. The issues that, I
13 think, everyone is well familiar with as to why...
14 Q. Before the fact, did Mr. Cruz tell you he
15 was going to fire Mr. Bradley?
16    MR. COHEN: Objection.
17    Go ahead.
18 A. I don't recall ever having any
19 conversation with him about that or knowing that.
20 Q. Before the fact, did Mr. Middleton tell
21 you Mr. Cruz was going to fire Mr. Bradley?
22 A. I don't recall ever being told that by
23 anyone in the office, Frank Middleton or the DA or
24 anybody else.

Page 79

1  Q. Before the fact, Mr. Horan never told you
2  that Mr. Bradley was going to be fired.
3  A. I never had conversations along those
4  lines with Mr. Horan on any topics.
5  Q. When did you learn Mr. Bradley was fired?
6  A. I learned that day.
7  Q. The same day?
8  A. Correct.
9  Q. From whom?
10 A. From Christine Kiggen. I was out of the
11 office that day. And -- I don't recall
12 specifically, but I believe she called me on my -- I
13 believe she called me when I was at home.
14 Q. What did she say?
15 A. She said that it was kind of shocking
16 news, something -- something along the lines of
17 "John Bradley got fired today."
18 Q. And what did you say?
19 A. I don't recall what my response was.
20 I -- I remember --
21 Q. What did you think?
22 A. -- it was -- what I thought was that it
23 was something that -- I wasn't surprised at it that
24 it happened, but to hear that it happened out of the

Page 80

1  blue, the timing of it, I wasn't expecting it.
2  Q. You were shocked. You just said that a
3  second ago, right?
4  A. To hear that John, who has been in the
5  office for so long --
6  Q. Was suddenly fired.
7  A. -- it was -- I wasn't ready for it.
8  Q. Okay. So certainly no one had ever said
9  to you that he had told Cruz he was going to resign
10 almost a year prior thereto, right?
11 A. I don't recall being told that by anyone.
12    MR. SINSHEIMER: That's all I have.
13 Thank you.
14    MR. COHEN: Just a couple quick
15 follow-up questions.
16    EXAMINATION
17    BY MR. COHEN:
18 Q. Did Tim Cruz ever put pressure on you to
19 contribute to any of his political campaigns?
20 A. No.
21 Q. Did anybody associated with Tim Cruz ever
22 put pressure on you to contribute --
23 A. I was never pressured by anybody.
24 Q. Did you ever witness anyone in the DA's

20 (Pages 77 to 80)

Page 81

1  office pressuring anyone else to contribute to Tim
2  Cruz's political campaign?
3      A. No.
4      Q. Do you have any reason to believe that
5  John Bradley's termination has anything to do with
6  John Bradley's position with respect to confidential
7  informants and the use thereof?
8      A. No.
9      Q. Do you have any reason to believe that
10 John Bradley's termination has anything whatsoever
11 to do with John Bradley's position relative to the
12 DA's position on prosecuting OUIs?
13     A. I don't know anything about that. I
14 don't -- I don't know that to be any basis for why
15 he was terminated.
16         MR. COHEN: I have no other
17 questions. Thank you.
18         MR. SINSHEIMER: Thank you.
19         MR. COHEN: Thank you.
20         (Deposition of THOMAS J. FLANAGAN,
21 JR. concluded at 3:56 p.m.)

Page 82

1              CAPTION
2      The deposition of THOMAS J. FLANAGAN, JR.,
3  was taken in the matter, on the date, and at the
4  time and place set out on the title page thereof.
5      It was requested that the deposition be taken
6  by the reporter and that same be reduced to
7  typewritten form.
8      It was agreed by and between counsel and the
9  parties that the deponent will read and sign the
10 transcript of said deposition.

Page 83

1              CERTIFICATE
2  Commonwealth of Massachusetts
3  Middlesex, ss.
4      I, Susan A. Romano, Certified Shorthand
5  Reporter No. 119393, Registered Merit Reporter,
6  Certified Realtime Reporter, and Notary Public in
7  and for the Commonwealth of Massachusetts, do hereby
8  certify that the witness whose deposition is
9  hereinbefore set forth was duly sworn by me and that
10 such deposition is a true record of the testimony
11 given by the witness.
12     I further certify that I am neither related
13 to or employed by any of the parties in or counsel
14 to this action, nor am I financially interested in
15 the outcome of this action.
16     In witness whereof, I have hereunto set my
17 hand and seal this 9th day of November 2015.
18
19
20
21         Susan A. Romano
22         Notary Public
23         My commission expires
24         March 13, 2020

Page 84

1          DEPOSITION ERRATA SHEET
2
3  Assignment No. J0229911
4  Case Caption: Bradley vs. Cruz
5
6      DECLARATION UNDER PENALTY OF PERJURY
7      I declare under penalty of perjury that I
8  have read the entire transcript of my deposition
9  taken in the captioned matter or the same has been
10 read to me, and the same is true and accurate, save
11 and except for changes and/or corrections, if any,
12 as indicated by me on the DEPOSITION ERRATA SHEET
13 hereof, with the understanding that I offer these
14 changes as if still under oath.
15
16     Signed on the _____ day of _____, 20___.
17
18     _____
19     THOMAS J. FLANAGAN, JR.