# Exhibit 4

Page 1

Volume 1
Pages: 1-197
Exhibits: 1-9
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x
JOHN BRADLEY,
   Plaintiff
  vs.    Cause No.
     1:13-cv-12927-RGS

TIMOTHY J. CRUZ, Individually,
MICHAEL HORAN, Individually,
FRANK J. MIDDLETON, Individually,
and OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,
   Defendants.
- - - - - - - - - - - - - - x

DEPOSITION

of

FRANK J. MIDDLETON, JR.

Sinsheimer & Associates
92 State Street, 9th Floor
Boston, Massachusetts 02109

Monday, September 21, 2015
10:20 a.m.

Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
3  SINSHEIMER & ASSOCIATES
   By: Robert S. Sinsheimer, Esquire
4  92 State Street, 9th Floor
   Boston, Massachusetts 02109
5  (617) 722-9954
   rsinsheimer@sinsheimer.com
6
7  On behalf of the Defendant:
8  MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO,
   P.C.
9  By: Bret A. Cohen, Esquire
   One Financial Center
10 Boston, Massachusetts 02111
   (617) 348-3089
11 bcohen@mintz.com
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1
2  INDEX
3  WITNESS                    PAGE
4  Frank J. Middleton, Jr.
5  By Mr. Sinsheimer             5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1
2  EXHIBITS
3  No.                     Page
4  Exhibit 1  Memorandum dated 3/23/12   8
5  Exhibit 2  To/From dated 6/13/12      8
   Exhibit 3  Affidavit of Karen
6        O'Sullivan       96
7  Exhibit 4  Memorandum dated 1/30/12   131
8  Exhibit 5  E-mail string       150
9  Exhibit 6  3-page Notes        163
10 Exhibit 7  Memorandum dated 8/30/07   174
11 Exhibit 8  Minutes of 3/27/12        176
12 Exhibit 9  Outline             190
13
14
15
16
17
18
19
20
21
22
23
24

Page 137

1    That was it.
2  Q.  And that conversation was sometime in
3    November of --
4  A.  I think it was probably -- I think it was
5    in December because I think it was before
6    -- he had a trial in December.  I think
7    it was before that, because I remember Tim
8    saying he's got a trial in a couple weeks
9    and he has his last one in a couple
10   months.
11        MR. SINSHEIMER:  I think this is
12   a great place to break for lunch.
13        MR. COHEN:  Okay.
14        (Luncheon recess.)
15
16
17
18
19
20
21
22
23
24

Page 138

1        AFTERNOON SESSION
2        MR. SINSHEIMER:  On the record.
3    Carol, please read back where I was.
4        (Record read back as requested.)
5  Q.  (By Mr. Sinsheimer) And did you have
6    conversations with anyone else other than
7    Tim Cruz about the fact that John Bradley
8    planned to leave the office after his
9    last two cases were tried?
10 A.  Yes.
11 Q.  Who?
12 A.  My wife, Tom --
13 Q.  Is that a privileged conversation?
14 A.  It is.
15 Q.  Okay.
16 A.  Tom Flanagan.  Christine Kiggen.  I
17   believe Sharon Donatelle.  Maybe Gayle
18   McKenna.  It was I was told everybody in
19   the office knew he was leaving.  He was
20   telling people he was leaving after his
21   last case.
22 Q.  Who do you understand -- let me just -- I
23   went too fast.  Tom Flanagan, Christine
24   Kiggen, Donatelle?

Page 139

1  A.  Sharon Donatelle.
2  Q.  Sharon Donatelle?
3  A.  Maybe Gayle McKenna.  I am not 100 percent
4    on that.
5  Q.  Maybe Gayle McKenna.  Understood.  Anyone
6    else you can think of today?
7  A.  No.
8  Q.  I've got four names; Flanagan, Kiggen,
9    Donatelle and McKenna.
10 A.  There were probably a half dozen others.
11   I just can't remember specifics.
12 Q.  All right.
13 A.  Especially when the change was made from
14   -- when the Chief District Court
15   prosecutor change was made from John to
16   Tim Shiner, that's when I started getting
17   inquiries from the Superior Court staff
18   that slowly then turned it into
19   complaints, that they demanded to know
20   what was going on, why he only had one
21   case.
22 Q.  Okay.  And who asked you why did John only
23   have one case?
24 A.  Tom Flanagan, Christine Kiggen, multiple

