# Exhibit 5

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN BRADLEY,
    Plaintiff,
VS.       Civil Action No.
TIMOTHY J. CRUZ (Individually),   1:13-cv-12927
MICHAEL HORAN (Individually),
FRANK J. MIDDLETON (Individually),
and OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,
    Defendants.

DEPOSITION OF SHARON DONATELLE

November 3, 2015

12:17 p.m.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, Massachusetts

Susan A. Romano, RMR, CRR, CSR #119393

Page 2

 1        APPEARANCES OF COUNSEL
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4     ROBERT SINSHEIMER, ESQUIRE
 5     WESLEY STOKER, ESQUIRE
 6     Sinsheimer & Associates
 7     92 State Street
 8     Boston, Massachusetts 02109
 9     617.722.9954
10     rsinsheimer@sinsheimerlaw.com
11     wstoker@sinsheimerlaw.com
12
13  ON BEHALF OF THE DEFENDANTS:
14     BRET A. COHEN, ESQUIRE
15     Mintz, Levin, Cohn, Ferris, Glovsky and
16     Popeo, P.C.
17     One Financial Center
18     Boston, Massachusetts 02111
19     617.542.6000
20     bcohen@mintz.com
21
22
23
24

Page 3

11  NO.     DESCRIPTION     PAGE NO.
12   1   Three-Page Document Bates-Stamped   11
13      PLYDA_0004886 through PLYDA_0004888
14   2   March 21, 2012 Memorandum     53
15      Bates-Stamped PLYDA_0004934 through
16      PLYDA_0004935
17   3   Document Entitled "Superior Court"   59
18      Bates-Stamped PLYDA_0004889 through
19      PLYDA_0004890
20
21
22  (Original exhibits attached to original transcript.)
23
24

Page 4

 1        SHARON DONATELLE
 2        November 3, 2015
 3        PROCEEDINGS
 4
 5     SHARON DONATELLE, the deponent, having been
 6  satisfactorily identified and duly sworn by the
 7  Notary Public, was examined and testified as
 8  follows:
 9     EXAMINATION
10     BY MR. SINSHEIMER:
11     Q.  State your full name for the record,
12  please.
13     A.  Sharon Elizabeth Donatelle.
14     Q.  Ms. Donatelle, my name is Rob Sinsheimer.
15  I'm going to ask you some questions on behalf of
16  John Bradley in a pending lawsuit.
17     You know John Bradley, correct?
18     A.  Yes, I do.
19     Q.  You are yourself an attorney?
20     A.  I am.
21     Q.  And you are first assistant now in the
22  Plymouth County DA's Office?
23     A.  Yes.
24     Q.  You're aware I've agreed to try to get

Page 41

1 Q. Yeah.
2 A. December.
3 Q. Of?
4 A. I don't know.
5 Q. Why did it come up between you and her
6 that there was a question whether this group that
7 was going to speak to the district attorney was a
8 big deal or not?
9 A. Because she called me and asked me if I
10 was aware of it.
11 Q. Insinuating that it was a big deal?
12 A. No. Just asking me if I was aware of it.
13 Q. Let's go back to the document. Look at
14 the very first page. See it says "W1"?
15 A. Yes.
16 Q. And then there's a statement, "Small
17 group of dissenters led by John Bradley." Do you
18 see that?
19 A. Yes.
20 Q. Apart from whether you're W1 or W3 or W2
21 or W whatever, did you ever make a statement like
22 that to Bridget Middleton?
23 A. No.
24 Q. Do you know if Tom Flanagan ever made a

Page 42

1 statement like that to Bridget Middleton?
2 A. I have no idea.
3 Q. Did you ever make a statement like that
4 to Frank Middleton?
5 A. No.
6 Q. Are you aware that there was a small
7 group of -- strike it.
8     Are you aware that there was perceived to
9 be a small group of dissenters led by John Bradley?
10 A. After the fact?
11 Q. During the year 2012 -- let's say the
12 year before John was let go. Were you aware that
13 there was dysfunction at the high levels of the
14 office?
15 A. What do you mean by "dysfunction"?
16 Q. Were you aware that the management group
17 had serious disputes between each other?
18 A. I knew that Frank was the first
19 assistant, and I believe John's title was deputy
20 first assistant and that they did not communicate
21 with each other.
22 Q. You told me that before.
23     How about Frank and Mike Horan? Do you
24 know whether they got along? I'm talking about the

