# Exhibit 6

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------x

JOHN BRADLEY,

    Plaintiff,

vs.    Civil Action No.:
    1:13-cv-12927-RGS
TIMOTHY J. CRUZ (Individually),
MICHAEL HORAN (Individually),
FRANK J. MIDDLETON (Individually),
And OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,

    Defendants.

------------------------------------x

    DEPOSITION OF TIMOTHY J. CRUZ, a witness called by counsel for the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Laurie J. Driggers, Certified Court Reporter, Registered Professional Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, Certified eDepoze Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at Sinsheimer & Associates, 92 State Street, Boston, Massachusetts, on Wednesday, March 25, 2015, commencing at 10:01 a.m.

Page 2

1    APPEARANCES
2
3    Robert S. Sinsheimer, Esquire
4    Wesley Stoker, Esquire
5    SINSHEIMER & ASSOCIATES
6    92 State Street, 9th Floor
7    Boston, Massachusetts 02108
8    617.722.9954
9    rsinsheimer@sinsheimerlaw.com
10    wstoker@sinsheimerlaw.com
11    COUNSEL FOR THE PLAINTIFF
12
13    Bret A. Cohen, Esquire
14    Caitie A. Hill, Esquire
15    MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO PC
16    One Financial Center
17    Boston, Massachusetts 02111
18    617.542.6000
19    bcohen@mintz.com
20    cahill@mintz.com
21    COUNSEL FOR THE DEFENDANTS
22
23    Also Present:
24    John Bradley

Page 3

INDEX

WITNESS: TIMOTHY J. CRUZ

| EXAMINATION | PAGE |
|---|---|
| (BY ATTORNEY SINSHEIMER) | 5 |

EXHIBITS

| NO. | | PAGE |
|---|---|---|
| Exhibit 1 | Sealed White Envelope | 21 |
| Exhibit 2 | Memorandum, January 30, 2012, PLYDA_0004931 to PLYDA_0004933 | 34 |
| Exhibit 3 | Correspondence, September 29, 2014 and Plaintiff's First Request for the Production of Documents to the Defendants Timothy J. Cruz, Michael Horan, Frank J. Middleton and the Office of the District Attorney for Plymouth County | 52 |
| Exhibit 4 | A-1, A-2 and A-3, PLYDA_0004886 to PLYDA_0004888 | 54 |
| Exhibit 5 | Personnel File, PLYDA_0000438 to PLYDA_0000537 | 62 |

Page 4

EXHIBITS
(continued)

| NO. | | PAGE |
|---|---|---|
| Exhibit 6 | E-mail, 11/17/2011 5:39:27 PM, PLYDA_0004122 | 151 |
| Exhibit 7 | Official Plymouth County District Attorney's Office Web Site, General Rules and Regulations, PLYDA_0004868 to PLYDA_0004869 | 216 |

(Original Exhibits 1 retained by Attorney Cohen and Original Exhibits 2 through 7 retained with the transcript.)

Page 97

1  A. Yes, not as a defense attorney.
2  Q. No. Let's back up, though, because I may --
3  may have misspoken. Wouldn't be the first time.
4      You tried a couple hundred jury trials as a
5  prosecutor?
6  A. Yes.
7  Q. Most of which were in the district court?
8  A. Most --
9  Q. Great job.
10 A. Most were a six-person jury, yes.
11 Q. Okay. And then a few, five or six in the
12 superior court?
13 A. Yes.
14 Q. No homicides?
15 A. Correct.
16 Q. Now, as a defense attorney, how many cases
17 did you try to juries?
18 A. I probably tried another, I don't know, I'm
19 guessing 20, 30 as a defense attorney.
20 Q. Any felonies?
21 A. Yes.
22 Q. Any -- any superior court felonies?
23 A. Yes.
24 Q. How many?

Page 98

1  A. I bet you at least ten or 12.
2  Q. Any homicides?
3  A. A manslaughter.
4  Q. Did -- was that a case that was indicted as a
5  first-degree murder --
6  A. No.
7  Q. -- and you got -- started off as a
8  manslaughter?
9  A. Started off as a manslaughter and I tried
10 that case actually with Mr. Bradley.
11 Q. Is that right?
12 A. (Deponent nods head.) Yup.
13 Q. How'd he do?
14 A. He did fine, but it was a not guilty.
15     MR. COHEN: Isn't that interesting.
16     MR. SINSHEIMER: It is. It is. It has
17 noth --
18     (Off the record at 11:47 a.m.)
19     (Discussion off the record.)
20     (Back on the record at 12:51 p.m.)
21     BY MR. SINSHEIMER:
22 Q. I think we were just finishing up some
23 background questions. Have you ever been terminated
24 from a job, Mr. Cruz?

