# Exhibit 7

Page 1

Volume 1
Pages: 1-165
Exhibits: 19-22
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - x
JOHN BRADLEY,
    Plaintiff
  vs.    Cause No.
      1:13-cv-12927-RGS

TIMOTHY J. CRUZ, Individually,
MICHAEL HORAN, Individually,
FRANK J. MIDDLETON, Individually,
and OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,
    Defendants.
- - - - - - - - - - - - - x

DEPOSITION

of

MICHAEL J. HORAN

Sinsheimer & Associates
92 State Street, 9th Floor
Boston, Massachusetts 02109

Thursday, September 24, 2015
10:14 a.m.

---

Page 3

```
 1            INDEX
 2  WITNESS              PAGE
 3  Michael J. Horan
 4  By Mr. Sinsheimer        5
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 2

```
 1  APPEARANCES:
 2  On behalf of the Plaintiff:
 3  SINSHEIMER & ASSOCIATES
    By: Robert S. Sinsheimer, Esquire
 4  92 State Street, 9th Floor
    Boston, Massachusetts 02109
 5  (617) 722-9954
    rsinsheimer@sinsheimer.com
 6
    On behalf of the Defendant:
 7
    MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO,
 8  P.C.
    By: Bret A. Cohen, Esquire
 9  One Financial Center
    Boston, Massachusetts 02111
10  (617) 348-3089
    bcohen@mintz.com
11
    ALSO PRESENT:
12  John Bradley
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1           EXHIBITS
 2  No.                    Page
 3  Exhibit 19  E-mail            29
 4  Exhibit 20  SEC Filing        47
 5  Exhibit 21  Affidavit of Michael
                O'Connell         128
 6
    Exhibit 22  Answers to Interrogatories 157
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1     didn't go through it every year but I
2     would say we did it every two years where
3     supervisors would -- there was an
4     evaluation form that they used.  It wasn't
5     necessarily uniform.  I think a lot of
6     times each department head had their own
7     form, but the goal was to see where a
8     particular employee was at that point and
9     if they were performing well.  And we
10    would, we would, you know, review those
11    things and take appropriate actions if
12    they were needed.
13  Q.  You would agree with me that the District
14    Attorney's office very often attract young
15    people that are looking to improve their
16    skills.  Correct?
17  A.  I would agree with that.
18  Q.  And then one of the reasons they will take
19    the job is to get some early trial
20    experience?
21  A.  Yes.
22  Q.  How do you determine the difference
23    between someone who still has a lot to
24    learn and someone whose performance is

1     substandard?
2  A.  I did not do that so I can't answer that
3    question.
4  Q.  How did the office do it, if you know?
5  A.  We relied on people like Mr. Bradley, Mr.
6    Middleton, Mr. O'Connell before
7    Mr. Bradley was the District Court
8    supervisor, to make those judgments for
9    us.
10  Q.  Prior to Mr. Bradley's termination, was
11    there any senior level person terminated
12    while you were there?
13  A.  I don't believe so.
14  Q.  So the information you gave me earlier
15    tended to be younger people that were
16    coming up through the ranks and couldn't
17    cut it, for lack of a better phrase, for
18    the most part?
19  A.  No, I wouldn't say that. I don't think we
20    have terminated very many attorneys
21    anyway.
22  Q.  You are the person that actually walked
23    into the office and terminated
24    Mr. Bradley, correct?

1  A.  He walked into my office.
2  Q.  All right. Sorry. Tell me the events of
3    that day, please.
4  A.  The events of that day were that to the
5    best of my recollection Mr. Cruz and I
6    talked in the afternoon.  It was
7    determined with my acquiescence that I was
8    going to deliver the news to Mr. Bradley.
9    I called him on the phone at about four
10    o'clock and asked him to come up to my
11    office, and he did.
12  Q.  Please continue.
13  A.  I had agreed to deliver the news to
14    Mr. Bradley because he had been a friend
15    of mine for almost 20 years, I knew he
16    hated Frank Middleton, and I knew he hated
17    Tim Cruz, and I thought with his career
18    and his commitment to being a trial
19    attorney and our friendship that it was
20    best that he hear that news from me.  I
21    thought he deserved that dignity that day.
22  Q.  Keep going.
23  A.  So Mr. Bradley came in my office. I told
24    him that I had bad news for him, and I

