# Exhibit 8

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN BRADLEY,
   Plaintiff,
VS.         Civil Action No.
TIMOTHY J. CRUZ (Individually),   1:13-cv-12927
MICHAEL HORAN (Individually),
FRANK J. MIDDLETON (Individually),
and OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,
   Defendants.

DEPOSITION OF CHRISTINE KIGGEN

November 3, 2015

4:09 p.m.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
One Financial Center
Boston, Massachusetts

Susan A. Romano, RMR, CRR, CSR #119393

Page 2

1  APPEARANCES OF COUNSEL
2
3  ON BEHALF OF THE PLAINTIFF:
4    ROBERT SINSHEIMER, ESQUIRE
5    WESLEY STOKER, ESQUIRE
6    Sinsheimer & Associates
7    92 State Street
8    Boston, Massachusetts 02109
9    617.722.9954
10   rsinsheimer@sinsheimerlaw.com
11   wstoker@sinsheimerlaw.com
12
13 ON BEHALF OF THE DEFENDANTS:
14   BRET A. COHEN, ESQUIRE
15   Mintz, Levin, Cohn, Ferris, Glovsky and
16   Popeo, P.C.
17   One Financial Center
18   Boston, Massachusetts 02111
19   617.542.6000
20   bcohen@mintz.com

Page 3

| NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 5 | Christine Kiggen Statement | 22 |
|   | Bates-Stamped PLYDA_0005050 | |
| 6 | December 30, 2010 E-Mail Chain | 76 |
|   | Bates-Stamped PLYDA_0001037 | |
| 7 | December 31, 2010 E-Mail Chain | 76 |
|   | Bates-Stamped PLYDA_0001043 | |
| 8 | January 5, 2011 E-Mail Chain | 81 |
|   | Bates-Stamped PLYDA_0001041 | |
| 9 | January 2011 E-Mail Chain | 86 |
|   | Bates-Stamped PLYDA_0001031 through | |
|   | PLYDA_0001033 | |

(Original exhibits attached to original transcript.)

Page 4

1       CHRISTINE KIGGEN
2       November 3, 2015
3       PROCEEDINGS
4
5      CHRISTINE KIGGEN, the deponent, having been
6  satisfactorily identified and duly sworn by the
7  Notary Public, was examined and testified as
8  follows:
9       EXAMINATION
10      BY MR. SINSHEIMER:
11   Q.  State your full name, please.
12   A.  Christine Kiggen, K-I-G-G-E-N.
13   Q.  Ms. Kiggen, my name is Rob Sinsheimer.
14 I'm going to ask you some questions on behalf of
15 John Bradley in a civil lawsuit.  Okay?
16   A.  Yes.
17   Q.  I think you've probably been told that
18 we're going to try to complete this within two
19 hours?
20   A.  Yes.
21   Q.  As a result of that, some of the
22 questions may be very colloquial.  Do not assume
23 they will take a form that you as a lawyer
24 anticipate is lawyering, if you will.  Okay?

Page 13

1  Q. Do you have an understanding -- just yes
2  or no for now -- as to why Mr. Bradley was fired?
3  A. Yes.
4  Q. Apart from -- I'm backing up a second.
5  Excuse me.
6      You're represented today by Bret Cohen,
7  Esquire sitting to your left?
8  A. Yes.
9  Q. And when did that representation
10 commence?
11 A. I'm not -- I don't know the date.
12 Q. Within the last week?
13 A. I don't know when District Attorney Cruz
14 retained Mr. Cohen.
15 Q. No. I'm talking about your personal
16 representation. He became your lawyer within the
17 last week, right?
18 A. I don't know him to be my lawyer. I know
19 that he represents DA Cruz in the office.
20     MR. SINSHEIMER: Well, as a
21 professional courtesy, in light of the
22 attorney-client privilege, are you her lawyer today,
23 sir?
24     MR. COHEN: Yes, I am.

