# Exhibit 9

John Bradley vs.  
Timothy J. Cruz, et al.

CONFIDENTIAL John E. Bradley, Jr., Volume II  
July 23, 2015

---

Page 1

Volume II  
CONFIDENTIAL PURSUANT    Pages 2-1 to 2-195  
TO PROTECTIVE ORDER    Exhibits 9 to 23  
UNITED STATES DISTRICT COURT  
DISTRICT OF MASSACHUSETTS  

----------------x  
            :  
JOHN BRADLEY,   :  
    Plaintiff,  :  
            :  
    vs.     : Civil Action  
            : No. 1:13-cv-  
TIMOTHY J. CRUZ    : 12927-RGS  
(Individually), MICHAEL HORAN :  
(Individually), FRANK J.   :  
MIDDLETON (Individually), and :  
OFFICE OF THE DISTRICT    :  
ATTORNEY FOR PLYMOUTH COUNTY, :  
    Defendants.  :  
            :  
----------------x  

CONTINUED DEPOSITION OF JOHN E. BRADLEY, JR., a witness called on behalf of the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Alexander K. Loos, Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC, One Financial Center, 35th Floor, Boston, Massachusetts, on Thursday, July 23, 2015, commencing at 12:16 p.m.

PRESENT:

Sinsheimer & Associates  
(By Robert S. Sinsheimer, Esq.)  
E-mail: rsinsheimer@sinsheimerlaw.com  
92 State Street  
9th floor  
Boston, MA 02109  
617.722.9954  
    for the Plaintiff.  
(Continued on next page)

---

Page 2

1  PRESENT (Continued):  
2   Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC  
    (By Bret A. Cohen, Esq. and Robert  
3   Sheridan, Esq.)  
    E-mail: bcohen@mintz.com  
4        rsheridan@mintz.com  
    One Financial Center  
5   Boston, MA 02111  
    617.542.6000  
6       for the Defendants.  
7  ALSO PRESENT: Michael Horan  
8  
9       * * * * *

---

Page 3

                INDEX

WITNESS        DIRECT CROSS REDIRECT RECROSS

JOHN E. BRADLEY, JR.  
BY MR. COHEN    2-5

            * * * *

            EXHIBITS

NO.    DESCRIPTION                PAGE

9   Case Summary Criminal Docket,     2-12  
    Commonwealth v. Choy, Kenneth S.  
10  Blank September 2012 calendar     2-15  
11  Typed and handwritten note, "A"-3 2-29  
12  Case Summary, Criminal Docket,    2-64  
    Commonwealth v. Choy, Frances Y.  

13  E-mail from Ms. O'Sullivan to     2-77  
    Mr. Bradley, dated 7/8/2008, with  
    attached image  

14  E-mail from Ms. O'Sullivan to     2-79  
    Mr. Bradley, dated 6/25/2008, with  
    attached image  

15  E-mail from Ms. O'Sullivan to Mr. 2-82  
    Bradley, dated 6/18/2008, with  
    attached image  

16  E-mail from Ms. O'Sullivan to     2-83  
    Mr. Bradley, with attached e-mail  
    chain and images  

---

Page 4

        E X H I B I T S, Continued  
NO.    DESCRIPTION                PAGE

17  Memorandum of Understanding, Olivio  2-130  
    Leverone (marked confidential and  
    retained by counsel)  

18  Criminal complaint and case       2-135  
    disposition sheet, docket no 0615 CR  
    007031  

20  Letter from Mr. Cohen to Ms. Robb,  2-174  
    dated July 1, 2013  

21  E-mail from Mr. Cohen to Ms. Robb,  2-179  
    dated August 26, 2013  

22  Annotated Laws of Massachusetts,  2-186  
    Chapter 12, Section 16  

23  E-mail from Mr. Bradley to        2-189  
    Ms. O'Sullivan, dated January 04,  
    2011, and related e-mail chain  

            * * * *

---

1 (Pages 1 to 4)

Doris O. Wong Associates, Inc. Professional Court Reporters   (617) 426-2432  
50 Franklin Street, Boston, MA 02110   Video Conference Center   www.doriswong.com

John Bradley vs.                          CONFIDENTIAL   John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                              July 23, 2015

Page 57

1    MR. SINSHEIMER: Object to the form --
2    well, I objected to the form of the question.
3        You can answer.
4        He didn't contact the US attorney's office.
5    Q.  I'm sorry?
6    A.  I said no.
7    Q.  I just want to make sure it's your
8    testimony that the only document that you presently
9    have in your possession, custody or control that is
10   connected in any way to the three memos that you
11   took from Tim Cruz's office is that which was marked
12   as Exhibit 11; is that right?
13       MR. SINSHEIMER: Object to the form of the
14   question. This is very technical. Now we have them
15   because you gave them to us. I mean...
16       MR. COHEN: Okay. Strike that.
17   Q.  That you took -- let me ask the question
18   differently.
19       The document, the single page that was
20   marked as Exhibit 11, Bates stamped 00443 by your --
21   by your attorney's office, is the single solitary
22   document that you had retained in your possession,
23   custody and control in advance of this litigation;
24   is that right?

Page 58

1    A.  Yes.
2    Q.  Other than those three memos, it's my
3    understanding you took nothing else from Mr. Cruz's
4    office; is that right?
5    A.  That's right.
6    Q.  At any other time during your tenure at the
7    district attorney's office, did you ever go into the
8    district attorney's office itself and take any other
9    documents?
10   A.  No.
11   Q.  When -- when Mr. Horan had terminated you
12   on the 28th of September, did you understand that
13   that termination was related to a decision that was
14   made by Tim Cruz?
15   A.  Yes.
16   Q.  In other words, it wasn't Mike Horan's
17   decision to fire you; is that right?
18       MR. SINSHEIMER: Object to the form of the
19   question.
20   Q.  Right?
21       MR. SINSHEIMER: I object to the form of
22   the question.
23   Q.  I mean, as you sit here today, you have no
24   reason to believe that Mr. Horan's decision -- it

Page 59

1    was Mr. Horan's decision to terminate you; is that
2    right?
3    A.  That's right.
4    Q.  In fact, as I understand it, you enjoyed --
5    for a long time had a good relationship with
6    Mr. Horan; is that right?
7    A.  Yes.
8    Q.  Now, up until the time that you sued
9    Mr. Horan, would you have considered him a friend?
10   A.  Yes.
11       Well, let me take that back a little bit.
12       Up until the time when he fired me,
13   understanding that it was Mr. Cruz's decision to
14   fire me, I considered him a friend.
15   Q.  Did you ever talk to Mr. Horan about why it
16   was that he was the one who was tasked with the
17   responsibility to terminate you?
18   A.  I don't think we -- I asked him if Tim was
19   there in the building as he was firing me. And
20   other than that, I don't think we had a discussion
21   about why it was Tim and not -- why it was not Tim
22   directly.
23   Q.  All right.
24       And do you have any reason to believe that

Page 60

1    the reason -- strike that.
2        Do you have any reason to believe that the
3    following is not true: That Mike Horan was tasked
4    with the responsibility to let you go because he had
5    a friendship with you and he wanted to handle it as
6    delicately as possible?
7    A.  Yes, I do have some reason to believe
8    that's not true.
9    Q.  Okay. And what's that reason?
10   A.  I think Tim simply was afraid to do it
11   himself.
12   Q.  Okay. So other than -- and what's the
13   basis of your belief that Tim was just afraid to do
14   it himself?
15   A.  Because that was Tim's modus operandi. He
16   simply did not want to get involved in anything
17   controversial in the office directly.
18   Q.  Other than the fact that you didn't think
19   that Tim wanted to be involved in anything
20   controversial, do you have any other reason to
21   believe that the circumstances of Mike Horan's being
22   the one to deliver the message to you was anything
23   other than Mike's effort to soften the blow, so to
24   speak?

