# EXHIBIT 9A

Case 1:13-cv-12927-IT   Document 117-10   Filed 02/11/16   Page 2 of 9

John Bradley vs.                              CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                                July 23, 2015

## Page 1

Volume II
CONFIDENTIAL PURSUANT    Pages 2-1 to 2-195
TO PROTECTIVE ORDER       Exhibits 9 to 23
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------x
                      :
JOHN BRADLEY,         :
    Plaintiff,        :
                      :
    vs.               : Civil Action
                      : No. 1:13-cv-
TIMOTHY J. CRUZ       : 12927-RGS
(Individually), MICHAEL HORAN :
(Individually), FRANK J. :
MIDDLETON (Individually), and :
OFFICE OF THE DISTRICT :
ATTORNEY FOR PLYMOUTH COUNTY, :
    Defendants.       :
                      :
----------------x

    CONTINUED DEPOSITION OF JOHN E. BRADLEY, JR.,
a witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Alexander K. Loos, Registered Diplomate
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC,
One Financial Center, 35th Floor, Boston,
Massachusetts, on Thursday, July 23, 2015,
commencing at 12:16 p.m.

PRESENT:

  Sinsheimer & Associates
    (By Robert S. Sinsheimer, Esq.)
    E-mail: rsinsheimer@sinsheimerlaw.com
    92 State Street
    9th floor
    Boston, MA 02109
    617.722.9954
      for the Plaintiff.
(Continued on next page)

## Page 2

1   PRESENT (Continued):
2     Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
        (By Bret A. Cohen, Esq. and Robert
3         Sheridan, Esq.)
        E-mail: bcohen@mintz.com
4               rsheridan@mintz.com
        One Financial Center
5       Boston, MA 02111
        617.542.6000
6         for the Defendants.
7   ALSO PRESENT: Michael Horan
8           * * * * *

## Page 3

              INDEX

WITNESS        DIRECT CROSS REDIRECT RECROSS

JOHN E. BRADLEY, JR.
BY MR. COHEN    2-5


              * * * *

           EXHIBITS

NO.     DESCRIPTION              PAGE

9    Case Summary Criminal Docket,    2-12
     Commonwealth v. Choy, Kenneth S.
10   Blank September 2012 calendar    2-15
11   Typed and handwritten note, "A"-3   2-29
12   Case Summary, Criminal Docket,   2-64
     Commonwealth v. Choy, Frances Y.
13   E-mail from Ms. O'Sullivan to    2-77
     Mr. Bradley, dated 7/8/2008, with
     attached image
14   E-mail from Ms. O'Sullivan to    2-79
     Mr. Bradley, dated 6/25/2008, with
     attached image
15   E-mail from Ms. O'Sullivan to Mr.  2-82
     Bradley, dated 6/18/2008, with
     attached image
16   E-mail from Ms. O'Sullivan to    2-83
     Mr. Bradley, with attached e-mail
     chain and images

## Page 4

          EXHIBITS, Continued
NO.        DESCRIPTION              PAGE

17   Memorandum of Understanding, ▮   2-130
     ▮ (marked confidential and
     retained by counsel)
18   Criminal complaint and case      2-135
     disposition sheet, docket no 0615 CR
     007031
20   Letter from Mr. Cohen to Ms. Robb,  2-174
     dated July 1, 2013
21   E-mail from Mr. Cohen to Ms. Robb,  2-179
     dated August 26, 2013
22   Annotated Laws of Massachusetts,    2-186
     Chapter 12, Section 16
23   E-mail from Mr. Bradley to        2-189
     Ms. O'Sullivan, dated January 04,
     2011, and related e-mail chain

              * * * *

1 (Pages 1 to 4)

Doris O. Wong Associates, Inc. Professional Court Reporters    (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center  www.doriswong.com

John Bradley vs.  CONFIDENTIAL  John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.  July 23, 2015

