# Exhibit 12

Page 1

Volume 1
Pages: 1-92
Exhibits: 13-18
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x
JOHN BRADLEY,
        Plaintiff
    vs.        Cause No.
        1:13-cv-12927-RGS
TIMOTHY J. CRUZ, Individually,
MICHAEL HORAN, Individually,
FRANK J. MIDDLETON, Individually,
and OFFICE OF THE DISTRICT
ATTORNEY FOR PLYMOUTH COUNTY,
        Defendants.
- - - - - - - - - - - - - - x

        DEPOSITION
            of
    KENDRA SALVATORE

    Sinsheimer & Associates
    92 State Street, 9th Floor
    Boston, Massachusetts 02109

    Tuesday, September 22, 2015
    1:10 p.m.


Reporter:  Carol A. Fierimonte, CSR

---

Page 2

1   APPEARANCES:
2   On behalf of the Plaintiff:
3   SINSHEIMER & ASSOCIATES
    By:  Robert S. Sinsheimer, Esquire
4   92 State Street, 9th Floor
    Boston, Massachusetts  02109
5   (617) 722-9954
    Rsinsheimer@sinsheimer.com
6
    On behalf of the Defendant:
7
    MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO,
8   P.C.
    By:  Bret A. Cohen, Esquire
9   One Financial Center
    Boston, Massachusetts  02111
10  (617) 348-3089
    bcohen@mintz.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 3

1          INDEX
2   WITNESS              PAGE
3   Kendra Salvatore
4   By Mr. Sinsheimer      5,88
5   By Mr. Cohen           80
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 4

1          EXHIBITS
2   No.                Page
3   Exhibit 13  E-mail string      29
4   Exhibit 14  E-mail string      35
5   Exhibit 15  E-mail string      39
6   Exhibit 16  E-mail string      59
7   Exhibit 17  E-mail string      64
8   Exhibit 18  E-mail string      65
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 33

```
 1   A.  No.
 2   Q.  In what -- how did you meet him?
 3   A.  When he -- when he came to the office and
 4       then he addressed the senior staff.
 5   Q.  But you sat in as Mr. Cruz's --
 6   A.  I sit in at the senior staff meetings,
 7       yes.
 8   Q.  You do?
 9   A.  Yes.
10   Q.  All of them?
11   A.  Yes.
12   Q.  Who usually went to those meetings in
13       2010?
14   A.  It would be the head of each department or
15       unit.  I don't know specifically in 2010.
16   Q.  Well, let's say at the end of 2009, give
17       or take.  Okay?
18   A.  Uh-huh.
19   Q.  Who would be the senior staff to the best
20       of your recollection?
21   A.  It would have been Frank Middleton.
22   Q.  Okay.
23   A.  Bridget Middleton.
24   Q.  Okay.
```

Page 34

```
 1   A.  Mike Horan.
 2   Q.  Tim himself, obviously?
 3   A.  Tim, yes.  Rob Thompson who handles
 4       appeals.  Donna Cruz, who is the CFO.  The
 5       District Court prosecutor would have been
 6       John.
 7   Q.  Okay.  John Bradley?
 8   A.  John Bradley.  Paul Cashin, who runs our
 9       diversion unit.  Ed Jacobs, who runs the
10       grants and sponsor projects.
11   Q.  The diversion unit, is that the pretrial
12       diversion for the first offenders, is that
13       what you are talking about?
14   A.  Yes.
15   Q.  That is a full-time job, one guy runs the
16       whole unit?
17   A.  He is the head of it.  There is actually
18       four of them.  They cover each court.
19   Q.  Really.  One from each court, and then he
20       supervises from Brockton?
21   A.  He supervises from Plymouth, yes.
22   Q.  Why was Bridget Middleton on the senior
23       staff?
24       MR. COHEN:  Objection.  Go ahead.
```