Page 140

1    others.
2  Q.  Those two that you can think of?
3  A.  Multiple others.  I just can't give you
4    the specifics.  A number of, pretty large
5    number of Superior Court staff were
6    disgruntled.  They were making, some of
7    them, less than half of what Mr. Bradley
8    was making.  He only had one case.  A
9    number of those people came to me and told
10   me that he was telling the rest of the
11   staff that I wouldn't give him any cases.
12   Now, the only thing, if I could just
13   qualify that a little bit.
14 Q.  Please, yes.
15 A.  I don't know if that last one, meaning
16   when they finally told me that he was
17   spreading that false statement that I
18   wouldn't give him cases, I don't know if
19   that was before he left or after he left,
20   after he was terminated.
21 Q.  Did you know he was going to be terminated
22   the date he was?
23 A.  Yes.
24 Q.  Ahead of time?

Page 141

1  A.  Yes.
2  Q.  How did that come about?
3  A.  I was sitting in my office and Tim -- I
4      think I had the door shut.  Tim knocked on
5      the door, came in.  He said you might want
6      to think about leaving early today.  So I
7      was like why.  He had like I am leaving
8      early, you might want to think about
9      leaving early today.  And then he
10     indicated that Mike was going to be
11     talking to Bradley.  He didn't tell me
12     exactly.  He didn't say the words
13     terminated.  Mike was -- this was
14     Bradley's last day and I might not want to
15     be around.
16 Q.  Okay.  You said, I think, if I heard you
17     correctly, that others had told you that
18     Bradley had told them that he was leaving.
19 A.  Yes.  Karen O'Sullivan had told Christine
20     Kiggen that, according to John, he was
21     going to try his last case and then he was
22     moving on.  And I pretty -- I couldn't
23     tell you who, but I know I heard it
24     through other sources as well.  Flanagan

Page 142

1      told me that it was well-known in the
2      Superior Court that John was leaving after
3      his last case.
4  Q.  But as far as you're testifying today, the
5      source of that information was Karen
6      O'Sullivan?
7  A.  According to Christine Kiggen.  I didn't
8      say it.  That is what she attributed, at
9      least John's direct statement and that
10     conversation.  She spoke to Ms. O'Sullivan
11     quite a bit.
12 Q.  Who else, if anyone, told you that they
13     believed that John was planning to leave
14     and if they heard it directly from John?
15 A.  Directly from John?  I don't know.  I
16     think Flanagan didn't say he heard it
17     directly from John.  He heard it from
18     multiple people who said they heard it
19     directly from John.
20 Q.  Tim Flanagan?
21 A.  Tom Flanagan.
22 Q.  Tom Flanagan.  I am sorry.
23 A.  Plus Mike Horan.
24 Q.  Did Hourihan, Daniel Hourihan leave the

Page 143

1      office?
2  A.  Yes, he did.
3  Q.  Why did he leave, do you know?
4  A.  I don't.
5  Q.  How about Lou Armisted, did he leave?
6      Yes.  He retired.
7  Q.  What does that mean, as opposed to --
8  A.  Well, he came and said he was retiring.
9      He told me that he was retiring, thanked
10     us, thanked Tim, thanked me for everything
11     we had done for him and said he was going
12     to retire.  He might do, he said I might
13     hang out a shingle in a while and do some,
14     you know, some work.
15        Hourihan simply said that he was
16     going to Bristol.  Same thing, he met with
17     Tim.  I don't know that he -- I think I
18     met with him too.  I have to meet with
19     everyone to do an exit interview and go
20     through their cases for reassignment so
21     they can show me the ones that are ticking
22     time bombs and decide, you know, where I
23     can send those cases.
24 Q.  Did Dan Hourihan go to Bristol?