Page 43

1 year before John left.
2 A. I don't know for certain.
3 Q. Is the office a better place now that
4 Frank's gone?
5     MR. COHEN: Objection.
6 A. I wouldn't say that.
7 Q. You're under oath.
8 A. I wouldn't -- I mean, I'm the first
9 assistant now, so, I mean, I think I'm doing a great
10 job. Beyond that, I mean --
11 Q. It's not a time for modesty when you're
12 under oath.
13     Do you think the office is a better place
14 now that Frank is gone? That's my question.
15     MR. COHEN: I think she's answered
16 the question.
17     MR. SINSHEIMER: No, she hasn't.
18 A. I think I'm doing a good job.
19 Q. At any time prior to the filing of this
20 lawsuit, did you hear from anybody that John was
21 fired because he didn't contribute to Cruz's
22 campaign?
23 A. No.
24 Q. Did anybody ever tell you prior to John

Page 44

1 being fired that he had already agreed to resign?
2 A. No.
3 Q. Did you have any understanding that he
4 had agreed to resign?
5 A. No.
6 Q. Did his firing come as a shock to you?
7     MR. COHEN: Objection.
8     Go ahead.
9     MR. SINSHEIMER: I'll withdraw it.
10     BY MR. SINSHEIMER:
11 Q. Did his firing surprise you? Counsel,
12 I'm not looking for a lawyer's answer.
13 A. No, I think -- no.
14 Q. Why not?
15 A. Because John did not appear to be very
16 productive in the last several months he was there.
17 It appeared to me that he wasn't working. I guess
18 that's it.
19 Q. And your understanding of the reason, if
20 it's true, that he wasn't productive is because he
21 had told somebody he didn't want to do superior
22 court cases?
23 A. That was my understanding.
24 Q. Which you learned from Frank Middleton.

Page 53

1   A. No, I don't.
2   Q. And what you do know is that until this
3   lawsuit was filed you always thought John was
4   credible, right?
5   A. Yes.
6   Q. And you always thought he was a decent
7   guy right?
8   A. Absolutely.
9   Q. You always thought he cared about his
10  family, right?
11  A. Yes.
12  Q. And you always thought that he respected
13  the courts.
14  A. Yes.
15      MR. SINSHEIMER: Give me a minute
16  to --
17      THE DEPONENT: Sure.
18      MR. SINSHEIMER: It's still only
19  1:30, so we're doing pretty good.
20      (Off the record at 1:10 p.m.)
21      (Exhibit No. 2, March 21, 2012
22  Memorandum Bates-Stamped PLYDA_0004934 through
23  PLYDA_0004935, marked for identification.)
24      (On the record at 1:14 p.m.)

Page 54

1   BY MR. SINSHEIMER:
2   Q. Ms. Donatelle, I'm going to show you a
3   document. We put a tag on it, No. 2. I'm going to
4   ask if you can identify it for me, please.
5   A. This is a memo that I prepared.
6   Q. And why?
7   A. Mr. Middleton asked me to prepare it.
8   Q. Summarizes your back -- no. That's --
9   did he tell you what he wanted in advance?
10  A. He asked me to summarize the occasion
11  when I had asked Karen O'Sullivan to come to work
12  with me in the family protection unit.
13  Q. Which she elected not to do?
14  A. She did.
15  Q. Do you consider her a friend?
16  A. Yes.
17  Q. Do you have respect for her skills as a
18  prosecutor?
19  A. Yes.
20  Q. When's the last time you spoke to her?
21  A. It's been a while. Probably -- I'm not
22  sure.
23  Q. Have you read her deposition in this
24  case?