Page 99

1  A. No.
2  Q. Do you have any criminal record?
3  A. No.
4  Q. Have you ever published anything?
5  A. I was a joint writer in one of those MCLE
6  booklets. I'm not sure if that counts, but my name's
7  on it.
8  Q. It counts. It counts.
9     What topic?
10 A. Domestic violence; 209As.
11 Q. Nothing about management of a district
12 attorney's office?
13 A. No.
14     (Reporter interruption.)
15     MR. SINSHEIMER: Oh, of a district
16 attorney's office.
17 A. No.
18 Q. So when you became a -- the district attorney
19 of Plymouth County, was John Bradley an assistant
20 district attorney?
21 A. No.
22 Q. And do you know where he was employed at that
23 time?
24 A. I believe he was at the U.S. Attorney's

Page 100

1  Office here in Boston.
2  Q. Do you know what else he was -- what he was
3  doing there?
4  A. I -- I don't know.
5  Q. From your recollection, how was it that he
6  came to become a Plymouth County district attorney?
7  Is that the district attorney?
8  A. I believe he had conversations with Mike
9  Horan.
10 Q. Mm-hmm.
11 A. Frank Middleton. I'm not sure if Bridget and
12 maybe Mike O'Connell.
13 Q. He had conversations with you?
14 A. No, I don't think so.
15 Q. You hired him without ever discussing it with
16 him?
17 A. I don't recall talking to him. I would've
18 relied on the other people.
19 Q. Did you -- well, you knew of him because
20 you'd tried cases --
21 A. Sure.
22 Q. -- against him?
23 A. I'd known him for a while.
24 Q. Right. You knew he was a good trial lawyer?

Page 101

1  A. I knew that he was a trial lawyer that I'd
2  tried cases against.
3  Q. You knew he was a good trial lawyer?
4  A. Yes.
5  Q. You knew that he had -- was asked by Mike
6  Sullivan to go into Boston and assist Mike in getting
7  that office off the ground?
8  A. I -- I don't know that, but I assumed that
9  because he went.
10 Q. He went together with Mike essentially?
11 A. I think so.
12 Q. Maybe not minute for minute, but when Mike
13 brought in a new administration, John went with him?
14 A. Yes.
15 Q. And you were aware of that?
16 A. Yes.
17 Q. And people talked about that down in Plymouth
18 County?
19 A. I -- maybe the lawyers.
20 Q. Well, you're a lawyer in Plymouth --
21 A. Yeah.
22 Q. -- County, right?
23    You go up to the courthouse and you sit in
24 that little room off the -- shoot the breeze, right?

Page 102

1  A. Sure.
2  Q. Back in those days before you were the -- the
3  head man?
4  A. Sure.
5  Q. Anybody else to your knowledge go from
6  Plymouth County directly to the United States
7  Attorney's office with Mike Sullivan?
8  A. Yes.
9  Q. Who?
10 A. Frank Gaziano.
11 Q. Right. And -- and Frank, John and Mike were
12 colleagues.
13 A. Yes.
14 Q. And Frank now, of course, is a superior court
15 judge?
16 A. Yes.
17 Q. Do you ever talk to Frank about this case?
18 A. No.
19 Q. You ever talk to Frank about any pending
20 case?
21 A. No.
22 Q. Do you know what opinion, if any, Mr. Gaziano
23 has of Mr. Bradley's trial skills?
24 A. No.

Page 103

1  Q. None -- none whatsoever?
2  A. No.
3  Q. Do you know what, if any, experience John
4  Bradley obtained while he was working as an assistant
5  United States Attorney?
6  A. No.
7  Q. Do you know why he left the United States
8  Attorney's office?
9  A. I thought it was two-fold.
10 Q. Go ahead.
11 A. I thought that he wasn't happy there and the
12 conversations he had with the other assistant DAs down
13 at my office.
14 Q. Which were?
15 A. O'Connell, Horan.
16 Q. Yeah. I know you gave me the names, but what
17 did he say?
18 A. Oh, I don't know what they said. I know they
19 had conversations.
20 Q. Did you know that he wanted to do homicide
21 cases when he came back?
22 A. I don't recall that.
23 Q. Who assigned -- gave him his first assignment
24 when he came back?

Page 104

1  A. I don't know.
2  Q. How long after you became the Plymouth County
3  district attorney was it before Mr. Bradley came back?
4  A. Close to a year and a half. Maybe a little
5  less, maybe.
6  Q. Now, you took over the -- the office knowing
7  that Mr. Sullivan had left during a term.
8  A. Yes.
9  Q. And you knew that there would be an election?
10 A. Yes.
11 Q. And did you know when you took the office
12 that you were planning to run for election?
13 A. Yes.
14 Q. And how did you know that?
15 A. I wouldn't have taken the job for a year to
16 shut down my law practice just to be DA for a year.
17 Q. So it was your intention upon taking the
18 office to hold the office politically?
19 A. Yes.
20 Q. And was that effectively communicated to the
21 staff?
22 A. I don't know.
23 Q. How long after you took the office did you
24 hold your first fundraiser?