1     told him that I had volunteered to deliver
2    it.  I thought that he would know what that
3    meant. I feel that he probably didn't. I
4    told him that that day was his last day in
5    the office, that I would still accept a
6    resignation from him because I thought
7    that would be better for his career going
8    forward. He told me that he was absolutely
9    not going to resign.  I told him that Mr.
10    Cruz had arranged for a similar position
11    for him in Worcester County.  He told me
12    that he was totally uninterested in that
13    position and he told me to instruct Mr.
14    Cruz to not contact any other district
15    attorneys' offices on his behalf.  He told
16    me he would be suing Mr. Cruz.
17        I told him, you know, he would
18    have to get his property out of his office
19    and I told him that the best way to do
20    that would be to contact Janet Sweeney,
21    who handled those types of personnel
22    issues in offices.  He asked, he said to
23    me I expect to be able to say goodbye to
24    my friends here, and I said of course you

Page 57

1    didn't go through it every year but I
2    would say we did it every two years where
3    supervisors would -- there was an
4    evaluation form that they used. It wasn't
5    necessarily uniform. I think a lot of
6    times each department head had their own
7    form, but the goal was to see where a
8    particular employee was at that point and
9    if they were performing well. And we
10   would, we would, you know, review those
11   things and take appropriate actions if
12   they were needed.
13   Q.  You would agree with me that the District
14       Attorney's office very often attract young
15       people that are looking to improve their
16       skills. Correct?
17   A.  I would agree with that.
18   Q.  And then one of the reasons they will take
19       the job is to get some early trial
20       experience?
21   A.  Yes.
22   Q.  How do you determine the difference
23       between someone who still has a lot to
24       learn and someone whose performance is

Page 58

1    substandard?
2    A.  I did not do that so I can't answer that
3        question.
4    Q.  How did the office do it, if you know?
5    A.  We relied on people like Mr. Bradley, Mr.
6        Middleton, Mr. O'Connell before
7        Mr. Bradley was the District Court
8        supervisor, to make those judgments for
9        us.
10   Q.  Prior to Mr. Bradley's termination, was
11       there any senior level person terminated
12       while you were there?
13   A.  I don't believe so.
14   Q.  So the information you gave me earlier
15       tended to be younger people that were
16       coming up through the ranks and couldn't
17       cut it, for lack of a better phrase, for
18       the most part?
19   A.  No, I wouldn't say that. I don't think we
20       have terminated very many attorneys
21       anyway.
22   Q.  You are the person that actually walked
23       into the office and terminated
24       Mr. Bradley, correct?

Page 59

1    A.  He walked into my office.
2    Q.  All right. Sorry. Tell me the events of
3        that day, please.
4    A.  The events of that day were that to the
5        best of my recollection Mr. Cruz and I
6        talked in the afternoon. It was
7        determined with my acquiescence that I was
8        going to deliver the news to Mr. Bradley.
9        I called him on the phone at about four
10       o'clock and asked him to come up to my
11       office, and he did.
12   Q.  Please continue.
13   A.  I had agreed to deliver the news to
14       Mr. Bradley because he had been a friend
15       of mine for almost 20 years, I knew he
16       hated Frank Middleton, and I knew he hated
17       Tim Cruz, and I thought with his career
18       and his commitment to being a trial
19       attorney and our friendship that it was
20       best that he hear that news from me. I
21       thought he deserved that dignity that day.
22   Q.  Keep going.
23   A.  So Mr. Bradley came in my office. I told
24       him that I had bad news for him, and I

Page 60

1    told him that I had volunteered to deliver
2    it. I thought that he would know what that
3    meant. I feel that he probably didn't. I
4    told him that that day was his last day in
5    the office, that I would still accept a
6    resignation from him because I thought
7    that would be better for his career going
8    forward. He told me that he was absolutely
9    not going to resign. I told him that Mr.
10   Cruz had arranged for a similar position
11   for him in Worcester County. He told me
12   that he was totally uninterested in that
13   position and he told me to instruct Mr.
14   Cruz to not contact any other district
15   attorneys' offices on his behalf. He told
16   me he would be suing Mr. Cruz.
17       I told him, you know, he would
18   have to get his property out of his office
19   and I told him that the best way to do
20   that would be to contact Janet Sweeney,
21   who handled those types of personnel
22   issues in offices. He asked, he said to
23   me I expect to be able to say goodbye to
24   my friends here, and I said of course you