Page 14

1      BY MR. SINSHEIMER:
2  Q. Would you accept that representation?
3  A. Yes.
4  Q. The reason -- let me put it right --
5  we're all lawyers. Anything that you -- news or
6  information you obtained from Mr. Cohen I'm going to
7  respect as attorney-client privilege. And I want to
8  make sure other information you heard, whether it be
9  scuttlebutt, hearsay, rumor, gossip, if it didn't
10 come from him, I'm entitled to, as long as it's
11 relevant material. Okay?
12 A. Yes.
13 Q. When did you meet Mr. Cohen for the first
14 time?
15 A. Last week. Strike that.
16     I met him maybe a year ago when he
17 visited the DA's office.
18     MR. SINSHEIMER: Are you representing
19 that's when --
20     MR. COHEN: Yeah. I did. I met
21 her --
22     MR. SINSHEIMER: Yeah. But you met
23 her --
24     MR. COHEN: I met her in connection

Page 15

1  with my representation in this case in collecting
2  information relative to this matter. Absolutely.
3      BY MR. SINSHEIMER:
4  Q. All right. So any question I ask you
5  about information on what you learned, I want you to
6  exclude information you learned exclusively from
7  Mr. Cohen. At that initial interview -- just yes or
8  no -- he wasn't providing the information to you.
9  You guys were filling him in, right?
10 A. Correct.
11 Q. And then last week when it became clear
12 to you that you were going to be a witness, you had
13 a second meeting with him.
14 A. That's correct.
15 Q. And the first meeting you were not alone,
16 correct? You were with a group? Just yes or no.
17 A. Yes.
18 Q. Did you ever witness with your own eyes
19 Mr. Bradley being insubordinate in any way?
20 A. Yes.
21 Q. In what context?
22 A. When District Attorney Cruz called a
23 meeting to address his policies, I saw John -- and
24 attendance was mandatory -- I personally observed

Page 16

1  John Bradley standing outside the main library
2  room -- most of the people were inside -- rolling
3  his eyes at other assistant DAs.
4  Q. The library is a relatively small room,
5  right?
6  A. Yes.
7  Q. It's hard for everybody to fit in there.
8  A. Yes.
9  Q. Every time there's an office meeting,
10 usually there's a few people on the outside, right?
11 A. Yes.
12 Q. Did you say you saw him roll his eyes?
13 A. Yes.
14 Q. At whom?
15 A. At other staff.
16 Q. Who?
17 A. At other lawyers.
18 Q. Who?
19 A. Tara Cappola.
20 Q. Tara Cappola?
21 A. Yeah.
22 Q. Did she respond?
23 A. She was sitting next to me. That's what
24 caught my eye. She was sitting next to me in the

Page 17

1  library with the bulk of the other people who
2  attended that were sitting inside the library. And
3  I was distracted by her eye-catch with Mr. Bradley,
4  who was out in the hallway. When I looked in that
5  direction, I specifically saw him rolling his eyes
6  as if he were mocking the meeting the district
7  attorney was holding.
8     Q. Okay. Any other times?
9     A. Disagreeing with charging decisions. I
10 don't know if you call that insubordinate, but other
11 than that, no.
12    Q. So -- well, I don't since you asked.
13       You've observed him in conferences where
14 there's disagreement.
15    A. I've had conversation with him about a
16 case where he criticized the charging decision, and
17 I didn't ask him for his opinion on the charging
18 decision. I asked him for some legal advice on a
19 motor vehicle homicide case.
20    Q. Okay.
21    A. And he unsolicited told me that he
22 thought the case was overcharged and that I better
23 have my hard hat helmet on when I went next door to
24 talk to the judge about the case.

Page 18

1     Q. Who was the judge?
2     A. I think it was Judge Ball.
3     Q. Ball?
4     A. I know it was Judge Ball.
5     Q. Ball? Carol Ball?
6     A. Carol Ball.
7     Q. Have you ever spoken to Judge Ball about
8  Mr. Cruz and his reputation?
9     A. No.
10    Q. Have you ever spoken to Judge Ball about
11 anything other than cases?
12    A. No.
13    Q. Have you contributed funds to Mr. Cruz's
14 campaigns?
15    A. Yes.
16    Q. And how often have you done so?
17    A. Define "how often." Each year or --
18    Q. I'm asking you --
19    A. I can't answer that.
20    Q. Is it annually?
21    A. Yes.
22    Q. In or around the year 2010, were you
23 aware that there was schism of sort in the office
24 between two different groups?