15 (Pages 57 to 60)

Doris O. Wong Associates, Inc. Professional Court Reporters                (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center            www.doriswong.com

Case 1:13-cv-12927-IT   Document 117-9   Filed 02/11/16   Page 4 of 16

John Bradley vs.                                CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                                       July 23, 2015

Page 65

1  is Karen O'Sullivan, but we haven't explained
2  exactly who she was.
3      So as of -- well, strike that.
4      When you first came back to the district
5  attorney's office in 2003, what role did she have?
6      A.  I don't know, other than she was an
7  assistant DA. I don't remember whether she was
8  in -- in superior court at that time or not.
9      Q.  And do you remember what her next role was
10 at the DA's office?
11     A.  I know at some time she was promoted to
12 superior court. I just don't know when that was
13 chronologically.
14     Q.  And do you know what Karen O'Sullivan's
15 participation in any election and/or political
16 campaigning was between the time that you arrived at
17 the office and the time of her ascension to the
18 superior court?
19     A.  I don't.
20     Q.  And then from the time she was promoted
21 into the superior court docket, she eventually had
22 an additional promotion at the DA's office; is that
23 correct?
24     A.  After she was promoted to superior court?

Page 66

1      Q.  Yes, sir.
2      A.  I don't believe so.
3      Q.  Okay. So what was -- in your mind, what
4  was the highest level that Karen O'Sullivan achieved
5  while at the Plymouth County DA's office?
6      A.  She was an assistant district attorney
7  assigned to superior court. She didn't have a
8  specific title.
9      Q.  And where did she rank in the office?
10         MR. SINSHEIMER: Object to the form.
11         You can answer.
12     A.  I'm not sure what you mean.
13     Q.  So there is a hierarchy in the office. The
14 hierarchy is Tim Cruz is at the top; Frank Middleton
15 is the first assistant, right?
16     A.  Yes.
17     Q.  And then there are -- there are people that
18 are below him --
19     A.  Right.
20     Q.  -- is that right?
21         Where did Karen O'Sullivan rank?
22     A.  You know, again, at the time I was below
23 Frank. I was the deputy first assistant. There
24 were couple of second assistants, and then, after

Page 67

1  that, nobody was ranked in any particular order.
2  They were just regular assistant DA's, and Karen
3  fell into that category.
4      Q.  Did you get along with Karen O'Sullivan?
5      A.  Yes.
6      Q.  Would you consider her a friend?
7      A.  I do.
8      Q.  And so approximately how long have you and
9  Karen O'Sullivan been friends?
10     A.  We've been friends for maybe about seven or
11 eight years.
12     Q.  And she has supported you in this
13 litigation, correct?
14     A.  Yes.
15     Q.  And per -- the way Karen O'Sullivan
16 supported you in this litigation was providing you
17 an affidavit --
18     A.  Yes.
19     Q.  -- is that right?
20         And tell us about your participation in the
21 creation of the affidavit that you eventually had
22 Karen O'Sullivan sign.
23     A.  I had no participation in that affidavit.
24     Q.  Did -- do you know -- how did Karen

Page 68

1  O'Sullivan know what subject matters to cover in
2  that affidavit?
3         MR. SINSHEIMER: Object to the form.
4         You can answer.
5      A.  I don't know.
6      Q.  So is it your testimony that you had no
7  conversations with Karen O'Sullivan about what was
8  going to be in the affidavit before you received it?
9      A.  The only --
10         MR. SINSHEIMER: That's not what he said.
11     A.  -- conversations I had with Karen were
12 about the fact that my lawyers at the time would be
13 contacting her. Other than that, I stayed out of
14 it.
15    *Q.  Is it your testimony that you never saw a
16 draft of the affidavit before?
17         MR. SINSHEIMER: Object -- objection.
18         Instruct you not to answer.
19         MR. COHEN: It's testimony in the case.
20         MR. SINSHEIMER: As far as I'm concerned,
21 until I know that it's not a privileged
22 communication between him and his prior counsel, I'm
23 instructing him not to answer. We don't get into
24 drafting, Counsel. His testimony clearly is he

17 (Pages 65 to 68)

Doris O. Wong Associates, Inc. Professional Court Reporters              (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center           www.doriswong.com

Case 1:13-cv-12927-IT   Document 117-9   Filed 02/11/16   Page 5 of 16

John Bradley vs.                          CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                        July 23, 2015

Page 73

1    a discussion as to when mine was scheduled.
2       Q.  And -- and what else was said in this
3    conversation?
4       A.  I think we also discussed when the other
5    depositions were scheduled in the case.
6       Q.  And what did Ms. O'Sullivan say to you
7    about her testimony in this case?
8       A.  She didn't say anything about her
9    testimony.  She told me that she thought that her
10   attorney had a problem with the day, and that it may
11   have to be rescheduled.  That's it.
12      Q.  So can you and I agree that, as an
13   assistant district attorney, you have certain fairly
14   high ethical and professional duties to the
15   Commonwealth?
16      A.  Yes.
17      Q.  Those ethical and professional duties are
18   different than others that don't hold positions
19   that, for example, can dictate people who are
20   prosecuted and what happens to them and the like; is
21   that right?
22      A.  Yes.
23      Q.  Do you believe that you -- your going into
24   Tim Cruz's office on September 29th was consistent

Page 74

1    with those duties of high integrity and ethical --
2       MR. SINSHEIMER:  Objection, asked and
3    answered.
4       You can answer again.
5       A.  You know, I think, as I said last time, my
6    moral compass might have been off a little, but I
7    was angry, and I was upset, and I had reason to
8    believe that those documents would be destroyed, not
9    be provided, or potentially used against
10   Ms. O'Sullivan.  And at the time I felt that it was
11   something I should do.
12      Q.  Did you have reason to believe that Tim
13   Cruz would have destroyed that evidence that you
14   just discussed?
15      A.  Yes.
16      Q.  And what was the basis of that belief that
17   Tim Cruz would have destroyed that evidence?
18      A.  Because it contained direct reference to my
19   failure to participate in the campaign.
20      Q.  So other than the fact that the documents
21   themselves had references to your failure to
22   participate in a campaign, do you have any other
23   basis for believing Tim Cruz would have destroyed
24   the evidence that you took from his office on

Page 75

1    September 29th, 2012?
2       A.  My reason was my lack of trust at that time
3    of Tim and the Middletons.  I didn't deem them to be
4    trustworthy at all.
5       Q.  So it was -- there are two reasons which
6    drove your decision to act the way you did on
7    September 29th:  One was the fact that you believed
8    that Tim would destroy this evidence because it
9    contained references to your decision not to
10   participate in the campaign; and two was because you
11   just didn't trust Tim Cruz and Frank Middleton; is
12   that right?
13      MR. SINSHEIMER:  Object to the form.
14      A.  Those reasons.  And also I was concerned
15   that the memorandums could be used to sabotage
16   Ms. O'Sullivan's career.
17      Q.  My question was just -- my question was
18   just about what the basis was of your belief that
19   Tim Cruz would destroy this evidence, and you just
20   told me what the evidence could be used for.
21      I'm just asking you, other than your lack
22   of trust of Tim Cruz and Frank Middleton, combined
23   with the fact it's your belief that this memo
24   contained reference to your failure to contribute or

Page 76

1    participate in the 2010 election, other than those
2    two, do you have any other basis for believing that
3    the evidence would be destroyed?
4       A.  Not that I could think of right now.
5       MR. SINSHEIMER:  Is this a good time for a
6    restroom break?
7       MR. COHEN:  Sure.  Of course.
8       (Recess taken)
9    BY MR. COHEN:
10      Q.  So from -- back to your earlier testimony,
11   the Choy prosecution, your involvement was from
12   sometime in 2003 through May 2011, right?
13      A.  Yes.
14      Q.  And during that time there was multiple
15   trials of Frances Choy; is that right?
16      A.  Yes.
17      Q.  And you testified there were three trials
18   of her?
19      A.  Yes.
20      Q.  And ultimately she was convicted of first
21   degree murder; is that right?
22      A.  Yes.
23      Q.  And do you know what that status is now?
24   Is it on appeal?  Do you know?