Page 109

1    But the confidential informants are
2  provided things of value, right?
3    A.  Yes.
4    Q.  And why -- would you give an example of why
5  you would give a confidential informant something of
6  value?
7    MR. SINSHEIMER: Object to the form.
8    You can answer.
9    A.  I guess, to back up a little bit I would
10 draw a distinction between confidential informant
11 and cooperators.
12    Confidential informants, generally
13 speaking, are people who provide the police with
14 information that they can later use without
15 testifying in court themselves. Cooperators, on the
16 other hand, are those who are willing to testify in
17 open court and assume the risk, obviously, that
18 their identities will be exposed.
19    The issue that I've raised deals with
20 cooperators and not confidential informants.
21    Q.  Okay. Thank you for addressing that.
22    Okay. So your concern, then, was the way
23 in which Timothy Cruz and the DA's office was
24 handling witnesses that you called cooperators; is

Page 110

1  that right?
2    A.  That's correct.
3    Q.  And a cooperating witness is somebody who
4  would provide live testimony, at some risk to him or
5  herself, against somebody that's being prosecuted;
6  is that right?
7    A.  That's right.
8    Q.  And with respect to the cooperating
9  witnesses, those witnesses sometimes are given
10 things such as lodging, or protection, or maybe even
11 witness -- maybe even identity changes; is that
12 right?
13    A.  Yes.
14    Q.  Okay. Now that we understand exactly what
15 we're talking about -- and I think we do -- tell --
16 tell us, if you would, what it was that, in your
17 mind, you were concerned about relative to the DA's
18 office with respect to cooperating witnesses.
19    A.  There was a pattern that had developed, as
20 I mentioned earlier, that there were cooperating
21 witnesses out there who were committing crimes after
22 they had received benefits from our office, and that
23 these -- these were people that were dangerous and,
24 perhaps, could commit crimes as serious as murder

Page 111

1  while they were out on the streets after receiving
2  benefits from the Plymouth County DA's office.
3    That was my concern.
4    Q.  Are you aware of circumstances where in
5  other counties cooperating witnesses have been --
6  received certain benefits and committed crimes of
7  one kind or another?
8    A.  I'm sure they have. I can't give you any
9  specific examples.
10    Q.  All right.
11    And you, yourself, had used cooperating
12 witnesses in the past, right?
13    A.  Yes.
14    Q.  And, in fact, it's a normal tool,
15 especially in the homicides, that -- that you had
16 prosecuted to use cooperating witnesses; is that
17 right?
18    A.  Yes.
19    MR. SINSHEIMER: Object to the form.
20    You can answer.
21    Give me a chance.
22    Q.  And are you aware of any situation,
23 Mr. Bradley, in which a cooperating witness that you
24 had used had actually committed a crime after being

Page 112

1  a cooperating witness?
2    A.  I mean, I'm sure it's happened. I just
3  can't give you an example off the top of my head.
4    Q.  As you sit here today, you certainly can't
5  testify, can you, that none of the cooperating
6  witnesses that you've used have never committed a
7  crime after testifying?
8    A.  No, I can't say that.
9    Q.  Okay. So nevertheless, you have a concern
10 that Timothy Cruz's office is using confidential
11 informants that are ultimately committing crimes; is
12 that right?
13    A.  Yes.
14    Q.  And did you ever put in writing to Timothy
15 Cruz this concern which you just articulated?
16    A.  No.
17    MR. COHEN: I -- it's my turn to have to
18 take a break.
19    MR. SINSHEIMER: You deserve one.
20    MR. COHEN: Yeah.
21    MR. SINSHEIMER: In fact, you can take a
22 48-hour one if --
23    MR. COHEN: Yeah, I need one.
24    THE REPORTER: Off the record?