Page 35

```
 1   A.  She was the media relations person, and at
 2       some point she became the Deputy Chief
 3       Legal Counsel.
 4       MR. SINSHEIMER:  Mark that as
 5   Exhibit 14.
 6       (Document marked as Exhibit 14
 7   for identification.)
 8       MR. COHEN:  Thank you.
 9   Q.  I show you a document marked Exhibit 14.
10       The first question is the same as last
11       time.  Just only if you have seen it
12       before.
13       (Witness perusing document.)
14   A.  Yes.
15   Q.  And in what capacity have you seen it?
16       MR. SINSHEIMER:  I will withdraw
17   it in that form, capacity.
18   Q.  First of all, is this one of the things
19       you have reviewed when you prepared for
20       today?
21   A.  No.
22   Q.  When did you first see this document?
23   A.  When it was sent.
24   Q.  Which, if I understand it, was November
```

Page 36

```
 1       17, 2011, around 12:39?
 2   A.  Yes.
 3   Q.  And did you tell anybody about it?
 4   A.  I spoke to Mr. Cruz about it.
 5   Q.  What did you say and what did he say to
 6       you?
 7   A.  I don't recall exactly.  He was out of the
 8       office, I believe, when it came in.
 9   Q.  Okay.
10   A.  So we had -- he was at a conference.
11   Q.  Okay.
12   A.  And we discussed that I was surprised that
13       --
14       MR. COHEN:  Just, Kendra, I know
15   you are a little nervous just in general.
16       THE WITNESS:  Yes.
17       MR. COHEN:  There is nothing to
18   be nervous about.  Just tell Rob as best
19   you can what you recall your conversation
20   with Tim was about.  Just relax.  You are
21   doing great.
22   Q.  By the way, if it is any consolation, you
23       don't look nervous to me at all.
24   A.  Okay.
```

Page 37

1  Q.  But I don't mean that to say -- I
2      understand that these are difficult
3      moments to be deposed.  It's not a
4      pleasant thing.  We all know that.  And I
5      think most lawyers have been deposed as
6      well.  Again, you are holding up fine.  If
7      I ask questions that are difficult or I am
8      being rude, just tell me.  I am just
9      trying to get the information that I need.
10 A.  Okay.
11 Q.  I am sure he told you that before you even
12     got here.
13 A.  Yes, he did.
14 Q.  Did you find this e-mail, Exhibit 14,
15     surprising?
16 A.  Yes.
17 Q.  Why?
18 A.  I thought it was very disrespectful to Mr.
19     Cruz.
20 Q.  But you liked Mr. Bradley, right?
21 A.  Yes.
22 Q.  Anybody could have a bad day, right?
23 A.  They could.
24 Q.  Yes.  You've had arguments with Mr. Cruz

Page 38

1      over the years, right?
2  A.  I have not.
3  Q.  Never?
4  A.  No.
5  Q.  And what happened next after you had these
6      initial thoughts?
7  A.  We spoke over the phone.  I said I was
8      surprised.  He was upset about it and --
9  Q.  Did he -- so he saw it like on his phone
10     or some device, is that what you think
11     happened?
12 A.  Yes.
13 Q.  And did he call you?
14 A.  I think I called him.
15 Q.  Specifically to discuss this matter or
16     because you needed to fill him in on other
17     information?
18 A.  I don't recall.
19 Q.  Fair enough.  All right.  Continue.  Just
20     remind me everything you said to him and
21     everything he said to you in that instant,
22     please, to the best of your present
23     recollection and good faith.
24 A.  I think I believe I just said I'm shocked

Page 39

1      that he sent that to you, and he was upset
2      about it and he said he would be speaking
3      to John when he got back from the
4      conference.
5  Q.  And that's it?
6  A.  That's what I recall.
7  Q.  And then they spoke?
8  A.  They spoke, I believe, the -- when he got
9      back to the office, within the next,
10     within a day or so of him returning.
11 Q.  Were you present for that conversation?
12 A.  I -- no.  I was in my office.  They were
13     in his office.
14 Q.  You didn't hear any of it?
15 A.  No.
16     MR. SINSHEIMER:  Mark that as
17     Exhibit 15, please.
18     (Document marked as Exhibit 15
19     for identification.)
20 Q.  I am going to show you Exhibit 15 and ask
21     you if you recognize that.
22     (Witness perusing document.)
23 A.  I do recognize it.
24 Q.  And it appears to be e-mails between you