Page 144

1  A.  Sure.
2  Q.  Is he at Bristol now?
3  A.  He is at Bristol now.
4  Q.  Tim Shine, did he leave?
5  A.  Yes.
6  Q.  Why did he leave?
7  A.  Private practice.
8  Q.  Tara Coppola, did she leave?
9  A.  Yes.
10 Q.  And why did she leave?
11 A.  Private practice.
12 Q.  Just because they preferred private
13     practice?
14 A.  Usually it's money.
15 Q.  What percentage, let's say, the year 2011,
16     roughly in that range, what percentage of
17     your work was administrative as opposed to
18     trial work?
19 A.  I don't know if I can -- it's not all, for
20     me it's not all administrative or trial
21     work.
22 Q.  Uh-huh.  What else was it?
23 A.  I have to supervise.  Well,
24     administratively supervising the staff and

Page 149

1    disagree with that?
2          MR. COHEN: Objection.
3          THE WITNESS: Answer?
4          MR. COHEN: Sure.
5    A.  I would strongly disagree with that. That
6         would be -- that would make no sense.
7    Q.  How many, let's say in 2011, roughly, how
8         many hours a week on average did you spend
9         in the office?
10   A.  It depended on the week. If I was
11        preparing --
12   Q.  No, it doesn't depend on the week, with
13        all due respect, because I asked the
14        question on average. That is what I am
15        looking for is your rough average.
16   A.  I don't know. I don't know how to average
17        out a whole year. I was working when I
18        wasn't at the office as much as when I was
19        at the office.
20   Q.  There was a concept of there being someone
21        being an on-call person?
22   A.  Yes.
23   Q.  What was that concept?
24   A.  It was a rotating list of the Superior

Page 150

1         Court ADA's who handled the on-call calls
2         during the week, that's calls during the
3         day and the night from any source. It
4         runs the gamut. Any citizen that calls in
5         looking for and has a question.
6             MR. SINSHEIMER: Mark that as
7         Exhibit 5.
8             (Document marked as Exhibit 5 for
9         identification.)
10            MR. COHEN: Thanks.
11   Q.  Have you seen this e-mail before?
12   A.  Sure.
13   Q.  Is this one of the e-mails that you
14        referred to earlier that you reviewed in
15        preparation for today?
16   A.  I didn't review it for today's depo, but I
17        have seen it in the past.
18   Q.  Okay. And who is Emily Garvey?
19   A.  She was one of my part-time secretaries.
20   Q.  How many secretaries did you have?
21   A.  I had one that worked until 2:30 or three
22        and then Emily covered me in the
23        afternoons and covered if she was out.
24   Q.  And who was Joseph <ason?

Page 151

1    A.  Captain of the State Police Detective Unit
2         assigned to the DA's office.
3    Q.  And so it looks if I read the e-mail from
4         Emily to Mr. Bradley that she is telling
5         him that you are going to be on vacation
6         for two weeks and you wanted Mr. Bradley
7         to be the on-call person and that he was
8         expected to reach out to Joe Mason.
9             Do you see that?
10   A.  On-call person regarding homicides.
11        Different callers, the homicide calls is
12        different than the on call.
13   Q.  It is more significant for one thing,
14        right?
15   A.  Well, the homicide calls is what I do,
16        meaning --
17   Q.  Okay. And my question to you, is it true
18        that you instructed Ms. Garvey to send
19        this e-mail?
20   A.  Yes.
21   Q.  And did you -- why didn't you just talk to
22        Mr. Bradley directly?
23   A.  Because this was 2007 and Mr. Bradley
24        refused to talk to me as of July 2006. So

Page 152

1         this was -- this would have been a year
2         after he stopped acknowledging my
3         presence. He did not want me to talk to
4         him, apparently, so I had this e-mail sent
5         by somebody. If I had sent the e-mail, he
6         wouldn't have reviewed it. My opinion was
7         he wouldn't have done any of it if I had
8         sent it. And this was at the direction of
9         the District Attorney that Mr. Bradley was
10        to cover for two weeks the job I did for
11        52 weeks out of the year, which is the
12        homicide call at night.
13   Q.  And it doesn't say that it is a directive
14        from the District Attorney, does it?
15   A.  No.
16   Q.  It says that you would be, you would,
17        Frank wants you, meaning Bradley, to be
18        the on-call guy?
19   A.  He would like you to be the on-call
20        person, yes.
21   Q.  Yes. And did you know whether John was on
22        vacation or not when you sent it?
23   A.  No, I didn't know. I think when this got
24        sent I was probably already gone.