Page 55

1   A. No.
2   Q. Have you seen her affidavit?
3   A. I have not.
4   Q. Did you know there was an affidavit?
5   A. Wait a minute. An affidavit --
6   Q. Filed with the complaint, the initial...
7   A. I believe I did see that.
8   Q. Do you have any personal knowledge one
9   way or the other whether anything in the affidavit
10  is true or false?
11  A. I don't remember what's in it.
12  Q. This document, when you prepared it, it
13  didn't have that phrase, "Attachment A," handwritten
14  at the top, did it?
15  A. No.
16  Q. The initials, though, those are your
17  initials?
18  A. They are.
19  Q. This is obviously a photocopy, correct?
20  A. Yes.
21  Q. You must have initialed the original?
22  A. I did.
23  Q. Do you know why it says "Attachment A"?
24  A. I assumed it became identified as a

Page 56

1   document relating to this case.
2   Q. So -- fair enough. But you don't really
3   know?
4   A. I don't know.
5   Q. You don't know, for example, if Frank
6   Middleton submitted it to the district attorney as
7   part of a large package?
8   A. Not aware of that.
9   Q. Not aware of that one way or the other.
10  A. No.
11  Q. Let's go back to Exhibit 1 again, please.
12  A. Yes.
13  Q. Right above what you apparently told
14  Bridget Middleton, those handwritten notes --
15  A. Yes.
16  Q. -- there's a statement "It's well known
17  that JB and KO sat out purposefully," right?
18  A. Yes.
19  Q. And you're quite sure you didn't say
20  that?
21      MR. COHEN: Objection.
22      MR. SINSHEIMER: Well, I'm asking.
23  What, are you objecting as a leading question?
24      MR. COHEN: No. No. I'm -- you

14 (Pages 53 to 56)

Page 57

1  mischaracterized her testimony. She didn't say that
2  she's quite certain she didn't --
3          MR. SINSHEIMER: I'm asking her.
4          MR. COHEN: Okay. That's not what
5  you said. But go ahead. You didn't ask her whether
6  she said that.
7          MR. SINSHEIMER: I hadn't finished
8  the sentence, Counselor.
9          MR. COHEN: Okay. Could you please
10 read the question back.
11         BY MR. SINSHEIMER:
12     Q. Did you say that to Bridget Middleton?
13     A. No.
14     Q. Are you quite sure that you didn't --
15     A. To the best of my recollection, I was
16 aware that they did not sit in on a meeting. I
17 have no recall of having said that they sat out
18 purposely -- or purposefully.
19     Q. The phrase, quote, to sit out, unquote,
20 do you understand that in Massachusetts politics
21 that can mean refusal to contribute money?
22     A. No.
23     Q. You never heard that before?
24     A. I have not.

Page 58

1      Q. This -- what meeting are you referring
2  to?
3      A. There was a meeting that occurred
4  approximately January of 2011 either before or
5  following our being sworn in for the new term of the
6  district attorney. We get sworn in in January
7  typically after an election, and there was a meeting
8  that was held in the conference room of the main
9  office.
10         And during that meeting the district
11 attorney spoke to his superior court staff and at
12 one point acknowledged the work that we do, and in
13 the other point he reinforced that it was his
14 office, that he was the elected official, and that
15 the policies of the office were his, and pretty much
16 that if there were people who didn't agree with his
17 policies, then they might want to consider other
18 options, words to that effect.
19     Q. Are you saying that John and Karen did
20 not attend that meeting?
21     A. What I'm aware of is that John -- my
22 memory of that is -- I don't recall Karen being
23 there, and John was, if my memory serves me,
24 standing in the threshold of the conference room but

Page 59

1  not in -- sitting down, which is the best of my
2  memory on that.
3          MR. SINSHEIMER: Would you mark this,
4  please.
5          (Exhibit No. 3, Document Entitled
6  "Superior Court" Bates-Stamped PLYDA_0004889 through
7  PLYDA_0004890, marked for identification.)
8          BY MR. SINSHEIMER:
9      Q. I'll show you what's been marked
10 Exhibit 3. Do you recognize that?
11     A. This -- I recognize this as something
12 that I saw the other day.
13     Q. Okay. Apart from that, you've never seen
14 it before you met with Mr. Cohen.
15     A. Correct.
16     Q. If I were to ask you to look at it and
17 read it -- well, just to save time, did you read it
18 when he showed it to you?
19     A. Yes.
20     Q. And do you recognize that to be the
21 text -- the remarks that Mr. Cruz made at the
22 meeting you were just describing?
23     A. This would be the essence of it.
24     Q. The meat of it.