Page 145

1   A. Yes.
2   Q. Okay. Tell me about it. What -- what's the
3   source of that hesitancy?
4   A. I still think that we're -- we're friends and
5   good friends, but I think our relationship has changed
6   over the years.
7   Q. And well, in what way?
8   A. I think with a lot of situations that we had
9   talked about earlier with the problems between the
10  three upper management people that I had, I think that
11  that created issues between he and I on a personal
12  level.
13  Q. Meaning what?
14  A. Meaning that we're not as good friends as we
15  used to be.
16  Q. You mean he's unhappy with you because of how
17  much power the Middletons have amassed in the office?
18  A. I don't know what that means for him. All I
19  can tell you is that --
20  Q. I'm gonna ask you --
21  A. -- unfortunate --
22  Q. -- know that --
23  A. -- unfortunately --
24  Q. So I'm asking you --

Page 146

1   MR. COHEN: He's answering for him.
2   THE DEPONENT: I'm --
3   MR. COHEN: That's what he's trying to
4   do, Rob. Right?
5   MR. SINSHEIMER: You are correct, sir.
6   MR. COHEN: Right.
7   MR. SINSHEIMER: You are correct. It's
8   mine -- go ahead. I didn't finish my --
9   A. Unfortunately, I just think our relationship
10  has changed over the years.
11  Q. Has Mike Horan ever personally told you that
12  he's unhappy with the fact that the Middletons have
13  amassed as -- as a team, too much power in the office?
14  A. He's never worded it that way.
15  Q. Fair enough.
16      You know what I'm talking about, though,
17  right?
18      MR. COHEN: Objection.
19  A. I -- I know that he's never worded it that
20  way.
21  Q. All right. You tell me what, if anything, he
22  has said in any way related to the notion that the
23  Middletons have amassed power in the office.
24  A. I -- I think he felt -- he felt that the --

Page 147

1   the Middletons were, for lack of a better word, taking
2   power from him.
3   Q. Taking power from him?
4   A. Yes.
5   Q. Did he ever tell you that they were taking
6   power from you?
7   A. No, not like that.
8   Q. Well, apart from those words, didn't he
9   address with you concerns that the Middletons had
10  created like a little fiefdom for themselves, that you
11  ought to watch your back?
12      MR. COHEN: Objection.
13  A. No, not like that.
14  Q. Well, apart from like that. That concept
15  that you are the chief executive and they are amassing
16  power that you might not be able to control, in very
17  general terms, that concept in any way, did that ever
18  come up between you --
19  A. No.
20  Q. -- and Horan?
21  A. I -- I -- a concept came up, but I believe
22  that nobody took power from me.
23  Q. Fair enough.
24      But you used the phrase a minute ago, a

Page 148

1   concept came up.
2       Tell me what concept you're talking about.
3   That's what I'm trying to find out, sir.
4   A. That he didn't like, in his mind, the
5   Middletons were allegedly gaining power.
6   Q. He told you that?
7   A. To that -- words to that effect.
8   Q. Were they there when he told you that?
9   A. No.
10  Q. He told you that -- who was there when he
11  told you that?
12  A. I don't know.
13  Q. How many times did he tell you that?
14  A. Not many over the years.
15  Q. Did he tell you that that was affecting your
16  relationship with Mr. Bradley?
17  A. Uh-uh.
18  Q. Did he tell you that that was --
19      MR. COHEN: You need to answer --
20  A. No. No.
21      I'm sorry. I had a drink of water.
22  Q. He told you that it was affecting his
23  relationship with Mr. Bradley, didn't he?
24  A. No.

Page 149

1  Q. So is it your testimony that your discussions
2  with Mr. Horan about the Middleton's power grab never
3  involved Mr. Bradley in any way, shape or form?
4  A. I don't agree regarding the phrase, power
5  grab. In my conversations with Horan, dealt with
6  Horan, not Bradley.
7  Q. So did you ever -- well, did you make the
8  decision to terminate Bradley all by yourself?
9  A. Yes.
10  Q. And when did you make that decision?
11  A. Pretty much the moment that I got the "I am
12  not your child" e-mail.
13  Q. Is that right?
14  A. Yup.
15  Q. Did you tell Mr. Bradley that?
16  A. No -- no.
17  Q. Did you tell anybody that?
18  A. Probably. I'm just not sure who I told.
19  Q. Well, think long and hard. Give me your best
20  present recollection of who you told --
21  A. I told Horan on or about the day that he
22  was -- he was let go.
23  Q. No. No. I'm telling -- I'm talking about at
24  the time -- your -- your testimony to me a minute ago