Page 61

1    could say goodbye to your friends.  And I
2    believe he did that that afternoon, at
3    least to whoever else was there.  And he
4    told me that he wanted me to make sure
5    that his goal in life was going to be to
6    destroy Tim Cruz's career and then he
7    left, and then he left my office.
8  Q.  Now, you said that you talked to Mr. Cruz
9      prior to that meeting?
10 A.  Right.
11 Q.  Tell me about that conversation,
12     everything that each of you said to the
13     other.
14 A.  I don't recall it.
15 Q.  Where was it?
16 A.  It was in Mr. Cruz's office.
17 Q.  I think you just told me a minute ago,
18     Mr. Bradley was a friend of yours?
19 A.  That is right.
20 Q.  And in this conversation you are being
21     told you are going to terminate your
22     friend?
23 A.  Right.
24 Q.  And you volunteered to do that?

Page 62

1  A.  That is correct.
2  Q.  You don't remember anything else?
3  A.  I don't remember what was said that day.  I
4      can tell you that over some short period
5      of time I had already told Mr. Cruz I
6      absolutely would not do it because of what
7      you just said, because he was my friend.  I
8      wasn't happy he was leaving the office for
9      a variety of reasons.  But it is obviously
10     a far more difficult day for the guy who
11     gets that kind of news, but it was not an
12     easy day for me.  So I don't have a
13     specific recollection of my conversation
14     with Mr. Cruz that day.
15 Q.  You said a minute ago that for a short
16     period of time you had been discussing
17     this with Mr. Cruz.
18 A.  Yes.
19 Q.  And that you apparently had said you
20     didn't want to do it?
21 A.  That is right.
22 Q.  When did he first approach you and tell
23     you that you wanted you to do it?
24 A.  I don't remember.

Page 63

1  Q.  I am going to pick on your word, your own
2      word, you can take it back if you want.
3      Short, at what length a period of time
4      were these discussions taking place?  Let
5      me withdraw that.  Over what period of time
6      did these discussions take place?
7  A.  To the best of my recollection, they took
8      place during and after the period of time
9      that Mr. Bradley tried his last case.
10 Q.  So Mr. Bradley tried a case and received a
11     good verdict?
12 A.  I believe so.
13 Q.  And then there were some discussions among
14     you and Mr. Cruz?
15 A.  To the best of my recollection, whatever
16     discussions Mr. Cruz and I had occurred
17     either during and/or after he finished his
18     trial.
19 Q.  If I suggest to you that that was -- well,
20     not during, but the trial finished two or
21     three days before he was asked to leave,
22     would that be consistent with your memory?
23 A.  Yes.
24 Q.  I understand you said earlier you can't

Page 64

1      remember, but do me a favor -- strike
2      that.  Please state for the record every
3      single thing you can remember about your
4      interactions with Mr. Cruz concerning
5      Mr. Bradley in the period between the
6      termination of Mr. Bradley's last trial
7      and the actual conversation you described
8      a moment ago.
9  A.  The only thing I recall is that those
10     discussions centered around who was going
11     to give Mr. Bradley the news.
12 Q.  Had Mr. Cruz made it clear that he wasn't
13     going to?
14 A.  I don't recall that, no.
15 Q.  But why was there a debate over who was
16     going to give him the news, or discussion.
17     I will withdraw the word "debate".
18         Why was there discussion about
19     who was going to give him the news?
20 A.  I think he preferred that I do it.
21 Q.  Mr. Cruz did?
22 A.  Yes.
23 Q.  Would you agree with me that over the
24     entire 14-year period of his District

Page 65

1    Attorney's tenure, that Mr. Cruz doesn't
2    like to take any kind of controversial
3    action?
4            MR. COHEN: Objection.
5            MR. SINSHEIMER: Withdrawn in
6    that form.
7    A. I would say --
8            MR. COHEN: Objection. He
9    withdrew the question.
10           THE WITNESS: Oh, okay.
11   Q. Mr. Cruz doesn't like to get his hands
12   dirty?
13           MR. COHEN: Objection.
14   A. I wouldn't put it that way.
15   Q. How would you put it?
16           MR. COHEN: Objection. Go ahead.
17   A. I think Mr. Cruz is conflict diverse. He
18   does not want to engage in situations that
19   are uncomfortable or he has to give
20   somebody bad news or are just difficult.
21           MR. SINSHEIMER: This is a good
22   place to take a five-minute break, Bret.
23           MR. COHEN: Sounds great.
24           (Brief recess.)