Page 19

1     A. I became aware of it, yes.
2     Q. When did you become aware of it?
3     A. In December 2010.
4     Q. How did you become aware of it?
5     A. The assistant district attorney Kristen
6  Freeman.
7     Q. What did she tell you?
8     A. She told me there was a small group of
9  assistant district attorneys who wanted to wait till
10 Frank Middleton, first assistant, went on vacation
11 so that they could approach the district attorney
12 and complain.
13    Q. And did she tell you who they were?
14    A. Yes.
15    Q. Who did she say they were?
16    A. She said they were Lew Armistead, Dan
17 Hourihan, Tara Cappola, Karen O'Sullivan, and John
18 Bradley.
19    Q. Those five.
20    A. Yes.
21    Q. And you're pretty confident in your
22 memory there.
23    A. Yes.
24    Q. Are any of those five still with the

Page 20

1  office?
2     A. No.
3     Q. Do you know why Lew Armistead left?
4     A. He retired.
5     Q. And what were the other names again?
6     A. Tara Cappola.
7     Q. Why did she leave?
8     A. She went on to private practice.
9     Q. And obviously we know why John Bradley
10 left, correct?
11    A. Correct.
12    Q. How about Karen O'Sullivan?
13    A. She went to the Bristol County DA's
14 office.
15    Q. Do you know why she was looking for work
16 elsewhere?
17    A. I believe she was unhappy for a very long
18 time.
19    Q. And do you know why she was unhappy?
20    A. She didn't get along with Frank
21 Middleton.
22    Q. Do you understand she alleged Frank
23 Middleton was rude to the point when she saw him in
24 the hall it looked like he was going to fight with

5 (Pages 17 to 20)

Page 65

1  Q. And the next thing down there, "There
2  were no examples of going to FM and not being
3  supported." What does that mean?
4  A. I asked them, "Why don't you go" -- I
5  asked Karen -- I didn't ask anyone except Karen --
6  "Why don't you go to Frank first and give him an
7  opportunity?" And that's when I offered to be part
8  of that, if that would help her and feel more
9  comfortable. And "Have you ever tried to go to
10 Frank and not got support?" And she indicated no.
11 So that would be what I meant by that.
12  Q. So your view of all this, as far as
13 Ms. O'Sullivan, is Ms. O'Sullivan has been unfair to
14 Frank Middleton.
15  A. She was taken advantage of by John
16 Bradley and used as a ploy to suit his agenda. Yes,
17 I do.
18  Q. You think that?
19  A. Yes, I do.
20  Q. And now she's the first assistant in
21 Bristol, right?
22  A. She's one of the first assistants there.
23  Q. And John is trying homicide cases out in
24 Worcester, right?

Page 66

1  A. I don't know that. I know he's in
2  Worcester County, and he had that baby house of
3  squalor case is what I know. That's what I know. I
4  don't know if that's charges of homicide.
5  Q. You don't?
6  A. No. I thought that they were having some
7  trouble trying to come up with a homicide charge. I
8  haven't followed it, though.
9  Q. And Frank's in the private sector.
10  A. Yes.
11  Q. Because he wants to be, you think?
12     MR. COHEN: Objection.
13  A. Yes. Frank would often say, "When I'm
14 off in private practice some day..." there are
15 several people that heard him say that, and they
16 commented. So once -- it was clear he was going to
17 be opening his own office.
18  Q. When did you first meet Frank Middleton?
19  A. 1995 maybe.
20  Q. In what context?
21  A. Associates. Colleagues.
22  Q. Working together?
23  A. Assistant DAs. Um-hum.
24  Q. And was he more senior than you?

Page 67

1  A. Yes.
2  Q. And when did Bridget come to the office?
3  A. She was there before me too.
4  Q. So you became close to both of them?
5  A. I was friendly with both of them in my
6  early years. Bridget and I were assigned to a
7  district court session together, so I got to know
8  her well. Attended some parties at their house in
9  the early days. Then didn't really have any close
10 relationship with them but was always friendly with
11 them when I saw them until more recently. Past --
12 well, I said "more recently." In the past ten years
13 once I came back up to superior court.
14  Q. You got close to them again?
15  A. I got to know them more because I was
16 physically -- the physical proximity. I was in the
17 same building as them. I got to see them more
18 and -- yes.
19  Q. Do you consider them good friends now?
20  A. I consider them friends, yes.
21  Q. Have you ever talked to either -- before
22 you became a -- before it was known that you were
23 going to be subpoenaed, did you ever tell them that
24 you believed that Karen O'Sullivan was used by John