19 (Pages 73 to 76)

Doris O. Wong Associates, Inc. Professional Court Reporters            (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center          www.doriswong.com

Case 1:13-cv-12927-IT   Document 117-9   Filed 02/11/16   Page 6 of 16

John Bradley vs.                                    CONFIDENTIAL  John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                                            July 23, 2015

Page 85

1      "Brockton Barbie (also sold in
2      Rockland)."
3      Could you read that part into the record?
4   A. It says:
5      "This recently paroled Barbie comes
6      with a 9mm handgun, a Ray Lewis knife, a
7      Chevy with dark tinted windows, and a meth
8      lab kit. This model is only available
9      after dark and must be paid for in cash
10     (preferably small untraceable bills).
11     Unless you are a cop, then we don't know
12     what you are talking about."
13  Q. Brockton is where the DA's office is
14  located?
15  A. Yes. The main office.
16  Q. There is others here beneath that: Duxbury
17  Weymouth, Downtown Boston/North End, Western Mass.,
18  et cetera, et cetera, right?
19  A. Yes.
20  Q. There is -- is it fair to say that these
21  depict women in various forms, everything from --
22  from gay, for example, to wealthy?
23  A. I haven't had a chance to read through the
24  whole thing. They depict a bunch of women standing

Page 86

1   in front of vehicles.
2   Q. Do you believe that these are the kind of
3   e-mails that should be exchanged in a government
4   e-mail server?
5   A. No.
6   Q. Do you agree with characterizations of the
7   women that's depicted in the e-mail that Karen
8   O'Sullivan sent you?
9   A. Do I agree with the content of it, is that
10  what you're asking?
11  Q. Right. Yes, sir.
12  A. No.
13  Q. Did you tell her that you didn't agree with
14  the content of these e-mails, that in any way you're
15  uncomfortable with them and not to send them to you?
16  A. I don't even remember receiving this. I
17  mean obviously I did, but I just don't remember it.
18  I don't remember ever reading it. And I don't
19  remember ever having a conversation with her about
20  it.
21  Q. So with respect to the e-mails that were
22  depicting an Asian in one form or another that were
23  sent to you by Karen O'Sullivan during the time of
24  your prosecution of Frances Choy, do you recall ever

Page 87

1   saying to Ms. O'Sullivan words to the effect that,
2   "It's probably inappropriate for e-mails to be
3   circulated between us that in some way poke fun at
4   Asians" while you're prosecuting Ms. Choy?
5   A. I don't remember ever discussing any
6   e-mails with her.
7   Q. Okay. Let's turn to another subject, if we
8   can.
9      Strike that.
10     Before we do, did you ever say anything to
11  Tim Cruz, or Frank Middleton, or anybody in the
12  office about -- say anything to them about these
13  e-mails that you were receiving from Karen
14  O'Sullivan?
15  A. No.
16  Q. All right. Let's turn to some big picture
17  items for a second.
18     There are two separate allegations that you
19  make as to why you were terminated relative to
20  whistle blowing: One relates to your claim that you
21  were terminated by the district attorney's office
22  based on some issues around the prosecution of OUI,
23  and the second was around your concerns about the
24  way confidential informants were being handled at

Page 88

1   the DA's office.
2      Is that right?
3   A. Yes.
4   Q. And at the bottom, those are the two claims
5   around whistle blowing on which you rely, OUI and
6   confidential informants; is that right?
7   A. Yes.
8   Q. So explain, if you would, for me,
9   Mr. Bradley, exactly what it is that you believe
10  Timothy Cruz and the Plymouth County DA's office was
11  doing wrong around the prosecution of OUIs, driving
12  under the influence and the like, that you had blown
13  the whistle on?
14  A. I had started keeping statistics right
15  after I became the supervisor for the district
16  courts of the jury-waived OUI trials, and I think
17  beginning in 2006 I would provide those to Mr. Cruz
18  and Mr. Horan, which showed a distinct pattern of
19  jury-waived not guilties in OUI cases, which reached
20  an unbelievably high percentage. And essentially
21  nothing was done about it up until the time of the
22  "Globe" spotlight series.
23  Q. So what was -- let's just euphemistically
24  say "Tim Cruz," and so speaking for the entire

22 (Pages 85 to 88)

Doris O. Wong Associates, Inc. Professional Court Reporters                    (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center                 www.doriswong.com

John Bradley vs.  
Timothy J. Cruz, et al.  
CONFIDENTIAL John E. Bradley, Jr., Volume II  
July 23, 2015

Page 89

1  office, right?
2      So I'm asking what was Tim Cruz doing or
3  not doing that you were blowing the whistle on?
4  What did he control in this process?
5      A.  He didn't do anything about what was
6  clearly a pattern of abuse by certain judges.
7      Q.  All right.
8      So it wasn't that Tim -- you're not
9  suggesting that Tim Cruz was engaged in any
10  corruption around OUIs, are you?
11      A.  No.
12  *Q.  As you sit here right now, your testimony
13  isn't, under oath, that Tim Cruz was somehow rigging
14  the system so that defendants would get out of the
15  crimes associated with OUI, right?
16  *A.  No.
17      MR. SINSHEIMER:  Wait.  Let's make sure,
18  the double negative.  He's not making that
19  allegation.  That was a long, convoluted question,
20  Bret.  And the way it came out on the transcript,
21  you're going to see there was a double negative, and
22  I hate double negatives on transcripts.
23      MR. COHEN:  Could you just repeat the
24  question back.

Page 90

1  *(Record read)
2      BY MR. COHEN:
3      Q.  All right.
4      So it's important that I, and I think we,
5  understand the substance of this whistle blowing
6  claim, the OUI claim.  And until now, I don't know
7  that I do.
8      And so it isn't your contention,
9  Mr. Bradley, that Mr. Cruz was somehow making sure
10  defendants got off of crimes they committed around
11  OUI, right?
12      A.  That's right.
13      Q.  Your concern was really with -- your
14  concern around the OUI issue was around the
15  judiciary; is that right?
16      A.  That was the main concern, but the
17  collateral concern was that we, as an office, knew
18  this was going on for a period of years and did
19  nothing about it.
20      Q.  Okay.  Is it your contention that it was
21  you, Mr. Bradley, that first brought this issue that
22  you're concerned about around OUIs to the surface?
23      A.  Yes.
24      Q.  Is it also your testimony, Mr. Bradley,