28 (Pages 109 to 112)

Doris O. Wong Associates, Inc. Professional Court Reporters  (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center  www.doriswong.com

John Bradley vs.                    CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                          July 23, 2015

Page 113

1   MR. SINSHEIMER: Yeah.
2   MR. SHERIDAN: We're off.
3   MR. COHEN: Yeah.
4   (Recess taken)
5   BY MR. COHEN:
6   Q.  So earlier you testified, Mr. Bradley, that
7   the concern that you had around cooperating
8   witnesses was that the DA's office was using some
9   cooperating witnesses that would ultimately commit
10  crimes; is that right?
11      A.  Yes. And giving, at least in one instance,
12  an inappropriate benefit.
13      Q.  Okay. So -- so you and I earlier agreed
14  that you, yourself, had likely used a cooperating
15  witness at some point during your career that had
16  ultimately committed a crime after the fact, right?
17      A.  Yes.
18      Q.  So your concern, you're not really whistle
19  blowing on yourself, right, Mr. Bradley?
20      A.  I wasn't whistle blowing on myself.
21      Q.  So the difference between the circumstances
22  which you, yourself, found yourself, or you found
23  yourself in -- which was using a cooperating witness
24  that would later commit a crime -- which, as you

Page 114

1   testified, probably happens more than anyone would
2   like, right?
3       A.  Yes.
4       Q.  -- is that, in one particular instance, a
5   cooperating witness had received a benefit that, in
6   your opinion, was inappropriate.
7       Was that right?
8       A.  Well, I think it was probably more than in
9   one instance. I think it was -- it would have been
10  several instances.
11      Q.  Okay. And -- and what district --
12  assistant district attorney was responsible for
13  using the cooperating witness at issue and providing
14  him or her with benefits that were inappropriate?
15      A.  Well, the -- the issues were being handled
16  by Mr. Middleton. He was the one who was the shot
17  caller on these issues regarding these cooperators
18  in the murder cases.
19      So with respect to one of the cooperators,
20  named ███████████, he had approved the use of
21  taxpayer money to post bail for ███████ and get
22  him out of jail.
23      Q.  And how much was that bail money?
24      A.  I want to say it was $350.

Page 115

1       Q.  As you sit here today, your complaint
2   around the ███████████ benefit to a cooperating
3   witness was $350?
4       A.  That was one of the complaints, right.
5       Q.  Okay. With respect to ███████████, was
6   there any other complaints that you had?
7       A.  Well, it was brought to my attention that
8   that information was not disclosed to the grand
9   jury; that it was a state trooper specifically asked
10  whether ███████████ was offered any promises,
11  rewards or inducements in exchange for his
12  testimony. And the response was that no, that his
13  cooperation would be generally brought to the
14  attention of the district attorney's office, when,
15  in truth, he had had his whole bail negotiated and
16  ultimately posted by the state police and the DA's
17  office.
18      And I had never heard, in 20-plus years --
19  and I don't think any other prosecutor with any
20  level of experience had heard -- of a prosecutor's
21  office posting cash bail for a defendant.
22      Q.  Do you know whether or not that defendant
23  subsequently did have that bail money returned?
24      In other words, did ███████████ skip town,

Page 116

1   to the best of your knowledge?
2       A.  I don't believe so.
3       Q.  So bail of -- bail money that's provided
4   for anybody, whether it's from the DA's office or
5   someone else, if they appear for trial as they're
6   supposed to, the bail money is returned, right?
7       A.  Usually.
8       Q.  Right.
9       As you sit here today, do you have any
10  reason that the $350 that you're testifying about
11  was actually not returned to the taxpayers?
12      A.  I have no idea.
13      Q.  All right.
14      And do you understand, as you sit here
15  today, what testimony ███████████ provided?
16      A.  I know he testified in one murder trial.
17  Beyond that, I'm not sure what he did in the way
18  of --
19      Q.  Do you know --
20      A.  -- testifying.
21      Q.  Do you know whether or not, in that
22  particular murder trial, whether a conviction was
23  achieved?
24      A.  I believe it was.

29 (Pages 113 to 116)

Doris O. Wong Associates, Inc. Professional Court Reporters    (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center   www.doriswong.com

John Bradley vs.
Timothy J. Cruz, et al.