Page 40

1      and Mr. Bradley, correct?
2  A.  Correct.
3  Q.  And in fact, that is what it is?
4  A.  Yes.
5  Q.  Other than a photocopy but --
6  A.  Yes.
7  Q.  Now, is this one of the things that you
8      looked at before you came in here today in
9      the last week or so?
10 A.  Yes.
11 Q.  It begins with Mr. Bradley basically
12     saying that he won a case and perhaps is
13     annoyed that no one seems to congratulate
14     him, the last thing on the bottom.
15 A.  Yes.
16 Q.  And you tell him you are sorry, right?
17 A.  Yes.
18 Q.  And he says classic example of, you
19     actually understood that to be an example,
20     right?
21 A.  I'm sorry?
22 Q.  It says, "Classic ex of how dysfunctional
23     things have become"?
24 A.  Yes.

Page 77

1  Q.  Okay.  And did you also feel that -- did
2      people also understand that two of them
3      were bringing home a quarter of a million
4      bucks a year, and there was a little
5      resentment on that?
6  A.  I don't know what they said about their
7      salaries.
8  Q.  Well, you heard stuff like that, didn't
9      you, between the two of them, government
10     employees, she never worked, you heard
11     that, right?  You are smiling.  I want the
12     record to be clear.  I am not making this
13     up, am I?
14         MR. COHEN:  Go ahead and answer.
15 A.  I don't know.  I don't know what people
16     specifically were saying.  Could they have
17     said that, sure.
18 Q.  You heard that kind of scuttlebutt in the
19     office, didn't you?
20         MR. COHEN:  Objection. Go ahead.
21 A.  I think that people were upset that they
22     were two top-level people in the office.
23         MR. SINSHEIMER:  Can we go off
24     the record for a second?

Page 78

1          MR. COHEN:  Yes, that is fine.
2      (Discussion off the record.)
3          MR. SINSHEIMER:  Back on the
4      record.
5  Q.  (By Mr. Sinsheimer)  Did you help Mr.
6      Horan draft his memo that supported
7      O'Sullivan's complaint regarding
8      Middleton's mistreatment of O'Sullivan?
9  A.  Yes.
10 Q.  Did you like O'Sullivan?
11 A.  No.
12 Q.  Why not?
13 A.  She wasn't a likable person.
14 Q.  What about her made that --
15 A.  Just for me, personally, she was not
16     friendly.
17 Q.  Why did you help Mr. Horan draft this
18     memo?
19 A.  He asked me to type it.
20 Q.  Oh, okay.  And you did?
21 A.  Yes.
22 Q.  Were you in charge of tracking employee
23     attendance?
24 A.  Yes.

Page 79

1  Q.  Were Frank and Bridget in the office as
2      much as they were supposed to be?
3  A.  They were in and out of the office.  I am
4      not sure what exactly you are looking for.
5  Q.  The truth and nothing but so help you God.
6      Were Frank and Bridget in the office as
7      much as they were supposed to be?
8  A.  She worked two days a week in the office,
9      she worked two days outside the office.
10 Q.  How about Frank?
11 A.  Frank was in and out of the office, but
12     whether he was out to meetings or, you
13     know, he could have been meeting with the
14     State Police, he could have been doing a
15     number of things.  So he was in and out of
16     the office.
17 Q.  Did Frank have a known drinking problem?
18 A.  Not that I am personally aware of.
19 Q.  Patty Durkin has a daughter, correct?
20 A.  Yes.
21 Q.  Did you arrange a conference -- and do you
22     know one way or the other whether the
23     daughter of Patty Durkin witnessed one of
24     the alleged events that led to Mr.