Page 153

1  Q.  Were you, in your mind, Mr. Bradley's
2      superior in the hierarchy of the office?
3  A.  Yes and no.
4  Q.  Was -- let me go back to something you
5      said a minute ago.  Mr. Bradley stopped
6      talking to you in 2006?
7  A.  Correct.
8  Q.  Did he tell you why?
9  A.  No.
10 Q.  Did you ever have a discussion with
11     anybody about the fact that Mr. Bradley
12     wasn't speaking with you?
13 A.  No, not really.
14 Q.  How about Mr. Horan?
15 A.  We may have.  Yes, I am sure it came up.
16     But I can't remember any particular
17     discussions.  Definitely not many.
18 Q.  How about Mr. Cruz?
19 A.  May have.  I don't remember any
20     particulars.  Definitely wasn't something
21     we spoke about very often if at all.
22 Q.  Did you think it was significant that a
23     senior member of the office wouldn't speak
24     with you?

Page 154

1  A.  Did I think it was significant?  I thought
2      it was bizarre.  I didn't think it was
3      significant.
4  Q.  Had you ever had an argument with
5      Mr. Bradley?
6  A.  No.
7  Q.  Have you ever to this day had an argument
8      with Mr. Bradley?
9  A.  No.
10 Q.  Have you ever had a face-to-face argument
11     with Karen O'Sullivan?
12 A.  No.
13 Q.  How about that time when she came in and
14     complained about the raises, that wasn't
15     an argument in your mind?
16 A.  It wasn't even close.  I told her the
17     reasons, that at that point the raises had
18     nothing to do with me.  She wasn't -- she
19     was complaining to me but it wasn't about
20     me.  I told her that I didn't set any of
21     those salaries, that those were all set by
22     Mike Horan.  He was in charge of raises at
23     that time, so I let Mr. Horan know that
24     she was complaining about him.

Page 155

1  Q.  You felt that Mr. -- you felt that Ms.
2      O'Sullivan was complaining to you about
3      Mr. Horan?
4  A.  Well, that is once I explained to her that
5      you're complaining about raises of people
6      that I didn't set the raises so --
7  Q.  Given the memos that we have seen,
8      Exhibits 1 through 4, if I suggest to you
9      it appears to an outsider it is the other
10     way around, that Mr. Horan is complaining
11     about you and that you were the one that
12     writes this long memo saying how false
13     everything he says is, how is it that Ms.
14     O'Sullivan would have come to you
15     complaining about Mr. Horan?
16 A.  I don't understand the question.
17 Q.  Fair enough.  You know why, it was an
18     absolutely terrible question.  Yeah, it
19     was.
20         MR. COHEN:  We are in violent
21     agreement.
22         MR. SINSHEIMER:  At least there
23     wasn't a jury in the room.
24         MR. COHEN:  Yes, right.

Page 156

1  Q.  If I understand it, you wrote Exhibit 1?
2  A.  Correct.
3  Q.  And basically, the very first thing it
4      says, "Mr. Horan claims that Ms.
5      O'Sullivan approached me recently to
6      inform me of an ongoing situation that
7      exists between herself, First Assistant
8      Middleton and Chief Middleton."  Right?
9  A.  Correct.
10 Q.  And your response is that is false?
11 A.  Correct.  That was information I had.
12 Q.  So it appears to me that, just reading
13     that, that Ms. O'Sullivan had made some
14     kind of complaint about you to Mr. Horan.
15 A.  It appears that way.
16 Q.  Which is also set forth in this
17     memorandum, Exhibit 4?
18 A.  Correct.
19 Q.  And what you are saying, it is actually
20     the other way around, that Ms. O'Sullivan
21     complained to you about Mr. Horan?
22 A.  No.  I am saying that she came in and
23     complained about disparate pay between men
24     and women to me, but I informed her that I