Page 60

1      A. Yes.
2      Q. Do you know who wrote that?
3      A. I have no idea.
4      Q. What else did you look at? What other
5  documents did you review to prepare for today?
6      A. I looked at --
7          MR. COHEN: Besides the
8  attorney-client privilege instructions and guidance
9  I gave you relative to prepare for the deposition.
10 Besides that, you can tell him --
11         MR. SINSHEIMER: I'd love to compare
12 on half the cases...
13         BY MR. SINSHEIMER:
14     Q. Go ahead.
15     A. I looked at my memo, the one we marked
16 Exhibit 2.
17     Q. Yes.
18     A. Okay.
19     Q. You obviously looked at Exhibit 1.
20     A. I looked at Exhibit 1, yes.
21     Q. And this, Exhibit 3?
22     A. And I did look at that.
23     Q. Anything else?
24     A. There were a few e-mails that I looked

15 (Pages 57 to 60)

Page 65

1  memorandum that was intended for the district
2  attorney, would that surprise you?
3       MR. COHEN: Objection. Improper
4  question.
5       Go ahead and answer the best you can.
6    A. Would it surprise me what?
7    Q. That -- that Ms. Middleton under oath
8  said that you are the person that made each one of
9  these statements under the heading "W3" and that she
10 reported that to the district attorney.
11   A. Well, I -- I don't believe that I made
12 all of those statements, as I've told you.
13      MR. SINSHEIMER: All right. I'll
14 leave it at that. We're all set.
15      MR. COHEN: Okay. I just have a
16 couple follow-up questions.
17      EXAMINATION
18      BY MR. COHEN:
19   Q. So if you look back on the document that
20 was marked as your Exhibit No. 1, there was a
21 reference to John Bradley sitting -- quote, sitting
22 out, end quote. Do you recall that testimony?
23   A. Yes.
24   Q. So that the record is clear,

Page 66

1  Ms. Donatelle, it is your understanding that sitting
2  out had to do with a particular meeting. Is that
3  right?
4       MR. SINSHEIMER: Objection.
5    A. Yes.
6       MR. SINSHEIMER: Objection.
7    A. Yes.
8       MR. SINSHEIMER: It's your witness,
9  sir.
10      BY MR. COHEN:
11   Q. Well, let me do it this way: What did,
12 in your opinion, sitting out mean?
13   A. When I read that, I interpreted the
14 sitting out to mean specifically the meeting in
15 January where the district attorney addressed his
16 superior court staff.
17   Q. At any point did you interpret the words
18 "sitting out" to mean relative to sitting out a
19 particular political election?
20   A. No.
21   Q. You've been a part of the Plymouth County
22 District Attorney's Office for 23 years. Is that
23 right?
24   A. Correct.

Page 67

1    Q. How many years has Tim Cruz been the
2  district attorney in that office?
3    A. Since 2001.
4    Q. Since 2001, Ms. Donatelle, tell us the
5  number of times somebody connected to Tim Cruz has
6  pressured you to contribute to a political campaign.
7    A. That's never happened.
8    Q. Ms. Donatelle, have you ever once seen or
9  learned of a circumstance where somebody connected
10 with that office was pressured by Tim Cruz or
11 somebody connected with him to contribute or
12 participate in an election?
13   A. I have not.
14   Q. Mr. Bradley makes essentially two other
15 allegations other than that which relates to the
16 political contribution. Before I get to that,
17 did -- before I forget, did John Bradley ever
18 complain to you that he felt forced in any way to
19 contribute or participate in the election of Tim
20 Cruz?
21   A. No.
22   Q. There are two other allegations that
23 Mr. Bradley makes essentially, and that is that he
24 was fired for failing to contribute to political

Page 68

1  contributions or participate -- strike that.
2       In addition to Mr. Bradley's complaint
3  that he believes he was terminated for failing to
4  contribute or participate in the political process
5  on Tim Cruz's behalf, he also alleges that he was
6  fired because of his, being John Bradley's, position
7  on OUIs, DUIs as well as with respect to
8  confidential informants. Are you aware generally
9  that those are Mr. Bradley's allegations?
10   A. Yes.
11   Q. As you sit here today, are you aware of
12 any circumstance where anyone under Tim Cruz's
13 administration has been fired or in some way had
14 their position negatively impacted because they
15 disagreed with a policy of the office relative to
16 OUIs or confidential informants?
17   A. No.
18   Q. Are you aware, Ms. Donatelle, of any
19 circumstance in which anybody affiliated with the
20 office was terminated or forced out of the office
21 because he or she took a position substantively
22 adverse to Tim Cruz?
23   A. No.
24      MR. COHEN: I have no other