Page 150

1  was very clear that you made up your mind that you
2  were gonna terminate Mr. Bradley the day you got that
3  e-mail, correct?
4  A. I -- let me rephrase that.
5  Q. Well, that's not what --
6  A. Well.
7  Q. You can't rephrase what you said. I'll give
8  you another chance to answer the question. The
9  transcript's going to speak for itself.
10  You tell me when did you make up your mind to
11  terminate Mr. Bradley?
12  A. When he didn't resign as he said he would at
13  our meeting on or about November 21 of 2011.
14  Q. All right. We'll come to that meeting in a
15  minute.
16  You -- but I gather that what -- what you're
17  telling me is that the e-mail that you referred to
18  earlier -- and I think we both know -- let me pull it
19  out.
20  MR. SINSHEIMER: Do you got one right
21  there -- I have one from yesterday.
22  MR. STOKER: No, I don't have it.
23  MR. SINSHEIMER: I got a clean one.
24  MR. STOKER: Actually, I think it's in

Page 151

1  the personnel file.
2  MR. SINSHEIMER: That's all right.
3  We're talking about that document, right?
4  MR. COHEN: Let me take a look at it,
5  please.
6  MR. SINSHEIMER: That's my only one right
7  this second, Bret. Eight means it was yesterday's
8  marked Eight.
9  MR. COHEN: And just for the record, it's
10  a Bates stamped 4122. It's Plymouth County District
11  Attorney's Association's. It's got a a number
12  eight --
13  MR. SINSHEIMER: Yeah.
14  MR. COHEN: -- at the top, which I think
15  is --
16  MR. SINSHEIMER: I'm going to cover that
17  up unless you object with today's tag.
18  MR. COHEN: No, I think it should stay
19  because it reflects what it is legitimately, but --
20  MR. SINSHEIMER: Fair enough.
21  Put a tag on that please, whatever the next
22  tag is.
23  (Exhibit 6 marked for identification.)
24

Page 152

1  BY MR. SINSHEIMER:
2  Q. All right. So apart from the handwritten
3  eight which I'll represent that I put on yesterday as
4  a document recalling to me in a deposition.
5  The document that you were referring to, just
6  for the record, just to make the record known as
7  Exhibit 6, right?
8  A. (Deponent viewing exhibit.) Exhibit 6, yes.
9  Q. And you received that e-mail from Mr. Bradley
10  around on November 11th -- November 17th, 2011.
11  Sorry. Let's get -- I'll get something.
12  MR. COHEN: Could you repeat the question
13  back, please?
14  (Question read, as requested.)
15  A. (Deponent viewing exhibit.) Yes.
16  Q. Okay. And is it your testimony that -- that
17  you instantly made up your mind that he was gonna have
18  to leave the office one way or the other?
19  A. Yes.
20  MR. SINSHEIMER: Okay. And I think it's
21  a good point to take five --
22  MR. COHEN: Okay.
23  MR. SINSHEIMER: -- for the afternoon.
24  It's already --

Page 157

1  A. I can't guess. I don't know.
2  Q. All right. So you believe that Bridget
3  talked to Geline about the fact that the Globe was
4  interested in this question of whether or not some
5  judges were too lenient in OUI cases.
6  A. Yes.
7  Q. And do you know how it was that Bridget knew
8  she should talk to Geline?
9  A. We had ongoing conversations with the MDAA
10 over bills that we had tried to file over the last few
11 years regarding problems with the OUI law and some of
12 the changes that were necessary, which led to
13 different pieces of legislation that were eventually
14 argued. Some was passed, some was not, and I was
15 involved in it I believe in 2007 and in 2010 or 2011.
16 Q. One of those bills was to require that -- or
17 provide the Commonwealth with a right to insist on a
18 jury trial?
19 A. Yes.
20 Q. As is the case in federal court?
21 A. Yes.
22 Q. That passed?
23 A. No.
24 Q. And who sponsored that bill?

Page 158

1  A. I believe I talked to Representative Calter,
2  who was from Kingston, at the time.
3  Q. Was it your idea to -- to seek introduction
4  of that bill?
5  A. I think so. I think I was part and parcel of
6  that with -- within MDAA. I think they got involved
7  also.
8  Q. Who, if anyone, in your office had federal
9  trial experience?
10 A. At what point?
11 Q. At the time this bill was being considered.
12 A. I -- I don't know.
13 Q. Well, we know John Bradley went to the U.S.
14 Attorney's Office, right?
15 A. Yeah.
16 Q. And we know he prosecuted cases there for
17 about two years, give or take, right?
18 A. Yes.
19 Q. Do you know if anybody else in the Plymouth
20 County District Attorney's Office other than John
21 Bradley, had federal trial experience after the --
22 after John came back to the office?
23 A. I can't think of anybody.
24 Q. You didn't know that in the federal system