Page 66

1            MR. SINSHEIMER: Back on the
2    record, please. Would you read back the
3    last question, please.
4            (Question read back as requested.)
5            MR. SINSHEIMER: Thank you.
6    Q. (By Mr. Sinsheimer) We had talked earlier
7    about the conversation you had with
8    Mr. Bradley on his last day. Do you
9    recall that?
10   A. I do.
11   Q. Is there anything else at all about that
12   conversation you can recall that hasn't
13   been put on the record?
14   A. About the conversation, no.
15   Q. About the events?
16   A. His reaction surprised me somewhat.
17           MR. COHEN: So just so the record
18   is clear, when you say his reaction, you
19   mean --
20           THE WITNESS: Mr. Bradley's
21   reaction. I am sorry.
22           MR. COHEN: Okay.
23   Q. So with respect to your state of mind, you
24   are telling me you described this reaction

Page 67

1    before, correct?
2    A. I am sorry.
3    Q. You had already described his reaction in
4    full, meaning his verbal reaction?
5    A. Yes.
6    Q. All right. What else about his reaction
7    other than what he said was significant?
8    A. He -- he seemed somewhat surprised.
9    Q. Okay. And you say that surprised you?
10   A. I couldn't imagine how he could be
11   surprised.
12   Q. And why was that?
13   A. Well, because of the "I am not your child"
14   e-mail, because of the conversation that
15   he had with the District Attorney where
16   they talked about Mr. Bradley finishing
17   his two trials and hitting the road
18   because he didn't like how the office was
19   running. There was another e-mail that
20   Mr. Bradley sent to Kendra Salvatore, Mr.
21   Cruz's executive assistant, wherein after
22   the first of those two trials Mr. Bradley
23   sent to her an e-mail that said something
24   to the effect that don't, don't worry

Page 68

1    about the DA getting tired coming down the
2    hall, I have already slapped my own back
3    for that win.
4            When you do that kind of stuff,
5    you can't be too surprised that it didn't
6    come out good for you.
7    Q. All right. So just to make the record,
8    the e-mail that you are referring to about
9    the congratulatory pat on the back so to
10   speak, that is Exhibit 15, or at least the
11   precise one is the first of that string?
12   A. Yes.
13   Q. And there are two or three more in that
14   string on that page?
15   A. That is correct.
16   Q. And this was sent in January of 2012?
17           (Witness perusing document.)
18   A. Yes.
19   Q. Immediately following a victory of a
20   substantially important murder case?
21   A. That, I don't know.
22   Q. Is there anything else you can recall
23   about the meeting?
24   A. No.

Page 69

1  Q.  You testified that you told Mr. Bradley
2      that essentially, and I am paraphrasing
3      just to change the topic here, that
4      essentially there was a job lined up for
5      him in Worcester.
6          Do you recall that testimony?
7  A.  I do.
8  Q.  Where did you get that information?
9  A.  Mr. Cruz.
10 Q.  Well, I had asked you earlier if you could
11     remember what Mr. Cruz told you and you
12     didn't bring that up. Is there anything
13     about that that you now remember?
14 A.  About that job opportunity?
15 Q.  Yes.
16 A.  Just in general terms, that Mr. Cruz had
17     spoken to Mr. Early and he was confident
18     that he could get Mr. Bradley a job out
19     there.
20 Q.  Had you spoken to Mr. Early?
21 A.  No.
22 Q.  What is the exact language you used in
23     describing that possibility to
24     Mr. Bradley?

Page 70

1  A.  It is exactly as I said before.
2  Q.  Word for word?
3  A.  Yes.
4  Q.  When did Mr. Cruz tell you that he had
5      spoken to Mr. Early?
6  A.  I don't recall.
7  Q.  Why did Mr. Cruz speak to Mr. Early?
8          MR. COHEN: Objection. Go ahead.
9  A.  I believe Mr. Cruz spoke to Mr. Early
10     because he didn't want Mr. Bradley to have
11     no job.
12 Q.  So you believe he voluntarily reached out
13     to Mr. Early?
14 A.  Yes.
15 Q.  Knowing he was going to terminate Mr.
16     Cruz?
17 A.  I believe so.
18 Q.  And do you have any idea when that was?
19 A.  I don't.
20         COURT REPORTER:  Your question
21     was --
22         MR. SINSHEIMER:  I just caught
23     that.  Thank you.
24 Q.  Mr. Cruz reached out to Mr. Early knowing