Page 68

1  Bradley?
2  A. Absolutely. I told them that from the
3  get-go.
4  Q. And you've also known Karen pretty well,
5  right?
6  A. Yes, I have.
7  Q. You know her to be a pretty independent
8  woman, right?
9  A. Yes.
10  Q. You know her to be a very talented trial
11 lawyer, right?
12  A. Yes.
13  Q. You know her to be comfortable in her
14 domestic life, right?
15     MR. COHEN: Objection.
16     Go ahead.
17  A. Yes. As far as I know.
18  Q. You know her to be self-assured, right?
19  A. Yes.
20  Q. You know her to be strongly in favor of
21 women's empowerment?
22  A. Yes.
23  Q. So how can you say that John Bradley used
24 her?

Page 69

1 A. John Bradley saw an opportunity -- when
2 he saw that Karen was frustrated in the office, saw
3 an opportunity to use someone who had some
4 credibility, which he did not have, to support his
5 cause. And I told her that in December 2010 until
6 the last time I talked to her.
7 Q. Why didn't John have credibility? I
8 don't understand that at all.
9 A. Because John sat in his office and didn't
10 communicate with anybody on a daily basis. John
11 tried very few cases toward the end of his career.
12 It was clear that John didn't support the district
13 attorney. It was gossip that John didn't speak to
14 the district attorney or the first assistant. And
15 people often wondered why he stayed when he was so
16 unhappy.
17 Q. It never occurred to you that Frank froze
18 him out?
19 A. Never occurred to me.
20 Q. John went to the United States Attorney's
21 Office, right?
22 A. Yes, he did.
23 Q. He went with Mike Sullivan, right?
24 A. Um-hum. Yes.

Page 70

1 Q. There was a lot of competition among the
2 folks to be among the select few that Mike was going
3 to take into Boston, right?
4 A. I don't know that. He took a lot of
5 them. I don't know about the competition. I don't
6 know of anyone who tried to go there and didn't go.
7 There were a lot of people who wound up going with
8 him.
9 Q. Who?
10 A. Suzanne Sullivan, Dave Tobin, Glen
11 MacKinlay, Frank Gaziano, Bill Connolly --
12 Q. They didn't --
13 A. Kim --
14 Q. -- all go just at once.
15 A. Excuse me?
16 Q. They didn't all go at once, did they?
17 A. They didn't, no.
18 Q. You can't come into the U.S. Attorney's
19 Office and put five new people in day one, right?
20 A. Correct.
21 Q. Have you ever worked in the U.S.
22 Attorney's Office?
23 A. I have not.
24 Q. Have you ever appeared in federal court?

Page 71

1 A. No, I have not.
2 Q. It was known in the Plymouth County DA's
3 Office to be a Plymouth County district attorney and
4 be selected by Mike Sullivan to come up and try
5 cases in the United States District Court would be a
6 plum, right?
7 A. Would be what? I'm sorry.
8 Q. A plum. Would be something you would be
9 proud of?
10 A. Yes.
11 Q. People wanted it, right?
12 A. Select people, yes.
13 Q. People talked about it regularly, right?
14 A. I didn't hear anybody talk about it. I
15 heard that they went. To be clear, I wasn't in the
16 superior court at the time it happened. I was in
17 the district court.
18 Q. I was about to ask you that. You were
19 still in district court.
20 A. Yes.
21 Q. So without denigrating, you were just
22 further down the --
23 A. Yes.
24 Q. -- the hierarchy.

Page 72

1 A. Absolutely.
2 Q. You weren't going to the U.S. Attorney's
3 Office at that stage in your career no matter --
4 A. Nor was I -- no. And nor was I privy to
5 the folks that were having conversations that wanted
6 to go.
7 Q. But you didn't hear the talk that this is
8 a really big deal; it's an almost unheard of career
9 opportunity down in Plymouth County to get to go to
10 Boston and work in the United States Attorney's
11 Office?
12 A. I never heard it expressed that way.
13 Q. Never heard it that way?
14 A. Never heard it expressed that way, no.
15 Q. Frank Gaziano is a judge now, right?
16 A. Correct.
17 Q. And Dave Tobin is still in the United
18 States Attorney's Office.
19 A. Yes, he is.
20 Q. And John Bradley is a homicide prosecutor
21 in Worcester County.
22 A. Yes.
23 Q. Do you know where the others are?
24 A. Glen MacKinlay is still there.