Page 91

1  that up until you became involved in this OUI issue,
2  we'll call it, that Mr. Cruz, DA Cruz had made no
3  effort to address the concerns which you're raising
4  today?
5      MR. SINSHEIMER:  Well, object to the form.
6      But you can answer.
7      A.  I'm not sure I understand that question.
8      I don't know what -- prior to becoming
9  supervisor to the district courts, I don't know what
10  Mr. Cruz knew or did not know about this particular
11  issue.
12      Q.  And when did you become the supervisor of
13  the district courts?
14      A.  I think it was early in 2006.  It might
15  have been late in 2005, but it was right in that
16  time period.
17      Q.  And up until that point, that is, in late
18  2005 early 2006, you have no reason to believe that
19  Tim Cruz even knew this OUI issue existed; is that
20  right?
21      A.  That's right.
22      Q.  And when is it that you first brought the
23  OUI issue to Tim Cruz's attention?
24      A.  It would have been at the end of the 2006

Page 92

1  calendar year.
2      Q.  And how did you bring the OUI issue to Tim
3  Cruz's attention?
4      A.  I tallied up statistics at the end of the
5  year, and I provided those statistics to both
6  Mr. Cruz and Mr. Horan.
7      Q.  And how did you present those statistics to
8  Mr. Cruz and Mr. Horan?
9      A.  It was on a -- a document.
10      Q.  And how did Mr. Cruz and Mr. Horan respond?
11      A.  I don't remember any response from
12  Mr. Cruz.  I do remember talking to Mr. Horan about
13  the statistics.
14      Q.  And what did you say to Mr. Horan, and
15  Mr. Horan say to you?
16      A.  You know, again, I'm not going to be able
17  to give you specifics.  I remember generally we
18  talked about, "Wow, this is ridiculous."
19      Q.  And at that point, and any time thereafter,
20  you never suggested that Tim Cruz and the DA's
21  office was somehow involved in corruption around
22  OUI, right?
23      A.  No.
24      Q.  And the --

23 (Pages 89 to 92)

Doris O. Wong Associates, Inc. Professional Court Reporters  
50 Franklin Street, Boston, MA 02110  Video Conference Center  
(617) 426-2432  
www.doriswong.com

Case 1:13-cv-12927-IT  Document 117-9  Filed 02/11/16  Page 8 of 16

John Bradley vs.                          CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                          July 23, 2015

Page 93

1    MR. SINSHEIMER: Again, he says "no" to
2  "never," and for the record he's agreeing with you,
3  sir, that there is no allegation of complicity.
4    Q.  So what happened next after you brought
5  this memo to Mr. Horan's attention?
6    A.  We just had a discussion, or a couple of
7  discussions about it, and that was about it at that
8  point.
9    Q.  And what did Tim Cruz's office do about
10 your concerns?
11   A.  Nothing.
12   Q.  Did you ever confront Tim Cruz and say
13 words to the effect, "I believe that I've raised a
14 very significant issue with" -- "with you, and
15 nothing's being done about it"?
16   A.  At some point we had a discussion about the
17 fact that we needed to do something about this, and
18 I don't remember when that was. It certainly wasn't
19 in 2006. It may have been in late 2007, but by some
20 point in 2008 we had a discussion about it.
21   Q.  So you originally raised this issue in late
22 2007 at some point; 2008 you actually have a
23 discussion with Tim Cruz about it; is that right?
24   A.  No. I raised the issue in late 2006 for

Page 94

1  the first time.
2    Q.  Put this another way:
3        When was the first time that you actually
4  spoke to Tim Cruz directly about the concerns around
5  the OUI issue?
6    A.  I don't remember.
7    Q.  Did -- to the best of your knowledge, did
8  Tim Cruz do anything about the concerns that you
9  raised at that time?
10   A.  No. Not the first time we discussed it.
11   Q.  When is the first time Tim Cruz did
12 anything about the OUI issues you raised?
13   A.  I believe it was sometime in 2008.
14   Q.  And what did Tim Cruz do about it?
15   A.  He asked Mr. Horan and myself to go down to
16 the Wareham district court and talk to the presiding
17 justice about the issue.
18   Q.  And did you and Mr. Horan do what District
19 Attorney Cruz suggested?
20   MR. SINSHEIMER: I'm going to again say for
21 the record that I think we ought to be very careful.
22 Both parties have got confidentialities when you
23 have DA's talking to judges, unless it's absolutely
24 essential for this litigation.

Page 95

1    MR. COHEN: It's all protected.
2    MR. SINSHEIMER: Mr. Horan was mentioned,
3  too.
4        It's perfectly legal for a DA to talk to a
5  judge. I'm putting on the record to be extremely
6  cautious about this testimony.
7    THE WITNESS: We did.
8    BY MR. COHEN:
9    Q.  Do you believe that there is anything about
10 that meeting between you and the judge and Mr. Horan
11 that was in any way designed to quash your concerns?
12   A.  I'm not sure what you mean by that.
13   Q.  Well, you've claimed that part of the
14 reason why you were fired from the DA's office was
15 because you whistle blew on this OUI issue, right?
16   A.  Right.
17   Q.  So I'm asking you whether or not this
18 meeting with the judge and Mr. Horan and yourself
19 was part of some conspiracy, in your mind, to -- to
20 not address the OUI issue that you had raised.
21   A.  No.
22   Q.  So in other words, is it fair to say that
23 you believe that that meeting with you, Mr. Horan,
24 the judge was a positive step in addressing your OUI

Page 96

1  concern?
2    A.  Yes.
3    Q.  And that meeting which took place, you do
4  believe it was a positive step in addressing your
5  OUI concern, took place in 2008, right?
6    A.  I believe so, yes.
7    Q.  Okay. And other than that meeting that was
8  held at the direction of Tim Cruz between yourself,
9  the judge and Mr. Horan, what other steps did Tim
10 Cruz instruct you to undertake around the OUI issue?
11   A.  None.
12   Q.  Did the OUI -- OUI issue improve after the
13 meeting with the district judge?
14   A.  For a very short period of time it did, in
15 that particular court in Wareham.
16   Q.  But that issue did not improve elsewhere;
17 is that your testimony?
18   A.  Yes.
19   Q.  Just out of curiosity, why didn't you go to
20 other district courts besides the Wareham district
21 court?
22   A.  Tim asked us to go down to Wareham, and
23 that's where we went.
24   Q.  Did you ever tell Tim that you think you

24 (Pages 93 to 96)

Doris O. Wong Associates, Inc. Professional Court Reporters         (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center       www.doriswong.com

Case 1:13-cv-12927-IT   Document 117-9   Filed 02/11/16   Page 9 of 16

John Bradley vs.                                    CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                                        July 23, 2015

Page 97

1    should go to other district courts in Plymouth
2    County?
3       A. No.
4       Q. Why not?
5       A. Because at the time Wareham seemed to be
6    the most problematic court, and that seemed to be at
7    least a good way to start the ball rolling.
8       Q. And for how long did things improve in the
9    Wareham district court?
10      A. I want to say about maybe two months.
11      Q. So then you noticed that things were no
12   longer improving in the Wareham district court.
13          Did you tell Tim that?
14      A. I don't remember if I told Tim. I
15   definitely told Mr. Horan, and I continued to keep
16   statistics.
17      Q. All right.
18          And so other than -- strike that.
19          So what did you do, personally, next, after
20   the 2008 meeting between yourself, Mr. Horan and the
21   judge about the OUI issue?
22      A. I notified the district court staff that we
23   had addressed the issue with the judge; at least we
24   had raised the issue with the judge. And I asked

Page 98

1    them to keep me posted on what was going on and to
2    bring to my attention any cases that they thought
3    were especially egregious. And I also continued to
4    keep statistics in Wareham, and I think at that time
5    I expanded them to include Plymouth and Hingham as
6    well. I don't think, up until 2008, I had been
7    keeping the statistics for the other courts.
8       Q. Thank you.
9           And what else did you do, Mr. Bradley, to
10   address the OUI issue?
11      A. Other than talking to Mr. Horan about it
12   periodically, I think that was it.
13      Q. Did Mr. Cruz ever discuss with you at any
14   time using the press to resolve your OUI concerns?
15      A. He discussed the fact, or brought to my
16   attention the fact that there was going to be a
17   reporter from the "Boston Globe" coming into the
18   office, and he asked me to sit down with the
19   reporter.
20      Q. And how is it that that reporter came into
21   the Plymouth County district attorney's office to
22   discuss the OUI issue?
23      A. I believe the reporter had contacted
24   Bridget Middleton, and she had arranged the meeting.