CONFIDENTIAL John E. Bradley, Jr., Volume II
July 23, 2015

Page 117

1  Q. Do you know about any other circumstances
2  surrounding ▮▮▮▮ testimony, other than
3  that which you've just testified to yourself?
4  A. About his testimony?
5  Q. Yes, sir.
6  A. Well, I know he -- he lied in that
7  particular trial about where he -- how his bail was
8  posted. And the assistant DA actually had to
9  produce a letter -- that, I think, was written by
10 Ms. O'Sullivan -- as a result of all the
11 machinations regarding ▮▮▮▮ bail that the
12 DA's office had, in fact, posted bail for him.
13  Q. Other than that, do you know anything else
14 about his testimony?
15  A. No.
16  Q. Do you know what role ▮▮▮▮
17 testimony played in having a person convicted for
18 murder?
19  A. I think he was a jailhouse informant; that
20 he had been in custody with the defendant, and that
21 he claimed that the defendant had made certain
22 statements to him of an incriminating nature.
23  Q. As you sit here today, do you have any
24 reason to believe that this testimony was false at

Page 118

1  the time it was given?
2  A. I don't know enough about it to comment on
3  that. I know that others who know ▮▮▮▮
4  better had some concerns about his credibility.
5     MR. SINSHEIMER: Why don't I --
6     THE REPORTER: Off the record?
7     MR. SINSHEIMER: Yeah.
8     MR. COHEN: Yeah.
9     (Discussion off the record)
10    BY MR. COHEN:
11  Q. Do you know or did you hear that there had
12 been threats on ▮▮▮▮ life?
13  A. I have no idea.
14  Q. Okay. Other than the situation which you
15 just described, that involving ▮▮▮▮ and the
16 $350 that was posted by the district attorney's
17 office for his bail, what other complaints did you
18 have about the district attorney's office use of or
19 managing of cooperating witnesses?
20  A. Well, there was another one named ▮▮▮▮
21 ▮▮▮▮, who had alleged to have information about
22 a number of murder cases. He had been committing a
23 series of crimes while he was out on bail, and he
24 had become the subject of fairly significant

Page 119

1  controversy within the office.
2  Q. And what was the controversy around
3  ▮▮▮▮?
4  A. Well, the concern was that he was going to
5  kill someone while he was out after receiving some
6  form of benefit from the DA's office.
7  Q. Okay. And what was the benefit?
8  A. I don't know. I don't know what the --
9  what the benefits were that he received.
10    I know he did receive housing and a -- and
11 I think he had a monetary allowance of some sort.
12 But I was never directly involved in -- in his
13 cases, so I don't know the particulars. All I know
14 is that a few different prosecutors who were
15 involved came to me and expressed concerns.
16  Q. And the concerns were about what, exactly?
17  A. That ▮▮▮▮ was committing crimes
18 while he was out and about; that he was receiving
19 benefits, and that he was a major risk and was
20 essentially playing the office to enable him to
21 further his life-of-crime lifestyle.
22  Q. And so what does ▮▮▮▮
23 situation -- strike that.
24    How does ▮▮▮▮ situation -- you

Page 120

1  had another cooperating witness committing crimes
2  after they've received -- how does that differ from
3  the situations you admitted you found your own
4  cooperating witnesses doing after they testified?
5     MR. SINSHEIMER: Object to the form of the
6  question.
7     MR. COHEN: Yep.
8  A. Well, the difference is they were just
9  utterly reckless in the way they looked at
10 cooperators like him. They're all different, and
11 you have to make a very careful decision as to who
12 you're going to, for lack of a better way to put it,
13 sign up as a cooperator and who you're not.
14    And the people you want to stay away from
15 are your violent offenders, because they're the ones
16 who would potentially kill someone while they're out
17 and about, having received a benefit from your
18 office.
19    And ▮▮▮▮ almost did. He shot
20 someone and missed.
21  Q. And you know that how, Mr. Bradley?
22  A. I was in the office at the time. It was a
23 big deal.
24  Q. Right.