Page 80

1      Middleton's termination?
2          MR. COHEN:  You know, counsel, I
3      am going to allow her to answer it.  I
4      definitely think it is outside of the
5      scope of the Court's order.  But go ahead
6      and answer.  Do you know?
7  A.  Yes.
8  Q.  And in terms of the investigation, did you
9      arrange a conference call with that
10     eyewitness?
11 A.  Did I?
12 Q.  Yes.
13 A.  No.
14 Q.  Do you know if there was one?
15 A.  I don't know.
16 Q.  Did Cruz nap in his office?
17         MR. COHEN:  Objection. Really?
18         MR. SINSHEIMER:  We are done.
19         MR. COHEN:  Okay.  All right.  So
20     I just have a couple quick questions for
21     you.
22             CROSS EXAMINATION
23     BY MR. COHEN:
24 Q.  So Kendra, you earlier were asked

Page 81

1    questions about Exhibit 14 which was
2    marked.
3         MR. COHEN:  Could you grab
4    Exhibit 14, counsel?
5    A.  Thank you.
6    Q.  Okay.  So take a step back here, Kendra.
7    A.  Okay.
8    Q.  Do you have access to Tim Cruz's e-mail?
9    A.  Yes.
10   Q.  And do you make it a practice to monitor
11   his e-mail?
12   A.  Yes.
13   Q.  And do you monitor his e-mail perhaps even
14   closer or more closely when he is away?
15   A.  Yes.  I monitor it 24/7.
16   Q.  Okay.  And, and when we put in front of
17   you Exhibit 14, do you see that?
18   A.  Yes.
19   Q.  And we don't need to go over the contents
20   of it, but this is the what we call
21   euphemistically, so to speak, the "I am
22   not your child" e-mail.
23        Do you see that there front of
24   you?

Page 82

1    A.  Yes, I do.
2    Q.  About how long after this e-mail, Exhibit
3    14, hit Mr. Cruz's e-mail box did you see
4    it?
5    A.  I see it simultaneously.
6    Q.  You happened to see the e-mail right when
7    it hit?
8    A.  Yes.
9    Q.  And Kendra, what was your reaction to
10   seeing the exchange between Mr. Bradley
11   and Mr. Cruz, and specifically
12   Mr. Bradley's last e-mail in this traffic?
13   A.  I was shocked.
14   Q.  How long after that e-mail hit and you saw
15   it and you were shocked did you actually
16   speak to Tim Cruz about it?
17   A.  That day, I am not sure exactly at what
18   point.
19   Q.  And I know you testified on previous
20   direct examination by my brother counsel
21   across the table from you, but you had a
22   conversation with Tim Cruz on that day
23   about this e-mail.  Is that right?
24   A.  Yes.

Page 83

1    Q.  And did Tim Cruz express a feeling or a
2    response towards the e-mail that he had
3    received?
4    A.  Yes.
5    Q.  And what was that?  What did Tim Cruz say
6    to you about the e-mail that he had just
7    received?
8    A.  I think he said I can't believe he sent
9    that e-mail.  He was very upset.
10   Q.  And what did you say in response, if you
11   remember?
12   A.  I think I said I was just as surprised,
13   that is it was very disrespectful.
14   Q.  Okay.  And did Tim Cruz ask you not to
15   speak about this with anybody, do you
16   recall?
17   A.  I don't recall.
18   Q.  All right.  So then after this e-mail, Tim
19   has a conversation with you about John
20   Bradley's career in the office.  Is that
21   right?
22   A.  Yes.
23   Q.  About how long after this e-mail exchange
24   was it that Tim Cruz had this conversation

Page 84

1    with you about John Bradley's career at
2    the Plymouth County District Attorney's
3    Office?
4    A.  He told me about it after he had met with
5    John.
6    Q.  Okay.  So approximately when in time was
7    the conversation that you had with Tim
8    about John Bradley in connection with this
9    e-mail relative to the time this e-mail
10   arrived in and around November 17th of
11   2011?
12   A.  I would guess it probably would have been
13   the following Monday or Tuesday, when he
14   returned from the conference.
15   Q.  Okay.  So it is your best memory, Kendra,
16   that sometime within a week or so of this
17   correspondence, November 17th, 2011
18   communication, that "I am not your child"
19   e-mail, that Tim Cruz had a face to face
20   with John Bradley?
21   A.  Yes.
22   Q.  And can you tell us where that
23   face-to-face meeting took place?
24   A.  In Tim's office.