Page 159

1  the government could demand a jury trial 'til John
2  told you, right?
3       MR. COHEN: Objection.
4  A. John never told me.
5  Q. He never told you?
6  A. No.
7  Q. How did you know that?
8  A. Well, initially, there was another bill
9  regarding sexually -- sexually dangerous persons and
10 civil commitments that District Attorney Leone argued
11 for, giving the Commonwealth the right to a jury trial
12 in the civil STP cases.
13 Q. Yeah.
14 A. That successfully went through and in my
15 conversations with -- with him and also with MDAA, we
16 thought that that would be the way to -- the way to
17 go.
18 Q. For the --
19 A. For the --
20 Q. -- drunk driving cases --
21 A. Yes.
22 Q. -- OUI cases?
23 A. Yes.
24 Q. Well, did you discuss with John the issue of

Page 160

1  OUIs and -- and how -- how the media was interested in
2  the leniency of the trial -- some of the -- some of
3  the district court trial judges?
4  A. I brought John into the -- into the media --
5  into that -- in those discussions.
6  Q. So you brought him?
7  A. In, absolutely.
8  Q. But he's the one that had the stats, right?
9  A. He had statistics because of his position,
10 right.
11 Q. And why did you bring him in?
12 A. Because he had the statistics.
13 Q. And was there actually a meeting with you and
14 John and others?
15      MR. COHEN: Objection.
16 A. I don't think I -- I can't recall being in a
17 meeting with John. My initial meeting was with the
18 Globe and with Bridget.
19 Q. Just the two -- three of you?
20 A. There were -- no. There -- there were more
21 than that.
22 Q. You brought more than one Globe reporter?
23 A. Yes.
24 Q. Saltzman and who else?

Page 161

1   A. Saltzman and I believe Tom Farragher, and I
2   think there was one other. I could be wrong, but I
3   think -- there was either two or three.
4   Q. So this wasn't Saltzman on his own, this was
5   a full-blown Spotlight deal?
6   A. Yes.
7   Q. Did you have a policy at that time about
8   talking to the media?
9   A. Yes.
10  Q. What was your policy?
11  A. The policy is that the ADAs don't talk to the
12  media.
13  Q. Ever?
14  A. Unless they get permission.
15  Q. Did John have permission to talk to the Globe
16  about the drunk driving matter?
17  A. He did during his meeting that he had with
18  Bridget and with whoever else from the Globe was
19  there.
20  Q. Do you know if there's memos or e-mails in
21  our 6,000 pages from Mintz Levin in which Bridget is
22  actually urging him to talk to the media?
23      MR. COHEN: Objection.
24  A. Bridget and I had a conversation about

Page 162

1   getting John involved in this case on -- or getting --
2   not the case, but getting him involved in the story.
3   Q. Tell me about that conversation.
4   A. John had the numbers plus John was in charge
5   of district court so I thought he should be involved
6   in the conversation.
7   Q. Mm-hmm. Do you also know whether John was
8   encouraged to call back the Globe directly when
9   Bridget was out of town?
10  A. No, I don't know that.
11  Q. You had no idea that happened?
12  A. Didn't know that, no.
13  Q. If, in fact, that happened, is that a
14  surprise to you today?
15      MR. COHEN: Objection.
16  A. Well, I know he did it.
17  Q. I'm asking you whether you know Bridget
18  encouraged him to do it.
19  A. I don't know if she encouraged him to.
20  Q. And then you sent him the e-mail that
21  basically said, you know, no one talks to the press
22  but me?
23      MR. COHEN: Objection.
24  A. That's not what it says, no.

Page 163

1       MR. COHEN: That's -- a
2   mischaracterization of the e-mail.
3       BY MR. SINSHEIMER:
4   Q. Well, you told me a little while ago that you
5   had no idea what triggered --
6   A. Right.
7   Q. -- this statement from Mr. Bradley?
8   A. Correct.
9   Q. But of course you do.
10      He said in response to something you said to
11  him, right?
12      MR. COHEN: Objection.
13  A. I don't know what he said it to.
14  Q. You don't see right on this page that this
15  e-mail is responsive to an e-mail that he got only
16  four or five hours earlier?
17  A. It's --
18      MR. COHEN: Object -- let me -- give me
19  the chance to object, okay?
20      THE DEPONENT: Sorry.
21      MR. COHEN: Objection.
22      Go ahead.
23  A. It's -- it's responding to my response to his
24  response -- it's responding to my response to his

Page 164

1   initial e-mail.
2   Q. All right. So there's an e-mail from him?
3   A. Yes.
4   Q. There's an e-mail from you back?
5   A. Yes.
6   Q. There's an e-mail back from him that you
7   don't like?
8   A. Yes.
9   Q. And I think the word for that is argument,
10  right?
11      MR. COHEN: Objection.
12  A. No.
13  Q. You're having an argument, you're having a
14  debate with your employee?
15  A. I disagree.
16  Q. Okay. And what's the basis of your
17  disagreement?
18  A. I don't think it's an argument when you tell
19  your boss that.
20  Q. When you tell your boss what, that I'm not a
21  child, to treat me with more respect?
22  A. Yes.
23  Q. That's what he said, right?
24  A. I know exactly what he said.