Page 71

1      he was going to terminate Mr. Bradley,
2      right?
3  A.  Yes.
4  Q.  And you have no idea when that happened?
5  A.  No, I don't.
6  Q.  Did you put any conditions on -- in other
7      words, when you were describing with
8      Mr. Bradley the possibility of him getting
9      employment elsewhere, did you make,
10     express that there would be any
11     conditions?
12 A.  No.
13 Q.  None whatsoever?
14 A.  No.
15 Q.  Is there anything else about the day of
16     his termination that you recall?
17 A.  No.
18 Q.  Nothing whatsoever?
19 A.  Nope.
20 Q.  Did you attend the 2014 prosecutor's
21     conference?
22 A.  I did not.
23 Q.  Understanding it might be hearsay but just
24     to put things in perspective, you

Page 72

1      understand it was a conference at which it
2      was alleged that Mr. Middleton may have
3      engaged in some misconduct?
4  A.  Yes.
5  Q.  I just want to make sure we are talking
6      about the same conference.  Your testimony
7      is you weren't even there?
8  A.  I was not there.
9  Q.  Do you know which conference I am talking
10     about?
11 A.  I do.
12 Q.  Were you involved in any way in the
13     investigation into the allegations that
14     Mr. Middleton may have engaged in some
15     misconduct?
16 A.  No.
17 Q.  Apart from my use of the word "involved",
18     were you monitoring or familiar with the
19     process of investigation?
20 A.  No, I was not.
21         MR. COHEN:  Objection. Go ahead.
22 Q.  You told me you read Mr. Cruz's deposition
23     transcript?
24 A.  Yes.

Page 109

1    means.
2 Q.   But I think you're telling me that in fact
3      there were quite a number of people and
4      they weren't led by Bradley, they all
5      agreed simultaneously that the Middletons
6      were the problem.  Correct?
7 A.   Well, I think that Mr. Bradley was
8      probably -- I guess I would characterize
9      him as the leader of it.  But there were
10     certainly a lot of folks that felt exactly
11     the same way that he and I did.
12 Q.  And you were one of them?
13 A.  I felt the same way about those issues as
14     Mr. Bradley did.
15 Q.  Now, if you jump down to the end, it says
16     it is well-known that JB and KO sat out
17     purposely.
18         Do you see that?
19 A.  I do.
20 Q.  What does that phrase "sat out" mean in
21     that?
22         MR. COHEN:  Objection.  Go ahead
23     and answer.
24 A.  I don't know.

Page 110

1 Q.   Your testimony is you don't know?
2 A.   I don't know what she meant when she wrote
3      that, no.
4 Q.   All right.  That is fair.  That phrase,
5      "to sit out the election", did that have
6      meaning in the vernacular of the Plymouth
7      County District Attorney's Office, quite
8      apart from any subjective intent she may
9      have had?
10 A.  This doesn't say election.
11 Q.  I am asking you what the phrase "sit out
12     an election", did that mean anything in
13     the vernacular in the Plymouth County
14     District Attorney's Office?
15 A.  I don't know.
16 Q.  All right.  Did you ever encourage Bradley
17     to talk about the Middletons hurting
18     office morale?
19 A.  To talk to who?
20 Q.  Cruz.  What did I say?
21 A.  You didn't say anybody.
22 Q.  Oh, sorry.  Did you ever encourage
23     Mr. Bradley to speak to Mr. Cruz about the
24     manner and means by which the Middletons

Page 111

1      were hurting morale?
2 A.   I am sure that I did.
3 Q.   I asked you a few minutes ago if they were
4      hurting morale and performance, and you
5      said you weren't sure about performance
6      but you were confident about morale.
7          Did I get that right?
8 A.   That is correct.
9 Q.   Wouldn't you agree with me that if morale
10     is harmed, performance follows pretty
11     closely?
12         MR. COHEN:  Objection.  Go ahead.
13 A.  I don't know.
14 Q.  Okay.  And what other types of information
15     did you confide in Mr. Bradley about?
16 A.  Regarding what?
17 Q.  Anything relating to the office.
18 A.  Mostly the issue that we have been
19     discussing, I think.
20 Q.  Did you tell Mr. Bradley that campaign
21     contributions were important to Mr. Cruz?
22 A.  Not that I recall.
23 Q.  Did you tell Mr. Bradley that Cruz kept
24     track of who contributed what?