Page 99

1       Q. So -- and Bridget Middleton reported to
2    Timothy Cruz; is that right?
3       A. At that time, I think so. At some point
4    her title changed and she was, I think, made deputy
5    chief legal counsel or something like that.
6       Q. And Bridget Middleton's role at that time
7    in the DA's office had to do with, among other
8    things, addressing the press inquiries; is that
9    right?
10      A. That's right.
11      Q. And, in any event, she worked for Timothy
12   Cruz; is that right?
13      A. That's right.
14      Q. So at some point the press is coming in to
15   discuss with the DA's office the OUI issue which
16   we've been discussing; is that right?
17      A. That's right.
18      Q. And Timothy Cruz, as you understand it,
19   directs Bridget Middleton to connect you with the
20   "Boston Globe" reporter who is doing a story on
21   this; is that right?
22      A. That's right.
23      Q. And that meeting with the press between,
24   with yourself took place approximately when?

Page 100

1       A. It was sometime during the summer of 2011.
2       Q. And did you speak to the press?
3       A. We had a meeting in the office with the
4    reporter, Bridget Middleton and I.
5       Q. And you're not suggesting, are you, that
6    this was Tim Cruz's effort -- that is, the meeting
7    with the press -- to somehow cover up this OUI
8    issue, are you?
9       A. No.
10      Q. And approximately how long did this meeting
11   with Bridget Middleton and the reporter last?
12      A. I would say about an hour.
13      Q. Do you know, as we sit here, for a fact how
14   it was that the -- the reporter came to the Plymouth
15   County DA's office?
16      A. I know they set it up through -- or I think
17   they set it up through Bridget.
18      Q. Do you know whether or not Bridget and/or
19   Tim or somebody from the office reached out to the
20   reporter to discuss with them this issue?
21      A. No.
22      Q. Okay. And what did you tell the reporter
23   about the OUI issue?
24      A. I just gave him kind of a summary of what I

25 (Pages 97 to 100)

Doris O. Wong Associates, Inc. Professional Court Reporters                    (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center                 www.doriswong.com

John Bradley vs.  
Timothy J. Cruz, et al.

CONFIDENTIAL John E. Bradley, Jr., Volume II  
July 23, 2015

Page 101

1  knew, that I had been keeping these statistics since
2  late 2005 or early 2006, and that we had a -- what
3  appeared to be a major problem on our hands.
4      Q.  What did Bridget say during the course of
5  that meeting?
6      A.  I don't remember. I don't remember what
7  she -- I don't remember what she said.
8      Q.  Do you remember Bridget Middleton
9  contradicting any of your concerns that you raised
10 with the reporter?
11     A.  I don't recall.
12     Q.  Do you recall anybody from the Plymouth
13 County DA's office contradicting any of the concerns
14 you raised with the reporter during the course of
15 that meeting?
16     A.  No.
17     Q.  Do you -- do you recall ever putting in
18 writing to Tim Cruz an explanation of what your
19 concerns were around the OUI issue and what should
20 be done to address it?
21     A.  I don't think I put anything in writing
22 other than the annual statistics that were provided.
23     Q.  So other than providing some annual
24 statistics to Timothy Cruz that would show the

Page 102

1  conviction rate in jury-waived trials, you do not
2  recall putting anything else in writing to Timothy
3  Cruz about this issue?
4      A.  No.
5      Q.  And other than -- I just want to make sure
6  we're clear that all this writing was -- with the
7  jury-waived statistics was just the statistics
8  themselves; is that right?
9      A.  Yes.
10     Q.  Okay.  Okay.  The second issue that you
11 claim that you were -- by the way -- strike that.
12         How do you connect the dots from the 2008
13 raising of the OUI issue to your 2012 termination?
14     A.  I'm not sure what you mean.
15     Q.  Well, you allege that Timothy Cruz
16 terminated you in part because you -- quote,
17 unquote -- "blew the whistle" on the OUI issue,
18 right?
19     A.  Yes.
20     Q.  You initially raised this issue in --
21 according to your testimony in 2007, right?
22     A.  2006.
23     Q.  2006.  Excuse me.
24         So you originally raised the OUI issue with

Page 103

1  Tim Cruz and Mike Horan in 2006, right?
2      A.  Right.
3      Q.  And then there was the reporter who came in
4  in 2008, as I understand it?
5      A.  2011.
6      Q.  2011.  I'm sorry.  I got my numbers wrong.
7         So eventually a reporter comes in in 2011,
8  right?
9      A.  Right.
10     Q.  And then you were ultimately terminated in
11 2012, right?
12     A.  Right.
13     Q.  Explain to me, if you would, how you
14 connect your raising the OUI issue with your
15 subsequent termination by Timothy Cruz in late 2012.
16     A.  Well, ultimately the OUI issue led to the
17 e-mail exchange which he has put forward in his own
18 sworn testimony as the reason that he fired me.
19     Q.  And what about that e-mail exchange?
20     A.  I'm not sure what you mean, "what about
21 it."
22     Q.  So -- well, it's your -- it's your -- okay.
23         Timothy Cruz testified that he -- he
24 terminated you in part because you -- hold on to

Page 104

1  this one, would you?
2         MR. SHERIDAN:  Uh-huh.
3      Q.  In part -- well, Timothy Cruz testified
4  that the final straw, so to speak, was your e-mail
5  in which you said to Timothy Cruz that you're not
6  his child, right?
7      A.  Yeah.  I thought he testified that was the
8  sole reason he fired me.
9      Q.  Okay.  So we're not here to discuss his
10 testimony.  We'll just assume for the sake of this
11 discussion that's it.  Right?
12         What evidence do you have that Timothy
13 Cruz's stated reason for your termination around
14 that e-mail -- that is the tone that you took with
15 him -- was not the real reason for your termination
16 and that the real reason was, among other things,
17 your raising of the OUI issue initially in 2007,
18 let's say?
19         MR. SINSHEIMER:  Object to the form.
20         You can answer.
21     A.  What evidence do I have of that?
22     Q.  Yes.
23         MR. SINSHEIMER:  Object to the form.
24         You can answer.