30 (Pages 117 to 120)

Doris O. Wong Associates, Inc. Professional Court Reporters
50 Franklin Street, Boston, MA 02110   Video Conference Center
(617) 426-2432
www.doriswong.com

John Bradley vs.                    CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                        July 23, 2015

Page 121

1    Were you -- by the way, were you a witness
2 to that crime, yourself?
3    A. No.
4    Q. So in other words, you know of
5 ▮▮▮▮▮▮▮▮ alleged conduct from other people,
6 right?
7    A. Yes.
8    Q. Was ▮▮▮▮▮▮ ultimately prosecuted for
9 that alleged crime?
10   A. I think so.
11   Q. Do you know what happened?
12   A. I believe he was convicted.
13   Q. And so it's your testimony, then, in this
14 proceeding that the DA's office was reckless in
15 using ▮▮▮▮▮▮ as a confident -- cooperating
16 witness; is that right?
17   A. And ▮▮▮▮▮▮, yes.
18   Q. Well, let's just talk about ▮▮▮▮▮▮
19 for one second. Let's stick with that.
20   So it's your testimony here today that the
21 district attorney's office was reckless in its use
22 of ▮▮▮▮▮▮ as a cooperating witness; is that
23 right?
24   A. I believe so.

Page 122

1    Q. And so there is, of course, Timothy Cruz in
2 the office, and then there is assistant district
3 attorneys. And it's the assistant district
4 attorneys who are charged with actually litigating
5 or prosecuting the criminal defendants; is that
6 right?
7    A. Yes.
8    Q. So it's your testimony, then, that whoever
9 the DA was that was responsible in the ▮▮▮▮▮ --
10   A. ▮▮▮▮▮.
11   Q. ▮▮▮▮▮?
12   A. I believe there is a ▮ at the end.
13   Q. ▮▮▮▮▮?
14   A. I believe so.
15      MR. SHERIDAN: Yeah.
16   Q. ▮▮▮▮▮.
17      So whatever DA was responsible for
18 prosecuting the ▮▮▮▮▮ matter was reckless in his
19 or her way?
20   A. The DA's were given their marching orders
21 from Mr. Middleton.
22   Q. So everything trickles down or up to
23 Mr. Middleton, right?
24   A. And eventually to Mr. Cruz.

Page 123

1    Q. And Mr. Cruz.
2       Is it your testimony, as you sit here
3 today, that the actual assistant DA that is using
4 the cooperating witness to testify has no
5 culpability for this alleged recklessness to which
6 you testify?
7    A. That's right.
8    Q. Okay. So -- and so if you were to go to
9 Mr. Middleton and say, "I need to use Mr. Smith as a
10 cooperating witness so I can get a conviction of a
11 murder," let's say that, and Mr. Middleton agrees
12 with you, so you can, you know, get the testimony to
13 get the conviction, you're saying ultimately you
14 would have no responsibility and anything that takes
15 place relative to that cooperating witness is
16 entirely Middleton's.
17      Is that your testimony?
18   A. No.
19   Q. So how -- what did I just say that's wrong?
20   A. Well, I mean, you gave an analogy that I --
21 I think is just maybe not apropos.
22   Q. All right.
23      So what, if any, responsibility does the
24 prosecuting assistant district attorney have --

Page 124

1    A. It all --
2    Q. -- around -- around -- around the
3 cooperating witness issue to which you complain of?
4    A. It all depends on the circumstances.
5       I mean, if -- if you have a guy who you
6 want to sign up as a cooperator, and you know he's
7 really dangerous and could go out and kill someone
8 and you then give him a benefit, such as posting his
9 bail or doing something else that allows him to get
10 out of custody, then I think you're undertaking a
11 risk that is way too high and outweighs the
12 potential benefit. And whoever makes that
13 determination, whoever has the final say in that
14 matter is responsible.
15   Q. So in your testimony, then, Mr. Bradley,
16 it's the person who has the final say, not the
17 prosecuting ADA that has any responsibility; is that
18 right?
19   A. Well, when you put it like that, no, I
20 wouldn't agree with that.
21      But that's not what happened here.
22 Mr. Middleton was the one affirmatively making the
23 decisions, and the line ADA's were simply following
24 what he told them to do.