Page 85

1  Q.  And was Tim's door open or closed?
2  A.  Closed.
3  Q.  And can you tell us about how long that
4      meeting was?
5  A.  I'd say about ten minutes, ten to 15
6      minutes maybe.
7  Q.  And did you ever come to learn what took
8      place in this meeting that occurred on or
9      about the Monday following the November
10     17, 2011 "I am not your child "e-mail
11     between John Bradley and Tim Cruz?
12  A.  Yes.
13  Q.  And tell us if you would -- well, how did
14     you learn what took place in that meeting?
15  A.  Mr. Cruz told me.
16  Q.  And what did Mr. -- and did Mr. Cruz tell
17     you what happened in that meeting like
18     shortly after that meeting took place or
19     was it weeks later or something, do you
20     remember?
21  A.  I believe it was that, that day.
22  Q.  Okay.
23  A.  After the meeting had occurred.
24  Q.  Okay.  And so now we are talking about a

Page 86

1     time frame of approximately, say, Monday,
2     November 21st or so.  Does that sound
3     about right?
4  A.  Sure, yes.  Okay.
5  Q.  And, and what does Tim Cruz tell you
6     occurred in that meeting between himself
7     and John Bradley?
8  A.  He told me that John agreed to resign
9     after he finished two homicide cases that
10     were still pending.  And that the DA
11     agreed to that, he thought it was
12     important for the cases had been going on
13     for so long, it was important for the
14     victim's families for John to stay on with
15     the cases.  So that was their agreement.
16  Q.  So and Kendra, I am really not trying to
17     put words in your mouth.  I want to make
18     sure I understand your testimony here.
19        Tim Cruz tells you that he had a
20     meeting in or around November 21st with
21     John Bradley, which you are aware of
22     because it was taking place right next to
23     you.  Is that right?
24  A.  Yes.

Page 87

1  Q.  And Tim Cruz tells you, essentially, that
2     there was an agreement between Tim Cruz
3     and John Bradley that after the two
4     homicides that Mr. Bradley was presently
5     handling, when those were concluded that
6     John Bradley had agreed to resign from the
7     office?
8        MR. SINSHEIMER:  Object to the
9     form of that question.  You can answer.
10  A.  Yes.
11  Q.  Okay.  Was there anything about my
12     question that I just asked that was
13     unclear or untrue in any way?
14  A.  No, that was true.
15  Q.  That was true?
16  A.  Yes.
17  Q.  Did Tim Cruz relay to you as you can
18     recall anything else that occurred in that
19     meeting between himself and John Bradley
20     on or about November 21st, 2011?
21  A.  I don't know what else was discussed in
22     the meeting.
23  Q.  Mr. Cruz didn't share anything else with
24     you, is that what you are saying?

Page 88

1  A.  Not that I recall.
2  Q.  Right.  So was it your understanding,
3     based on what Tim Cruz told you, that
4     after John Bradley finished those two
5     trials, murder trials, that he would then
6     volunteer to leave the office?
7  A.  Yes.
8  Q.  Have you now shared with us everything
9     that you can recall took place during the
10     course of that conversation between
11     yourself and Tim Cruz on or about Monday,
12     November 21st or so?
13  A.  Yes.
14        MR. COHEN:  Nothing else.  Do you
15     have anything else?
16        MR. SINSHEIMER:  Only one thing.
17        REDIRECT EXAMINATION
18  BY MR. SINSHEIMER:
19  Q.  Before you came here today, did Mr. Cohen
20     tell you he was going to ask you
21     questions?
22  A.  No.
23  Q.  Did Mr. Cruz ever ask you to write
24     anything up about his agreement with