Page 165

1  Q. All right. And does it make you angry still
2  today?
3  A. It doesn't make me angry.
4  Q. I'm just -- I'm reacting to your tone right
5  here in this room.
6      MR. COHEN: I think that you
7  mischaracterized his tone entirely for the record.
8      MR. SINSHEIMER: That's fair. Maybe I'm
9  missing something. It was a question. Does it make
10 him angry, he answered it.
11     MR. COHEN: Fair enough.
12     BY MR. SINSHEIMER:
13 Q. And -- but you didn't say to him what you've
14 told us, which is John, you're fired.
15 A. No.
16 Q. You didn't even put it in writing?
17 A. No.
18 Q. You didn't tell anybody else?
19     MR. COHEN: Objection.
20 A. I -- on that -- at that day, no.
21 Q. And who was the first person you told that I
22 got this e-mail from Bradley and I'm gonna make him
23 leave?
24 A. I probably showed it to my wife.

Page 166

1  Q. Your wife?
2  A. Yeah.
3  Q. What's her name?
4  A. Rose Marie.
5  Q. What' her last name?
6  A Cruz.
7  Q. Is she a lawyer?
8  A. No.
9  Q. What does she do for a living?
10 A. She's a registered nurse at Children's
11 Hospital.
12 Q. Children's?
13 A. Yes.
14 Q. And she said, hey, you gotta fire him?
15     MR. COHEN: Objection.
16 So wait a second, so now we're gonna ask Tim
17 Cruz what conversations he had with his wife --
18     MR. SINSHEIMER: Well --
19     MR. COHEN: -- or --
20     MR. SINSHEIMER: -- no.
21     MR. COHEN: Okay.
22     MR. SINSHEIMER: He brought it up.
23     MR. COHEN: You asked him -- you asked
24 him who the first person was he's told -- he told

Page 167

1  you --
2      MR. SINSHEIMER: You're asserting --
3      MR. COHEN: He told you it was his wife.
4      MR. SINSHEIMER: -- the disqualification
5  of Massachusetts Law?
6      MR. COHEN: I don't know. I'd have to
7  talk to my client as to whether or not he'd want to
8  waive that privilege.
9      MR. SINSHEIMER: I don't care. I'll move
10 on.
11     BY MR. SINSHEIMER:
12 Q. Who else, other than your wife did you tell?
13 A. At the outset, no one.
14 Q. Who's the first -- my question was, which
15 triggered your intriguing answer, was who was the
16 first person you told. But I'm gonna change the
17 question in light of your counsel's objection to who
18 else other than your wife did you tell?
19 A. At what point?
20 Q. I'm looking for the next -- your testimony,
21 if I understand it, is that at the moment you got
22 that, that was it for John Bradley, right?
23 A. I -- the moment I -- I received --
24 Q. That's what you told us?

Page 168

1  A. The moment I received that e-mail, I knew he
2  could no longer work in the office with that level of
3  disrespect for me and for the office.
4  Q. Okay. And the question -- and the first
5  person you told is, yes or no, was your wife?
6  A. Yes.
7  Q. Who's the next person you told?
8  A. I don't remember.
9  Q. Who's the one after that?
10 A. I think it was my conversation with John
11 Bradley.
12 Q. Okay. Tell me about that conversation.
13 A. On the day in question, which I believe was
14 November 21, when I came back, I was away, I saw him
15 walking in front of my office, told him I wanted to
16 talk to him. He continued to walk down to his office
17 and got his Starbucks coffee that he must have had on
18 his desk. Came back to my office, came in. We closed
19 the doors and we sat down.
20 Q. Mm-hmm. Tell me the entire conversation.
21 Everything you said to him and everything he said to
22 you.
23 A. The first thing I said to him was is, you're
24 obviously not happy here so why are you here? And at

Page 169

1  that point, he did not disagree with me. He sat there
2  looking at me very unapologetic for sending that
3  e-mail and we had a further conversation regarding
4  that his time in the office was over.
5     Q. Tell me about it, word-for-word, everything
6  you can remember. And if you can't remember the exact
7  words, your best present recollection --
8     A. Yeah.
9     Q. -- will do.
10    A. That his time in the office was -- he was
11 done in the office and he agreed with that. He knew
12 that his time in the office was over. He spoke at
13 some point that he wanted to talk about the Middletons
14 and I said there was no need to get into that at this
15 point. He agreed with that. I told him how
16 disappointed I was that I believed that -- I -- I take
17 terminating somebody very seriously, especially
18 somebody who is married and has a child and how
19 disappointed that I was -- because I felt that we were
20 friends.
21    He at that point told me that we were never
22 friends. We were friendly and we continued to have
23 the conversation and he said to me he wanted to keep
24 two -- his two remaining cases that he had left and he