Page 112

1 A.   Not that I recall.
2 Q.   Is it possible you did?
3          MR. COHEN:  Objection.
4          MR. SINSHEIMER:  I will withdraw
5      it in that form.
6 Q.   Is it your testimony that it didn't
7      happen, or is it your testimony that as
8      you sit here you just can't recall?
9 A.   As I sit here, I don't recall it.  I mean
10     it's an office where someone runs for, for
11     it every four years.  I mean those issues
12     do get discussed, but I don't remember
13     that specific line of discussion with
14     Mr. Bradley.
15 Q.  Did you ever tell Mr. Bradley that the
16     employees were expected to contribute to
17     the campaigns?
18 A.  No.
19 Q.  Did you tell Mr. Bradley about the memo
20     that the Middletons had written about
21     Karen O'Sullivan?
22 A.  I don't remember if I told Mr. Bradley
23     that there was a memo.  He, I and everyone
24     else in the office knew that they were

Page 113

1  doing an investigation in response to the
2  O'Sullivan allegations, but I don't
3  remember specifically if I talked about a
4  memo or not.
5  Q.  Did you tell him that he was referenced in
6      a memo and probably referring specifically
7      to this document, Exhibit 6 and 11A?
8  A.  I don't recall.
9  Q.  Possible?
10 A.  I don't know because I don't remember when
11     I saw this.
12 Q.  This being Exhibit 6 and 11A?
13 A.  Correct.
14 Q.  Do you have -- other than anything you
15     have heard from Mr. Cohen, are you aware
16     of allegations that someone took a copy of
17     Exhibit 6 and 11A from Mr. Cruz's office?
18 A.  Yes.
19 Q.  And you understood my question was other
20     than learning it from Mr. Cohen and his
21     office?
22         MR. SINSHEIMER:  Going out of my
23     way, sir.
24         MR. COHEN:  I appreciate it.

Page 114

1  Q.  Do you want to think about that?
2  A.  Yes.
3  Q.  Okay.  From who did you learn it other
4      than Mr. Cohen and his office?
5  A.  Mr. Cruz.
6  Q.  And what did you learn?  What did you
7      learn he thought?
8  A.  I learned that Mr. Bradley, the day, the
9      Saturday after I told him that he wasn't
10     going to be working at the DA's office any
11     more, that he went into Mr. Cruz's desk
12     and found the memo and took it.
13 Q.  And when did Mr. Cruz tell you that?
14 A.  I don't recall.
15 Q.  Was it after Mr. Bradley's deposition in
16     this case?
17 A.  I don't recall.
18 Q.  Other than the information you may have
19     obtained from Mintz Levin, did you ever
20     hear that Ms. O'Sullivan took the
21     document?
22 A.  Yes.
23 Q.  From whom did you hear that?
24 A.  I heard that from Mr. Cruz.  I think that

Page 115

1  is it.
2  Q.  When did you hear that?
3  A.  Best of my recollection, likely close in
4      time to when I heard that the document had
5      been taken.
6  Q.  And so he told you first that Ms. -- well,
7      I don't know about the order.  Which order
8      did he tell you?
9  A.  I don't remember.
10 Q.  So one time he told you Mr. Bradley took
11     it, another time he told you he thought
12     Ms. O'Sullivan took it?
13 A.  I think it had to do with the timing of
14     when it took place.
15 Q.  Explain that to me.
16 A.  I believe I was told that Ms. O'Sullivan
17     sometime summer of 2012 was quoting
18     directly from this document, which would
19     mean, I guess, the assumption would be
20     that it had been taken prior to the day
21     after Mr. Bradley's termination.
22 Q.  And where did you learn that?
23 A.  I believe it was Mr. Cruz.
24 Q.  But and where did he say he learned it,

Page 116

1  she is quoting directly from the document?
2  A.  I don't recall how that worked.
3  Q.  Have you and Mr. Cruz discussed between
4      yourselves which one, if either, actually
5      took the document?
6  A.  Just, just to the extent that I just
7      described.
8         MR. COHEN:  One second.  So just,
9      Rob, so we are clear, to the extent that
10     this is in connection with the litigation,
11     there is a joint defense privilege
12     associated with this communication.
13         MR. SINSHEIMER:  Except that
14     there is a joint defense privilege, you
15     don't have to argue about that.  But if
16     you are sitting back in the office having
17     a conversation, you know, and I am not
18     alleging either one took it, but you know,
19     well, Bradley testified to it but we don't
20     believe him, we think she took it, I am
21     entitled to that conversation.
22         MR. COHEN:  I actually don't
23     think that you are.  So I think you can
24     ask him, Rob, with all due respect, you