Doris O. Wong Associates, Inc.  Professional Court Reporters       (617) 426-2432  
50 Franklin Street, Boston, MA 02110   Video Conference Center       www.doriswong.com

John Bradley vs.  CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.  July 23, 2015

Page 105

1   A.  Just my own personal belief as to the
2   timing of it all. That this had been an issue that
3   had been building for a period of six or seven years
4   that he had done almost nothing to address, that had
5   been in the papers, that he had become uncomfortable
6   or disenchanted with the fact that I had been
7   speaking to the "Globe" about it. And then we
8   ultimately had the e-mail exchange.
9   Q.  Whose responsibility was it to deal with
10  the press at the Plymouth County district attorney's
11  office?
12  A.  It was mainly Bridget Middleton's
13  responsibility.
14  Q.  Can you and I agree that Timothy Cruz got
15  to decide who dealt with the press with respect to
16  matters pertaining to the Plymouth County DA's
17  office?
18  A.  Yes.
19  Q.  And can you and I also agree that if
20  Timothy Cruz tells you not to talk to the press
21  about a particular matter, you should follow that
22  instruction?
23  A.  Yes.
24  Q.  And can you and I also agree that Timothy

Page 106

1   Cruz telling you not to talk to the press about a
2   particular issue in and of itself does not mean that
3   you're being in any way disadvantaged based --
4       MR. SINSHEIMER:  Keep going.
5   Q.  -- based on some concern that you may have
6   raised?
7       MR. SINSHEIMER:  Object to the form of the
8   question.
9       You can answer.
10  A.  In and of itself, yes.
11  Q.  Okay. We'll set that aside.
12      Let's go to the confidential informant
13  issue for a minute.
14      There is another reason why you've claimed
15  that you were fired, and that is around your whistle
16  blowing around the confidential informant issue
17  we'll call it.
18      Fair enough?
19  A.  Yes.
20  Q.  Why don't you, in your own words, describe
21  for us what the confidential informant issue was.
22  A.  Generally speaking, that there was a method
23  of operation that was being used in the office by
24  Mr. Middleton, with the endorsement of Mr. Cruz,

Page 107

1   that was enabling at least two confidential
2   informants, or cooperators, to be running amok,
3   committing crimes after they had received benefits
4   from the office; and that the -- the office had
5   turned a blind eye to what these folks were doing
6   out there. And that there also were credibility
7   issues concerning these cooperators.
8   Q.  Part of this is, you know, look; I'm a
9   civil litigator. I'm not a criminal lawyer, and I
10  haven't spent time in that. I don't entirely
11  understand your answer, so I'm going to ask you a
12  couple of questions to try to get to understand it
13  better.
14      Fair enough?
15      So as I understand it, DA's offices across
16  the Commonwealth -- frankly across the United
17  States -- but they'll use what are called
18  confidential informants to gather information
19  against criminals; is that right?
20  A.  Right.
21  Q.  And these confidential informants are
22  individuals that -- whose identities are kept from
23  public view as much as possible; is that right?
24  A.  Yes.

Page 108

1   Q.  And it's also my understanding that often
2   the reason why these confidential informants'
3   identities are kept from public view is because
4   they're exposing criminal activity and their own
5   personal safety could be affected adversely if it
6   were to be known publicly who they were?
7   A.  That's right.
8   Q.  And it's also fair to say that sometimes
9   these confidential informants provide information in
10  exchange for certain benefits, let's just call them,
11  fair enough?
12  A.  Yes.
13  Q.  And it's also fair to say that sometimes
14  these confidential informants are -- have been given
15  money of one form or another; is that right?
16  A.  No.
17  Q.  So have -- has a confidential informant
18  ever been given a place to stay, as far as you know?
19      MR. SINSHEIMER:  Hold on.
20      Object to the form of the question.
21  A.  Yes. Sometimes they're provided with
22  lodging.
23  Q.  Okay. So when I said "money," I probably
24  answered that -- I said it not well.

27 (Pages 105 to 108)

Case 1:13-cv-12927-IT   Document 117-9   Filed 02/11/16   Page 12 of 16

John Bradley vs.                          CONFIDENTIAL   John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                  July 23, 2015

**Page 145**

1  trial. And, in fact, instead of checking in with
2  me, he was asking the victim witness advocate on the
3  case how things were going.
4       Q.  Other than what you just testified to, can
5  you think of any other hostility that DA Cruz
6  engaged in after the October of 2011 stories began
7  to run?
8       A.  The day-to-day things, he seemed to be
9  avoiding contact with me. Wouldn't come into my
10 office. He seemed to try to avoid me in the
11 hallways, if possible. When he couldn't avoid me,
12 it was a -- it was a very brief hello in passing,
13 that type of thing.
14      Q.  And -- so it's the hallway interactions.
15 It's his failure to talk to you about a particular
16 trial.
17      And what else would you describe as hostile
18 by Timothy Cruz post October 2011?
19      A.  Just in general he seemed to almost cut off
20 all contact with me, direct contact.
21      Q.  And -- okay. So I just want to make sure I
22 understand the panoply of hostility directed towards
23 you by DA Cruz.
24      First was he wasn't friendly to you in the

**Page 146**

1  hallways; two, he didn't discuss with you a
2  particular high-profile murder trial that you were
3  involved in as, in your opinion, he normally would
4  have done; and three, he generally cut off all
5  direct communications with you.
6       Is that it?
7       A.  That's all I can think of right now.
8       Q.  And it is true that you never confronted or
9  asked --
10      A.  Oh, I'm sorry. One other thing.
11      My district court supervisor's job was
12 taken away from me shortly thereafter.
13      Q.  All right.
14      So the four things that you now have
15 testified to that were hostile, as you described it,
16 post October of 2011 "Globe" stories was: One,
17 the -- the chilly reception received in the
18 hallways; two, the fact that he didn't discuss with
19 you a particular murder trial; three, that he cut
20 off all direct contact with you; and four, that the
21 district court responsibilities were taken away from
22 you shortly thereafter.
23      Is that it?
24      A.  That's all I can think of right now.

**Page 147**

1       Q.  And so one of those four examples is that
2  shortly after the October 2011 e-mail -- strike
3  that. Strike that.
4       That one of the examples that you gave was
5  that your district court responsibilities were taken
6  away from you shortly after the October 2011
7  articles came out, right?
8       A.  Right.
9       Q.  Can I see -- I think you've got previously
10 marked as Exhibit 8, right.
11      Could I see that, please?
12      MR. SINSHEIMER:  Did somebody take my stack
13 to use it to...
14      A.  Exhibit 8?
15      THE REPORTER:  Did we use that one yet,
16 today?
17      MR. COHEN:  No, not today.
18      MR. SINSHEIMER:  I don't have that with me
19 now.
20      MR. COHEN:  Exhibit 8. It's the "I'm not
21 your child" e-mail.
22      MR. SINSHEIMER:  The what?
23      MR. COHEN:  The "I'm not your child"
24 e-mail.

**Page 148**

1       MR. SHERIDAN:  Let me see if I've got a
2  copy here.
3       MR. COHEN:  Can we just go --
4       MR. SHERIDAN:  Here we go.
5       MR. SINSHEIMER:  We know what it looks
6  like.
7       Q.  Do you have it in front of you?
8       MR. SINSHEIMER:  No. No, we don't.
9       MR. COHEN:  So I've got his.
10      MR. SINSHEIMER:  Use that one. I don't
11 need a copy.
12      BY MR. COHEN:
13      Q.  So what I'm going to do is I'm going to
14 show you this e-mail, Mr. Bradley.
15      Can you identify the date on that e-mail?
16      A.  November 17th of 2011.
17      Q.  Right.
18      So that date is the month after the date
19 that you describe in Paragraph 39, right?
20      A.  Yes.
21      Q.  And that's the e-mail in which you told
22 your -- your boss, Timothy Cruz, quote, "I am not
23 your child," period, end quote.
24      Is that right?