31 (Pages 121 to 124)

Doris O. Wong Associates, Inc. Professional Court Reporters        (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center     www.doriswong.com

Case 1:13-cv-12927-IT   Document 117-10   Filed 02/11/16   Page 7 of 9

John Bradley vs.                          CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.                                            July 23, 2015

Page 125

1  Q. Okay. So it's your testimony, then,
2  Mr. Bradley, that Frank Middleton would embed
3  himself in a particular prosecution that, say, you
4  were involved in, and he would tell you who to use
5  as a cooperating witness and who not, so you really
6  didn't have much say in that; is that your
7  testimony?
8     MR. SINSHEIMER: Object to the form of the
9  testimony.
10 A. Not in my cases.
11 Q. So in your case it's your testimony that
12 you had -- you have say in how cooperating witnesses
13 were used and the circumstances surrounding that,
14 right?
15 A. I did. That's correct.
16 Q. Were you the only ADA in the Plymouth
17 County district attorney's office who had a say in
18 how cooperating witnesses were used?
19 A. I don't know.
20 Q. You can't testify what each and every ADA's
21 responsibility was around the use or not use, as the
22 case may be, of a cooperating witness; is that
23 right?
24 A. Yeah, I can.

Page 126

1  Q. You can?
2  A. Yeah.
3  Q. So in --
4  A. Back then.
5  Q. Okay. So when you were there, and you were
6  at the ADA's office -- excuse me. Strike that.
7     Back when you were at the Plymouth County
8  district attorney's office, other than yourself,
9  Mr. Bradley, what other ADAs had any say in the use
10 of cooperating witnesses?
11 A. I don't know that there were any others.
12 Q. Is it your testimony here today Karen
13 O'Sullivan would have no say in how a cooperating
14 witness was used or used at all in her cases?
15 A. I would say that she had anywhere from no
16 say to very little say.
17 Q. So -- and what's the basis of that belief,
18 Mr. Bradley?
19 A. My conversations with the other ADAs and
20 overall knowledge I had at the time of how things
21 were being done.
22 Q. Did you ever specifically have a
23 conversation with Karen O'Sullivan in which she told
24 you she has little or no say in the use of

Page 127

1  cooperating witnesses?
2  A. Yes.
3  Q. And -- and is it your testimony here today
4  that she told you that she had little or no say in
5  the use of cooperating witnesses?
6  A. Yes.
7  Q. And is it also your testimony, Mr. Bradley,
8  that Karen O'Sullivan was told by Mr. Middleton to
9  actually use a cooperating witness that she didn't
10 want to use because she had concerns?
11 A. I don't know if -- if that specific
12 instance played out with Karen O'Sullivan's cases.
13 I know it did with some of the others.
14 Q. So can you identify for the record a single
15 instance where an ADA said, "I'm not comfortable
16 using a particular cooperating witness because I
17 fear that he or she may commit crimes in the
18 future," and Frank Middleton overruled him or her
19 and ordered that particular ADA to use a cooperating
20 witness that the ADA feared would commit a crime
21 later?
22 A. I believe that did happen with a few cases.
23 Q. Yeah. Right. I understand that,
24 Mr. Bradley.

Page 128

1     Can you identify a single case in which
2  Mr. Middleton forced an ADA to use a cooperating
3  witness in a trial in which the ADA did not want to
4  use a cooperating witness because of a fear of
5  future crimes that that cooperating witness could
6  undertake?
7  A. Well, I don't know about the specific part
8  about forcing the ADA to call the witness at trial,
9  but I know that there were instances where
10 Mr. Middleton forced the issue of having the
11 cooperator involved in the case, and giving the
12 cooperator benefits, and running the risk that the
13 cooperator would commit crimes such as murder.
14 Q. Okay. And what -- what under oath here can
15 you testify the circumstances took place?
16 A. I know it took place in the ▮▮▮▮▮
17 ▮▮▮▮▮ case. I know that Tara Cappola, who
18 had ▮▮▮▮▮ as a witness in one of her cases,
19 had raised concerns to me, to Mr. Middleton, and I
20 believe to others in the office as well that this
21 guy was -- was far too risky, and that he should not
22 be used as a cooperator. And ▮▮▮▮▮ went on
23 to commit a murder in, I think it was February of
24 2013.