Page 170

1  wanted to try them. And I asked him, what -- what
2  cases and when are they?
3     He told me that they were two different
4  homicide cases. The first homicide case was, I think,
5  the Caswell case which was scheduled for trial
6  probably in two to three weeks from when we were
7  talking. And he then told me that the second --
8     Q. Just -- interrupt.
9     So by -- by -- to make life easy, it would've
10 been crazy to transfer that case?
11    A. Yeah.
12       MR. COHEN: Objection.
13       BY MR. SINSHEIMER:
14    Q. Forget the word crazy. I'm just trying -- so
15 keep going.
16    A. And that there was the other case --
17    Q. Let me -- excuse me.
18    Did the Caswell case go off on time?
19    A. Yes.
20    Q. So just to -- parenthetically, two or three
21 weeks after this was over he tried a case and
22 prevailed?
23    A. Yes.
24    Q. Okay. Keep going. Sorry.

Page 171

1     A. And then he said that his other case, it was
2  a double homicide case which had been around for years
3  that was gonna be tried in February, it was Snow and
4  Winquist.
5     And once again, because I knew the age of
6  that case, I knew that he had a relationship with the
7  victims in those cases and I didn't think it was gonna
8  be fair to the victims to -- to move him off that case
9  at that point, I said you can stay and try those
10 cases, but when those are over, it's over. You're
11 done here.
12    Q. Mm-hmm.
13    A. He said okay. We never spoke about
14 retirement. We never spoke about pensions or anything
15 such as that. Last thing I said to him was -- well,
16 one of the last things I said to him was, now that
17 you're leaving, you're going to be leaving in
18 February, so therefore I'm going to need a new
19 district court prosecutor.
20    I'm not going to move you out of there right
21 now. It's the middle -- middle of November. I'm
22 gonna put a new district court -- chief district court
23 prosecutor in January because you're leaving in
24 February. And I would ask for your help to help that

Page 172

1  person transition to go from you to them. He agreed
2  that he would.
3     At that point, we -- he got up and I said, if
4  you have -- you want to come back and talk to me, feel
5  free any time. Come back and talk to me in the next
6  week. He got up and said okay and left.
7     Q. And you say there's not a word about
8  retirement?
9     A. Not a word.
10    Q. Did you know he was married at that time?
11    A. Yeah.
12    Q. Did you know he had a child at that time?
13    A. I did.
14    Q. Did you know he had 19 years there?
15    A. I didn't know that.
16    Q. Well, did you know he had a long time in?
17    A. Yes.
18    Q. And how long have you been an employee of the
19 Commonwealth of Massachusetts?
20    A. Seventeen and a half altogether.
21    Q. How many employees at the Commonwealth of
22 Massachusetts have you met over the years?
23    A. How many employees?
24    Q. Yeah.

Page 173

1    MR. COHEN: Objection.
2    A. Hundreds.
3    Q. Have you ever met one that isn't acutely
4    aware of what their retirement date is?
5    MR. COHEN: Objection.
6    A. Good point, but we never talked about
7    retirement.
8    Q. Have you ever met a single employee of the
9    Commonwealth of Massachusetts that is not acutely
10   aware of what their retirement age is?
11   MR. COHEN: Objection.
12   BY MR. SINSHEIMER:
13   Q. Would you agree with me that it is part of
14   the culture of state employees in the Commonwealth of
15   Massachusetts and has been as long as you've been an
16   employee, to be acutely aware of when your 20 years is
17   in?
18   MR. COHEN: Objection.
19   A. I'm sure he was acutely aware of when his 20
20   years was.
21   Q. What do you base that on?
22   A. Based upon what you just said.
23   Q. Because your testimony is you didn't talk to
24   him about it?

Page 174

1    A. Absolutely not.
2    Q. But -- but you -- but you know that I'm
3    right?
4    A. You're right about what?
5    Q. Everybody who's ever been employed by the
6    Commonwealth of Massachusetts is counting to the --
7    counting the days like a prisoner for their -- that's
8    a rhetorical, you can take that back, you said based
9    on what I just said.
10       You understand, all kidding aside, I gotta
11   rephrase it.
12       It is a cultural matter of common knowledge,
13   employees of the Commonwealth of Massachusetts almost
14   to the person, are acutely aware of their retirement
15   age.
16   MR. COHEN: Objection.
17       Go ahead.
18   A. I don't know that.
19   Q. You just told me that was what it was based
20   on, that -- you're -- you're not --
21   A. Based on your question?
22   Q. Yeah. You don't know that?
23   A. The -- no.
24   Q. Tell me what you -- what's your understanding