37 (Pages 145 to 148)

Doris O. Wong Associates, Inc. Professional Court Reporters                    (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center                www.doriswong.com

John Bradley vs.                          CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                              July 23, 2015

Page 149

1    A.  That's the e-mail, yes.
2    Q.  And -- and it was after that e-mail that
3  you no longer had the district court
4  responsibilities; is that right?
5    A.  I believe that's true, yes.
6    Q.  All right.
7       And so is it possible that your telling
8  your boss, the Plymouth County district attorney,
9  that, quote, "I'm not your child," end quote, might
10 have something to do with your responsibilities
11 changing at the -- at the Plymouth County district
12 attorney's office?
13      MR. SINSHEIMER:  Object to the form of the
14 question.
15      You can answer.
16   A.  Sure, that's possible.
17   Q.  As you sit here today, can you provide
18 evidence that the e-mail that we just read, again,
19 into evidence, had nothing to do with any changes to
20 your responsibilities --
21      MR. SINSHEIMER:  Object to the form.
22   Q.  -- at the district attorney's office?
23      MR. SINSHEIMER:  Object to the form of the
24 question.

Page 150

1    A.  No.
2    Q.  Between Exhibit 8 that's in front of you,
3  which is dated 11/17/2011, and your termination on
4  September 28th, 2012, you handled two cases to
5  trial, Caswell and Winquist; is that right?
6    A.  Yes.
7    Q.  And it's true, isn't it, that other than
8  those two matters, which had been pending for some
9  time, those were the only two matters that you were
10 directly responsible for handling in that time
11 frame?
12   A.  Yes.
13   Q.  So from the time after the "I'm not your
14 child" e-mail, through your termination, you no
15 longer had the district court lead attorney
16 responsibilities, and you only were responsible for
17 the two cases I just mentioned, the Caswell and the
18 Winquist matter; is that right?
19   A.  Not entirely.  I think the district court
20 supervisor's job was taken away from me sometime
21 after the first of the year.
22   Q.  Okay.  But -- so -- so let me rephrase it,
23 then.
24      Sometime shortly after the "I'm not your

Page 151

1  child" e-mail in November of 2011, the district
2  court responsibilities are removed from you; is that
3  right?
4    A.  Yeah.  It was within -- within three
5  months.
6    Q.  Okay.  Within -- within -- so -- so within
7  three months of the November 2011 e-mail your
8  district court responsibilities are removed,
9  correct?
10   A.  Yes.
11   Q.  And then all that you did and were
12 responsible for the Plymouth County district
13 attorney's office from that period through your
14 subsequent termination in September 2012 was see to
15 conclusion those two murder cases, the Caswell and
16 the Winquist matter; is that right?
17   A.  Not entirely.
18   Q.  Okay.  So tell us what other matters that
19 you were responsible for handling during that period
20 of time.
21   A.  Well, in terms of cases, you're right.
22   Q.  I want to know in terms of cases.
23   A.  You're right.
24   Q.  So let me ask you the question again.

Page 152

1       So in terms of actual cases that you're
2  responsible for handling between the time of the
3  "I'm not your child" e-mail through your termination
4  September 2012, there were two, Caswell and
5  Winquist, and that's it; is that right?
6    A.  Those were my trial cases, yes.
7    Q.  And were there other cases that you were
8  the primary attorney responsible for handling in the
9  period of time of -- from after the "I'm not your
10 child" e-mail in November of 2011 through your
11 termination?
12   A.  I think I was working on one of my appeals,
13 too, but I'm not -- I don't have a specific memory
14 of which one now.
15   Q.  So the only two cases that you have a
16 memory actually of being responsible for handling
17 during the relevant period of time for this
18 discussion, November 2011 through September 2012,
19 were Caswell and Winquist; is that right?
20   A.  Yes.
21   Q.  With respect to your district court
22 responsibilities being removed, did you ever
23 complain to anybody about that?
24   A.  I believe I had a discussion with Mr. Horan

                                           38 (Pages 149 to 152)

Doris O. Wong Associates, Inc.  Professional Court Reporters            (617) 426-2432
50 Franklin Street, Boston, MA  02110  Video Conference Center          www.doriswong.com

John Bradley vs.  CONFIDENTIAL  John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                   July 23, 2015

Page 153

1    where I expressed my dissatisfaction with that
2    decision.
3        Q. And what did Mr. Horan tell you?
4        A. It wasn't very in depth. My recollection
5    was he just told me that that's the way Tim wanted
6    it, and I think there was some reference to, you
7    know, the Middletons were starting to become
8    effective in their efforts to marginalize me.
9        Q. You weren't a fan of theirs, right? Of the
10   Middletons?
11       A. I'm sorry.
12       Q. You're not a fan of the Middletons, are
13   you?
14       A. No.
15          MR. COHEN: Can we go off the record for
16   one second.
17          (Discussion off the record)
18       BY MR. COHEN:
19       Q. Is it fair to say that you and the
20   Middletons did not enjoy a good working
21   relationship?
22       A. Over the past several years, that's
23   correct.
24       Q. And do you put the entire blame on the

Page 154

1    Middletons for that poor working relationship?
2        A. And on Mr. Cruz.
3        Q. And so therefore you take no responsibility
4    yourself for any of the poor working relationship
5    between yourself and Mr. Middleton, and
6    Mrs. Middleton?
7        A. I think it's almost entirely of their
8    doing.
9        Q. You mean -- when you say "their doing," you
10   mean of Frank, Bridget Middleton as well as
11   Mr. Cruz; is that right?
12       A. Yes.
13       Q. Okay. Is there any responsibility, as you
14   sit here today, that you take, Mr. Bradley, for the
15   demise of the relationship between you and the
16   Middletons?
17       A. Well, I'm not sure what you mean by taking
18   responsibility. I suppose I'm responsible for not
19   making efforts to try to repair the relationship,
20   but at the time and as time went on, I didn't think
21   there was any legitimate chance of that happening.
22       Q. What evidence do you have -- well, strike
23   that.
24          What facts are you aware of that would

Page 155

1    support any contention that Frank Middleton was
2    responsible for your termination?
3        A. Well, I was told many, many times by
4    Mr. Horan that both Frank and Bridget were trying to
5    get Tim to fire me.
6        Q. Other than the statements that you
7    attribute to Mr. Horan in which he told you that
8    Frank and Bridget were trying to get you fired, do
9    you have any other facts that would support your
10   contention that Frank and Bridget had anything to do
11   with your termination?
12          MR. SINSHEIMER: Object to the form.
13          You can answer.
14       A. The memo that was referenced earlier, the
15   attachment to the memo that was submitted by Bridget
16   Middleton to Mr. Cruz that referenced my failure to
17   participate in a campaign, or sitting out the
18   campaign, or however it was phrased. And I knew
19   that they didn't like me, and that they -- they had
20   Tim's ear.
21       Q. So other than the memo to which you just
22   spoke of, and your understanding that the Middletons
23   didn't like you, and that they had Tim's ear, what
24   other facts do you have to support a contention that

Page 156

1    Frank and/or Bridget Middleton caused you to be
2    fired?
3           MR. SINSHEIMER: Object to the form.
4           You can answer.
5        A. Well, again, Mr. Horan told me several
6    times that they were trying to get me fired.
7        Q. All right. Sorry.
8           So other than the fact that Mr. Horan told
9    you that the Middletons were trying to get you
10   fired, the fact that you knew that the Middletons
11   didn't like you, and the fact of the memo to which
12   you've testified to, do you have any other facts
13   that would support a contention that either Frank or
14   Bridget Middleton caused you to be fired?
15          MR. SINSHEIMER: Object to the form of the
16   question.
17       A. Not that I can think of right now.
18       Q. You, yourself, complained to Tim Cruz about
19   the Middletons; is that right?
20       A. Yes.
21       Q. What about Mr. Horan, sitting across from
22   us right now? What facts are you aware of that
23   would support a contention that Mr. Horan was the
24   cause of your termination?