32 (Pages 125 to 128)

Doris O. Wong Associates, Inc. Professional Court Reporters       (617) 426-2432
50 Franklin Street, Boston, MA 02110  Video Conference Center    www.doriswong.com

John Bradley vs.  CONFIDENTIAL John E. Bradley, Jr., Volume II
Timothy J. Cruz, et al.  July 23, 2015

Page 129

1    Q. And what role did the Plymouth County
2    district attorney's office have in allowing that
3    murder to take place?
4    A. He had been -- he had been a cooperator for
5    a while. They had -- they had knocked down a
6    minimum mandatory gun charge that he had picked up,
7    I want to say the summer before, which was almost
8    unheard of in the office to reduce a gun charge, and
9    particularly for somebody who was as violent and
10   risky as ▮▮▮▮▮▮▮▮.
11   Q. Do you know who the ADA was responsible for
12   using ▮▮▮▮▮▮▮▮?
13   A. There were several.
14   Q. Do you know if Karen O'Sullivan was
15   involved in that?
16   A. You know, I think she was, but I'm not
17   sure.
18        MR. COHEN: By the way, we believe these
19   documents, for obvious reasons, are highly
20   confidential, but we're going to hand them out here.
21   These -- yeah.
22        So I'm going to -- I'm going to have marked
23   as an exhibit, and I'm going to mention this on the
24   record to the court reporter because we're putting

Page 130

1    in the record highly confidential information. It
2    needs to be handled especially careful in this
3    instance. I've got both redacted and unredacted,
4    and I'm going to show the witness the -- the
5    unredacted version for purposes of this testimony.
6        Can I have this marked as the next exhibit,
7    please.
8            (Document marked as Bradley
9            Exhibit 17 for identification)
10   BY MR. COHEN:
11   Q. Do you see what is marked as Number 17?
12   A. I'm looking at it now, yes.
13   Q. Could you describe for the record what this
14   document is?
15   A. It is a memorandum of understanding between
16   the Plymouth County DA's office and ▮▮▮▮▮▮▮▮.
17   Q. All right.
18        And do you see there is a prosecuting
19   officer's signature there?
20   A. Yes. That's my signature.
21   Q. And it's dated July 23, 2010, right?
22   A. Right.
23   Q. And this says above it:
24        "I acknowledge" and -- "that I've read

Page 131

1    this memorandum of understanding in its
2    entirety. I have acknowledged that this
3    memorandum of understanding fully and
4    accurately sets forth my agreement with the
5    witness with respect to the witness
6    protection services. I agree to provide
7    those witness protection services approved
8    by the Witness Protection Board."
9        Do you see that?
10   A. I do.
11   Q. And this -- on the front, it's the
12   memorandum of understanding -- is with -- so we're
13   very clear, it's with ▮▮▮▮▮▮▮▮, right?
14   A. Yes.
15   Q. So it's true, isn't it, Mr. Bradley, that
16   you are the prosecuting attorney that signed off on
17   the particular memorandum of understanding with
18   ▮▮▮▮▮▮▮▮; is that right?
19   A. My signature is on there, yes.
20   Q. But you, in other words, agreed to the
21   agreement as articulated in what was just marked as
22   Number 17 on behalf of the Plymouth County district
23   attorney's office; is that right?
24   A. Yes and no.

Page 132

1    Q. What's the no, Mr. Bradley?
2    A. Well, the no is that I didn't have any
3    direct involvement with it.
4    Q. Right.
5    A. This was one of the many decisions that
6    Mr. Middleton made, and he was not around at the
7    time a signature was needed. So I was the only one
8    who could sign off on it.
9    Q. Okay. And did Mr. Middleton force you to
10   sign that document, Mr. Bradley?
11   A. No.
12   Q. I mean, you're not suggesting, as you sit
13   here today, Mr. Middleton coerced you in any way to
14   sign this document?
15   A. No. I signed it because he was not there,
16   and I signed it as a favor to the victim witness
17   advocate who was dealing with --
18   Q. Right.
19   A. -- this matter.
20   Q. So -- and you're not suggesting, by the
21   way, that Timothy Cruz forced you to execute this
22   agreement, are you?
23   A. No.
24   Q. So it is -- ▮▮▮▮▮▮▮▮ is one of the

33 (Pages 129 to 132)

Doris O. Wong Associates, Inc. Professional Court Reporters     (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center   www.doriswong.com

John Bradley vs.
Timothy J. Cruz, et al.