Page 175

1    of how employees view their retirement throughout the
2    Commonwealth of Massachusetts.
3    MR. COHEN: Objection.
4    A. I think if you speak to any 25-year-old
5    assistant DA in any court, they'll tell you the same
6    thing, they're not thinking about retirement.
7    Q. Lifers. How about lifers?
8    MR. COHEN: Objection.
9    A. I believe, as you get older, you probably
10   become more aware of it, or -- not older, but stay in
11   the system longer.
12   Q. Now, at any time in the -- it was roughly
13   nine months later that John actually was asked to
14   leave the office, correct?
15   A. Nine or ten.
16   Q. Okay. A substantial segment of a year?
17   A. Right.
18   Q. And he did try the Winquist case?
19   A. Yes.
20   Q. Snow committed suicide --
21   A. Yes.
22   Q. -- along the way.
23       Did -- in that intervening time, did you ever
24   personally talk to him at all about the fact that he

Page 176

1    was leaving?
2    A. I don't believe so.
3    Q. Did you ever personally solicit from him any
4    question about his plans?
5    A. No.
6    Q. Did you ever talk to another district
7    attorney about whether or not there would be a place
8    for him?
9    A. Yes.
10   Q. Who?
11   A. Joe Early.
12   Q. When did you talk to Joe Early?
13   A. Probably August or September.
14   Q. Of?
15   A. 2012.
16   Q. So if I am understanding you correctly,
17   roughly three months before Bradley was actually told
18   he was gonna leave?
19   A. No. Bradley left in September so it was --
20   it was either August -- August or September.
21   Q. Roughly a month?
22   A. Yeah.
23   Q. Give or take?
24   A. Yeah.

Page 177

1  Q. Where was that conversation?
2  A. With Early?
3  Q. Yeah.
4  A. I think it was at MDAA headquarters.
5  Q. Face-to-face?
6  A. I think so.
7  Q. Well, as opposed to the phone, I mean?
8  A. Yeah. I think it was face-to-face.
9  Q. All right. Tell me about it, everything you
10 said to him and everything he said to you.
11 A. I told him that I had a guy, that, you know,
12 if he could -- if he could look to him I'd appreciate
13 it and see if you have a spot for him.
14 Q. Did you tell him why you were trying to place
15 him?
16 A. I told him that -- that we had been friends
17 for a long time and that we'd had a falling out and it
18 would be better off for him to be somewhere else.
19 Q. And so your -- you told Joe Early that John
20 Bradley would be better off somewhere else?
21 A. Yeah.
22 Q. And -- I'm trying to picture this now. Are
23 you and Early in a room?
24 A. I thought we were out in the corridor of the

Page 178

1  MDAA. We have a monthly meeting and I think -- I
2  thought we were outside --
3  Q. Yeah.
4  A. -- in the corridor.
5  Q. And was anybody with Joe?
6  A. I don't think so.
7  Q. Was anybody with you?
8  A. No.
9  Q. And how was it -- were you just passing in
10 the hall? I mean --
11 A. We -- we -- I think we had a break and I saw
12 him in the hall and I grabbed him.
13 Q. So you grabbed him specifically to talk about
14 John Bradley?
15 A. Yeah.
16 Q. And is he the first of the nine other DAs
17 that you grabbed for that purpose?
18     MR. COHEN: Objection.
19 A. I didn't grab nine other DAs.
20 Q. Well, you beat me to it. I was gonna ask you
21 is he the only, but I don't know, I asked that.
22     So -- so -- so the only DA you talked about
23 with -- about Bradley with in terms of placing him for
24 a future career was Early?

Page 179

1  A. No.
2  Q. Who else?
3  A. Dan Connolly called me.
4  Q. When?
5  A. After he left the office.
6  Q. After John was already gone?
7  A. Yeah. Yeah. A week or two.
8  Q. Yeah. No. I got it.
9     After -- between the time that -- that you
10 say you and John agreed he was gonna leave and the
11 time that John actually left, the only DA you talked
12 to, one on one, was Early?
13     MR. COHEN: Objection.
14     Go ahead.
15     BY MR. SINSHEIMER:
16 Q. If I asked a crappy question, let me just fix
17 it.
18     So John leaves -- you have this conversation
19 November 21st?
20 A. On -- if that's a --
21 Q. Give or take.
22 A. I'm not sure of the date.
23 Q. November 2011?
24 A. Yes.

Page 180

1  Q. He leaves September 2012?
2  A. Yes.
3  Q. Somewhere in between there you talked to
4  Early?
5  A. Yes.
6  Q. Early's the only district attorney who
7  actually has the title of district attorney, that you
8  talked to about John Bradley, prior to John Bradley
9  leaving after November 21st, 2011?
10 A. I think so.
11 Q. Okay. And you started to tell me the
12 conversation.
13     You were in a hall at the MDAA meeting?
14 A. Yeah.
15 Q. You sought out Early?
16 A. Right.
17 Q. Right? And you said to him, you know, I got
18 this guy, he'd be better off somewhere else or words
19 to that effect?
20 A. I -- I think I said to him I -- we -- we'd
21 both be better off left --
22 Q. We'd both be better --
23 A. -- because we had a falling out and that he'd
24 be -- it's time for him to go somewhere else and --