39 (Pages 153 to 156)

Doris O. Wong Associates, Inc. Professional Court Reporters          (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center        www.doriswong.com

John Bradley vs.  
Timothy J. Cruz, et al.  
CONFIDENTIAL John E. Bradley, Jr., Volume II  
July 23, 2015

Page 157

1      MR. SINSHEIMER: Object to the form of the
2  question.
3      You can answer.
4   A.  Mr. Horan was the cause of my termination?
5   Q.  Yes, sir.
6      MR. SINSHEIMER: Object to the form of the
7  question.
8      You can answer.
9   A.  Well, nothing other than the fact that he
10 was actually the one that terminated me.
11  Q.  Okay. Other than the fact that Mr. Horan
12 delivered the message of the termination to you, do
13 you have any other facts to suggest that the
14 gentleman sitting to my left in any way caused you
15 to be terminated, meaning that it was his decision
16 or he influenced the decision to terminate you?
17     MR. SINSHEIMER: Object to the form --
18 well, wait a second.
19  A.  Well --
20     MR. SINSHEIMER: Hang on one second.
21     MR. COHEN: You can object. You did.
22     MR. SINSHEIMER: I don't want to object to
23 everything. I have a very specific reason for
24 objecting to these, and I'm not sure I heard it that

Page 158

1  time.
2      You can answer it, I guess.
3   A.  He was the chief of staff. That was his
4  role. That was his title. And he was Tim's
5  right-hand man in all personnel areas.
6   Q.  Okay. So have you now testified to all the
7  reasons in which you know or you believe that
8  Mr. Horan had any role in the decision to terminate
9  you?
10  A.  Yes.
11  Q.  So the two reasons why you believe
12 Mr. Horan had a role in terminating you are: One,
13 that he was the one who actually told you you were
14 fired; and two, because he happened to have the
15 title of chief of staff.
16     Is that right?
17  A.  That was his job.
18  Q.  Is that right?
19  A.  Yes.
20     MR. SINSHEIMER: You're done, Bret.
21     MR. COHEN: Huh?
22     MR. SINSHEIMER: You're done. Don't think
23 too hard. You're done. You've had, like, ten
24 hours.

Page 159

1      MR. COHEN: Almost done.
2   Q.  Which was the trial that you concluded on
3  the 28th of September?
4   A.  James Winquist.
5   Q.  Strike that.
6      It was the 26th, I think. You were
7  terminated on the 28th?
8   A.  Right.
9   Q.  So the record's clear, on September 26th,
10 if you look at your -- strike that.
11     If you look at the calendar, if you
12 would -- and what number exhibit is that?
13  A.  10.
14  Q.  All right.
15     So if you look at Exhibit Number 10, and
16 I'll look at it with you, you're going to see that
17 it -- the 26th is what day?
18  A.  Wednesday.
19  Q.  Will you just indulge me and put a little X
20 on Wednesday?
21  A.  An X?
22  Q.  An X, yeah.
23     And you've just Xed out the 26th, right?
24  A.  That's right.

Page 160

1   Q.  So you complete -- I'll take the red pen
2  back. Thank you.
3      That's when that trial concludes, and you
4  are then terminated on the 28th; is that right?
5   A.  Yes.
6   Q.  Were there any events that took place of
7  any significance relative to your complaint at the
8  Plymouth County DA's office from the time of your
9  completion of that last trial on the 26th through
10 Mr. Horan letting you know you were terminated on
11 the 28th?
12  A.  No. In fact, my memory is that I took the
13 27th off, so I wasn't in the office that day.
14  Q.  Not -- not unusual for an ADA, after a
15 completion of a challenging murder trial, to take a
16 day off, right?
17  A.  Right.
18  Q.  You have -- strike that.
19     Mr. Bradley, do you consider yourself a --
20 a good homicide prosecuting attorney?
21  A.  I hope so.
22  Q.  Forget hope for a second.
23     Do you consider yourself a good homicide
24 prosecutor?

40 (Pages 157 to 160)

Doris O. Wong Associates, Inc. Professional Court Reporters          (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center        www.doriswong.com

Case 1:13-cv-12927-IT  Document 117-9  Filed 02/11/16  Page 16 of 16

John Bradley vs.                          CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                            July 23, 2015

Page 189

1  (Document marked as Bradley
2  Exhibit 23 for identification)
3  THE WITNESS: Okay.
4  BY MR. COHEN:
5  Q. It's an e-mail from yourself -- well, at
6  the top it's an e-mail from yourself to Karen
7  O'Sullivan; is that right?
8  Put another way, Mr. Bradley --
9  A. Yes.
10  Q. -- it's long in the day and this is the
11  last series of questions, and then we're going to
12  wrap up.
13  But there is an e-mail that says -- from
14  Karen O'Sullivan to you, dated -- begins dated
15  January 4th, 2011, at 5:12 p.m.
16  Do you see that?
17  A. I do.
18  Q. And her e-mail says "WTF."
19  Is that -- what did "WTF" mean?
20  A. That means "what the fuck."
21  Q. Right.
22  And what is she referencing?
23  A. I don't know.
24  Q. You don't remember what she was

Page 190

1  referencing?
2  A. No. It looks like the -- I don't know if
3  there was an e-mail leading up to this or what the
4  triggering event for that question was.
5  Q. Okay. And then your response begins --
6  could you read your response into the record,
7  please?
8  A. Sure. It says:
9      "That was our wimp of a DA trying to
10     provide some cover for our crazy first
11     assistant. By the way, FM told Tim that CK
12     approached him about you folks meeting with
13     Tim because she was concerned for him (FM)
14     and that Dawley and I helped orchestrate
15     it."
16  Q. Let's put --
17  A. I know what it was about now.
18  Q. Okay. What was it about?
19  A. It was about a staff meeting that was held,
20  presumably earlier that day, in front of the
21  superior court staff where -- where Tim had
22  basically reaffirmed that Frank was his right-hand
23  man. And that, as I recall, he used some strong
24  language to the staff, and basically said, "If you

Page 191

1  don't like it, there is the door," or something like
2  that.
3  And the background was that there were
4  several assistants that were going to go in to talk
5  to Tim about -- about their issues with Frank and
6  Bridget Middleton, and that this was done with the
7  knowledge and support of Mr. Horan. And somehow
8  Frank had found out about it, and they had gone in
9  to see Tim before this group of assistant DAs could
10  come in and talk to him.
11  Q. And the -- your reference to the "wimp of a
12  DA," that was in reference to Tim Cruz; is that
13  right?
14  A. That's right.
15  Q. So in other words, you were calling Timothy
16  Cruz a wimp; is that right?
17  A. To a colleague, right.
18  Q. To a colleague, right?
19  A. Right.
20  Q. And you and I can agree that calling
21  Timothy Cruz to a colleague a wimp is not
22  respectful; is that right?
23  A. No.
24  Q. No, it's not? Or no, you agree with me

Page 192

1  that it is not respectful?
2  A. No. The conversation, again, was not
3  involving Mr. Cruz, but it wasn't, certainly wasn't
4  complimentary or respectful of him.
5  MR. COHEN: Anything else?
6  We're done. Thank you.
7  Talk to you for a minute.
8      (Whereupon, the deposition was
9      concluded at 5:17 p.m.)

48 (Pages 189 to 192)

Doris O. Wong Associates, Inc. Professional Court Reporters         (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center       www.doriswong.com