CONFIDENTIAL John E. Bradley, Jr., Volume II
July 23, 2015

Page 133

1  individuals that are cooperating witnesses that you
2  presently complain about; is that right?
3     A. That's right.
4     Q. And ultimately it was you, you are the one
5  who executed the particular memorandum of
6  understanding with ▓▓▓▓▓▓, right?
7     A. Well, again I would say yes and no.
8     Q. Right. No, because you just did it as a
9  favor, right?
10    A. Well, I signed it on Mr. Middleton's
11 behalf.
12    Q. Okay. And so now that we have it in the
13 record that you were the one who executed the
14 memorandum of understanding, can you -- do you
15 testify here that you had no responsibility for
16 anything that took place after that fact?
17    A. That's right.
18    Q. And it's true, Mr. Bradley, you could have
19 said, "No, I'm not signing this memorandum of
20 understanding," right?
21    A. I could have.
22    Q. No one ever told you that there was going
23 to be an action taken against you if you didn't sign
24 this memorandum; is that right?

Page 134

1     A. Action taken against me?
2     Q. Yes. No one ever told you that your job
3  was in jeopardy if you didn't execute --
4     A. No.
5     Q. -- the memorandum of understanding that is
6  attached as Exhibit Number 17, right?
7     A. That's right.
8        MR. COHEN: Okay. Do you mind if I take
9  that document back from you?
10       MR. SINSHEIMER: Just this one here?
11       MR. COHEN: Yes, because of that one --
12       MR. SINSHEIMER: I'm -- actually, I'm fine
13 with you taking it. I don't want it.
14       MR. COHEN: Thank you.
15       MR. SINSHEIMER: We'll look at it. You're
16 going to keep it.
17       MR. COHEN: He's going to take care of it
18 special in that instance. We're going to talk about
19 that later.
20       Could I have --
21       MR. SHERIDAN: Yep. You know what? We
22 have it marked as Exhibit 5.
23    Q. Could you open up, look at Exhibit 5,
24 please?

Page 135

1        MR. SINSHEIMER: That's the complaint.
2        MR. COHEN: Yep.
3     Q. Hey, before you turn to that, Mr. Bradley,
4  a couple of quick questions:
5        The statistics that you allegedly gave Mike
6  Horan and Tim Cruz around the OUI issue, where are
7  they?
8     A. I don't believe I have them anymore.
9     Q. And is it also fair to say that both the
10 issue of the OUI issue and the cooperating witness
11 issue, in neither instance did you write a formal or
12 informal complaint to Timothy Cruz identifying what
13 the particular issue was and asking for some
14 corrective action to take place?
15    A. I did not put anything in writing, no.
16       MR. COHEN: Oh, sorry. This is the one
17 next. Thanks.
18       Okay. Marked as 18, please. I think we're
19 on 18, right?
20       Thank you, sir.
21          (Document marked as Bradley
22          Exhibit 18 for identification)
23 BY MR. COHEN:
24    Q. Let me know when you've had a chance to

Page 136

1  review these.
2        Just so we're clear here, I'm waiting for
3  you, Mr. Bradley.
4     A. Okay.
5     Q. Okay. Do you recognize these documents?
6     A. I do.
7     Q. Okay. And can you tell us, if you can,
8  what these documents refer to, generally?
9     A. They refer to a criminal case. The name of
10 the defendant has been blanked out.
11    Q. But you recall the name of the defendant in
12 this instance, correct?
13    A. I do not.
14    Q. You don't?
15       Would ▓▓▓▓▓▓, would that name ring a
16 bell?
17    A. No.
18    Q. Okay. So -- all right.
19       So these -- this involves a criminal --
20 what are the actions involved in this instance?
21 What's the issue?
22    A. It was a firearm case.
23    Q. And were you involved in this matter?
24    A. Yes, I was.

Doris O. Wong Associates, Inc. Professional Court Reporters    (617) 426-2432
50 Franklin Street, Boston, MA 02110   Video Conference Center   www.doriswong.com