# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____
                              )          Civil Action No. 1:13-cv-12927

JOHN BRADLEY,            )

           )

        Plaintiff,      )

           )

v.                        )

           )

TIMOTHY J. CRUZ (Individually),  )

MICHAEL HORAN (Individually),  )

FRANK J. MIDDLETON (Individually), )

 And OFFICE OF THE DISTRICT   )

ATTORNEY FOR PLYMOUTH    )

 COUNTY,                )

           )

        Defendants.    )

_____)

## PLAINTIFF'S L.R. 56.1 OMNIBUS FILING
## ASSERTING DISAGREEMENTS WITH DEFENDANTS'
## ALLEGED AGREED UPON FACTS
## AND ASSERTING ADDITIONAL FACTS
## SUBJECT TO PROOF BY COMPETENT EVIDENCE.

Plaintiff responds paragraph by paragraph to Defendant's L.R. 56.1 filing as follows:

1.    There is no material question of fact concerning this paragraph.

2.    There is no material question of fact concerning this paragraph.

3.    There is no material question of fact concerning this paragraph.

4.    There is no material question of fact concerning this paragraph.

5.    There is no material question of fact concerning this paragraph.

6.   This paragraph raises no material question of fact, but is not relevant in any way to the issues before the court.

7.   There is no material question of fact concerning this paragraph, but the reference to Mr. Bradley passing on his second attempt is not relevant in any way to the issues before the court.

8.   There is no material question of fact concerning this paragraph.

9.   There is no material question of fact concerning this paragraph.

10.   There is no material question of fact concerning this paragraph.

11.   There is no material question of fact concerning this paragraph, although it is not clear that Bradley and Middleton were ever close.

12.   There is a material question of fact.  Bradley was always civil and courteous to Middleton, and spoke with him often, when necessary. (Tr. F. Middleton, pp. 153-154).

13.   There is a material question of fact.  Bradley's disagreements were, for the most part, with Middleton.  *See*, (Plaintiff's Additional Facts, "Core Whistleblower Facts," pp. 17-20, *infra*).

14.   There is a material question of fact. Bradley acknowledged that he and Cruz occasionally had disagreements and robust debate over important office issues. *See*, (Plaintiff's Additional Facts, "Core Whistleblower Facts," pp. pp. 17-20, *infra*).

15.   There is a material question of fact. Bradley admits sending the email in question, but denies that it was disrespectful. (Tr. Bradley Vol. II. 190-191).

16.   There is no material question of fact concerning this paragraph.

17.   There is no material question of fact concerning this paragraph.

18.   There is no material question of fact concerning this paragraph.

19.   There is no material question of fact concerning this paragraph.

20.   There is no material question of fact concerning this paragraph.

21.   There is no material question of fact concerning this paragraph.

22.   There is no material question of fact concerning this paragraph.

23.   There is no material question of fact concerning this paragraph.

24.   There is no material question of fact concerning this paragraph.

25.   There is no material question of fact concerning this paragraph.

26.   There is no material question of fact concerning this paragraph.  Note however that this paragraph summarizes testimony.  Therefore, the statement herein that there is no question of material fact is limited to agreement that the paragraph accurately summarizes the testimony.  **It cannot be read as agreement that the summarized testimony is, in fact, accurate**.  Ms. Salvatore may be a biased witness.

27.   There is no material question of fact concerning this paragraph.

28.   There is a material question of fact, the statement is categorically false.  *See*, (Plaintiff's Additional Facts, "The Reasons Proffered for Termination Are Pretextual," pp. 21-25, *infra*).

29. There is a material question of fact, the statement is categorically false.  *See*, (Plaintiff's Additional Facts, "The Reasons Proffered for Termination Are Pretextual," pp. 21-25, *infra*).

30. There is a material question of fact; the parties met to discuss a number of topics**.** (Bradley Vol. I, pp. 141-143, 167-168).

31. There is a material question of fact.  Bradley's version is attached and can be found at (Bradley Vol. I, pp. 141-143, 167-168).

32. There is a material question of fact; the statement is argumentative.  Bradley's testimony speaks for itself. (Bradley Vol. I, pp. 141-143, 167-168).

33. There is no material question of fact concerning this paragraph.

34. There is no material question of fact concerning this paragraph.

35. This paragraph summarizes testimony.  There is no question of material fact but that is limited to agreement that the paragraph accurately summarizes the testimony.  **It cannot be read as agreement that the summarized testimony is, in fact, accurate**.

36. There is no material question of fact concerning this paragraph.

37. There is no material question of fact concerning this paragraph.

38. There is no material question of fact concerning this paragraph, that an email was sent. Plaintiff does not agree that the email was disrespectful.

39. There is no material question of fact concerning this paragraph.

40. There is no material question of fact concerning this paragraph.

41.   There is a material question of fact concerning this paragraph.   Bradley was not "reminded" of something that never happened. (Tr. Bradley Vol. I, pp. 141-143, 167-168).

42.   There is a material question of fact.   Cruz assigned Horan to do his dirty work because he was afraid to do it himself. (Bradley Vol. I, p. 171).

43.   There is no material question of fact concerning this paragraph.

44.   There is a material question of fact.   Bradley did not resign and he did not make the statement attributed to him. (Tr. Bradley Vol. I, pp. 169-171).

45.   There is no material question of fact concerning this paragraph.

46.   There is a material question of fact concerning this paragraph.   Horan is the person who actually terminated Bradley.   He may or may not have been a decision maker. (Tr. Bradley Vol. I, pp. 141-143, 170; Tr. Horan, pp. 59-61).

47.   There is a material question of fact.   The claim is a self-serving unsupported statement. (Bradley Vol. I, pp. 141-143, 167-168).

48.   There is a material question of fact.   Moreover this matter is inadmissible because, at the time, Bradley was represented by counsel and any offers made to obtain employment for him were in the nature of privileged settlement discussions or negotiations. (Bradley Vol. I, pp. 141-143, 167-168).

49.   There is a question of fact concerning this paragraph.   Moreover, this matter is inadmissible because Bradley was represented by counsel and any offers made were in the nature of settlement discussions or negotiations. (Tr. Bradley Vol. II, pp. 171-172).

50.   There is no material question of fact concerning this paragraph.

51.   There is no material question of fact concerning this paragraph.

52.    There is a material question of fact concerning this paragraph.  Mr. Horan and Mr.

   Bradley had several conversations concerning same.  Moreover, it was common

   knowledge in the office. (Tr. Bradley Vol. I, pp. 42-43, 87, 104, 125, 127, 132; Exhibit

   3).

53.   There is a material question of fact.  The true fact is to the contrary. (Tr. Bradley Vol. I,

   pp. 42-43, 46-47, 87, 104, 125, 127, 132).

54.   There is no material question of fact concerning this paragraph.

55.   There is no material question of fact concerning this paragraph.

56.   There is no material question of fact concerning this paragraph.

57.   There is no material question of fact concerning this paragraph.

58.   There is a material question of fact. (Exhibit 1, pp 1-2; Exhibit 2, p. 1; Exhibit 4, pp. 1-2;

   and Plaintiff's Additional Facts, "Core Failure to Contribute Facts" pp. 10-17, *infra).*

59.    There is no material question of fact concerning this paragraph.

60.   There is a material question of fact concerning this paragraph.  Ms. Glavin filed an

   affidavit herewith rebutting this allegation appended herewith as "Exhibit 4."

61.   There is no material question of fact concerning this paragraph.  However, Ms.

   O'Sullivan was pressured in to contribution and ultimately was constructively terminated.

   (Deposition Transcript of Karen O'Sullivan).

62. There no material question of fact concerning this paragraph.  However, this paragraph merely summarizes testimony.  Therefore, the statement herein that there is no question of material fact is limited to agreement that the paragraph accurately summarizes the testimony.  **It cannot be read as agreement that the summarized testimony is, in fact, accurate**.

63. There no material question of fact concerning this paragraph.

64. There is a material question of fact.  Quite to the contrary, the memorandum was written by Bridget Middleton.  She freely admitted to the fact that the matter was about politics. (Tr. B. Middleton, pp. 64-67).  Sharon Donatelle at first denied even making the statement.  A whole section about this memorandum is set forth below in Plaintiff's Additional Facts, (§III, ¶¶ 110-117, *infra*).  More about this memorandum will be set forth below in Plaintiffs statement of disagreed upon facts.

65. There is a material question of fact.  Bradley attended the meeting.

66. There is no material question of fact concerning this paragraph.

67. There is no material question of fact concerning this paragraph.

68. There is no material question of fact concerning the allegation that having Mr. Bradley complete the cases was in the interest of the victims and the Commonwealth.  Whether that was Cruz's real intention is self-serving, and not a matter subject to stipulation

69. There is a material question of fact.  Cruz asked Horan to fire Bradley. (Tr. Bradley Vol. I, pp. 169-171).

70.  There is a material question of fact.  Moreover, this matter is inadmissible because Bradley was represented by counsel and any offers made were in the nature of settlement discussions or negotiations. (Tr. Bradley Vol. II, PP. 171-172).

71.  There is no material question of fact concerning this paragraph.

72.  There is no material question of fact concerning this paragraph.

73.  There is no material question of fact concerning this paragraph.

74.  There is no material question of fact concerning this paragraph.

75.  There is no material question of fact concerning this paragraph.

76.  There is no material question of fact concerning this paragraph.

77.  There is no material question of fact concerning this paragraph.

78.  There is no material question of fact concerning this paragraph.

79.  There is no material question of fact concerning this paragraph.

80.  There is no material question of fact concerning this paragraph.

81.  There is no material question of fact concerning this paragraph.

82.  There IS a material question of fact. (Exhibit 18, pp. 1, ¶ 4; p. 2, ¶¶ 6, 9; p. 3, ¶ 15; p. 4, ¶ 22)

83.  There is no material question of fact concerning this paragraph.

84.  There is no material question of fact concerning this paragraph.  However, this paragraph is neither relevant nor material.

85. There is no material question of fact concerning this paragraph.

## PLAINTIFF'S ADDITIONAL FACTS

86. On Friday, September 28, 2012, near the end of the day, Defendant Michael Horan entered Plaintiff John Bradley's office at the Plymouth County District attorney's headquarters in Brockton, Massachusetts.  Therein, Bradley and Horan spoke alone. (Tr. Bradley Vol. I, p. 170-171; Tr. Horan, p. 59-61).

87. In key respects their recollections of the conversation differ. (Tr. Bradley Vol. I, p. 170-171; Tr. Horan, p. 59-61).

88. Bradley's version of the conversation is as stated in his deposition. (Tr. Bradley, Vol. I, pp. 170-171).

89. Horan's version is found in his deposition transcript. (Tr. Horan, p. 59-61).

90. Both agree that the conversation was brief.  Both agree that, during the conversation, Bradley was asked to resign his position as an Assistant District Attorney. (Bradley, p. 170-171; Horan, p. 59-61)

91. Bradley did not resign.  Horan, acting on Cruz's behalf, fired him. (Bradley, pp. 170-171; Horan, p. 59-61).

92. According to Bradley, Horan never stated exactly why Bradley was being fired. (Bradley, p. 170-171).

93. Plaintiff will prove that he was fired because he failed to contribute money and other support to Cruz's 2010 political campaign, and that he "blew the whistle" on several issues of malfeasance involving use of government funds to post bail for informants.  In so doing, Bradley lost out in a political power play orchestrated by Frank and Bridget Middleton sanctioned and supported by the Defendant Timothy Cruz.  Among the aspects

of this political power play was a requirement that members of the office support Cruz

politically, sport Cruz bumper stickers on their cars, attend political fundraisers, and

ultimately contribute cash to Cruz campaigns.  Astonishingly, despite low office morale,

Cruz collected $61,000 in contributions from employees between 2008 and 2013.

(Tr. Bradley Vol. I, 134; Exhibit 19).

## CORE "FAILURE TO CONTRIBUTE FACTS"

The evidence that Bradley was fired for "failure to contribute" is circumstantial.  It boils

down to seven factual "bullet points" of information.  These are listed below.  Each is then

supplemented by background or foundation facts.

94. First, Mike Horan told John Bradley repeatedly that Cruz was upset that Bradley sat out

the election, and that Bradley was expected to contribute.  *See*, (§ I, *infra*).

95. Second, Mike Horan also told a high ranking Assistant District Attorney named Karen

O'Sullivan she was expected to contribute to Cruz's campaign, and would likely be

punished for not so doing.  *See*, (§ II, *infra*).

96. Third, Bradley was used as an instrumentality of retaliation himself when he was forced

to transfer an employee for failing to contribute to the campaign at the behest of Cruz.

*See*, (§ III, *infra*).

97. Fourth, there is a "smoking gun document."  Referring to the political campaign of 2010,

it castigates Bradley and O'Sullivan for "sitting out" and "doing nothing."  "It is well

known that Bradley and O'Sullivan 'sat out' last year."  *See*, (§IV, *infra*).

98. Fifth, Michael O Connell filed an affidavit demonstrating that Horan was concerned

about political contributions as far back as 2003.  *See*, (§V, *infra*).

99.  Sixth, a woman named Mary Glavin refutes claims made in Defendant's L.R. 56.1 filing

and to the contrary openly acknowledges the "pay to play' culture within the office.  *See*,

(§VI, *infra*).

100.  Seventh, the Defendants endeavored to marginalize Bradley's participation in the office

beginning in 2010, effectively freezing him out.  *See*, (§ VII, *infra*)

101.  Additionally, the evidence supporting Defendants suggested reasons for the termination

is pre-textual and not credible.  *See*, (Plaintiff's Additional Facts, "The Reasons Proffered

for Termination Are Pretextual," pp. 21-25, *infra*).


## I.       HORAN STATEMENTS TO BRADLEY

102.  Bradley testified that Horan told him repeatedly that his job was at risk because of

unwillingness to contribute to Cruz campaign:

> Q.   Yes, sir.  What I'm asking you specifically, the basis of your belief that you
> no longer having the district court responsibilities at the Plymouth County District
> Attorney's Office was due to your decision not to participate in Timothy Cruz's
> election activities.
>
> A.   Michael Horan had told me **several times** that Frank and Bridget Middleton
> had talked to Timothy Cruz about my not participating in the campaign and trying
> to persuade Mr. Cruz to fire me. (Tr. Bradley Vol. I, p. 42).


## II.      HORAN STATEMENTS TO KAREN O' SULLIVAN

103.  Karen O'Sullivan is a highly accomplished career prosecutor with a stellar professional

reputation.  Bradley signed the complaint which makes the allegation plain as day. <u>See</u>

(Exhibit 1, pp. 1-2; Tr. O'Sullivan, p. 73).

104.   Today she serves as the First Assistant District Attorney in Bristol County.  As such she
       is responsible for the day to day functioning of the office, and carries a load of major
       homicide cases. (Tr. O'Sullivan, p. 73).

105.   O'Sullivan had been a rising star in Plymouth.  She left the office under circumstances
       that easily could be construed as "constructive termination."  O'Sullivan signed an
       affidavit which was filed in court with Bradley's complaint.  The affidavit is attached
       hereto and incorporated herein. (Exhibit 1, pp. 1-2).

106.   O' Sullivan testified that Horan had repeatedly emphasized political contribution in
       conversations.  She stated: "Mike Horan told me that my salary increase or lack of salary
       increases had to do with my failure to contribute to Tim Cruz's campaign."
       (Tr. O'Sullivan, p. 39).

107.   Toward the end of the depositions, O'Sullivan was asked whether she understood the
       significance of her allegations.  The entire colloquy is reprinted below:

                                   BY MR. COHEN:

       Q.      So going back to the conversation briefly that you had with Mike
       Horan in which he relayed to you that your compensation was going to be
       adversely affected by your failure to contribute significantly to the
       political campaign of Timothy Cruz -- okay?

       A.      Yes.

       Q.      So you understand that if that were, in fact, the case, that is, that
       your compensation was being adversely affected by your failure to
       contribute, that would be a state ethic violation.  Is that right?

       A.      Yes.

       Q.      And that you also understood that Mike Horan, who is now your
       now boss, was relaying to you that the leadership of the Plymouth County
       District Attorney's Office, which Mike Horan was a part of, was adversely
       affecting your compensation based on your failure to contribute.  Is that
       right?

A.     Yes.

Q.     So you have your then boss Mike Horan, part of the leadership team at Plymouth County District Attorney's Office, allegedly telling you that he and the others had a conversation in which it was determined that your compensation was going to be adversely affected by your failure to contribute politically.   Is that right?

A.     Yes. (Tr. O Sullivan, pp. 167-168).

### III.     BRADLEY IS ORDERED TO TRANSFER RICK LINEHAN BECAUSE LINEHAN DID NOT CONTRIBUTE

108.  Bradley had been ordered to move an employee named Richard Linehan to a less

desirable location as punishment for failure to contribute.  Bradley was offended by this

request but he followed orders and did what he was told.  Bradley revealed this to Karen

O Sullivan. (Tr. Bradley Vol. I, pp 45-46; Tr. O'Sullivan, pp. 164-165).

109.  At his deposition he recalled the matter:

Q.   Okay.  What's the basis, Mr. Bradley, of your belief that individual contributions by employees of the District Attorney's Office, such as yourself, were important to Tim Cruz?

A.   Well, I was told on many occasions by Mr. Horan that they were important to Mr. Cruz.  I knew that decisions were made based on political contributions such as who would get raises and how big the raises would be.  And I had been told in one instance to move a district court prosecutor to an outlying court far from his home because he hadn't been doing enough politically.

Q.     And which attorney was this?

A.     Rick Linehan.

Q.     Can you spell that last name for me?

 A.     L–I–N–E–H–A–N

(Tr. Bradley Vol. I, pp. 45-46).

### IV.    THE SMOKING GUN MEMORANDUM

110. Attached as "Exhibit 3" is a memorandum which Cruz kept in his desk.

111. It is the same document referred to in Defendant's submission per L.R. 56.1 ¶ 64.

112. The document was drafted by Bridget Middleton in December of 2010, less than two months after the election. (Tr. B. Middleton, p. 67).

113. Among phrases utilized in the memorandum are the following: "JB and KO made a personal determination to do nothing for Tim because they don't like how the office is run." This statement means that JB and KO (John Bradley and Karen O'Sullivan) failed to contribute to Cruz's political campaign. (Exhibit 3, p. 3; Tr. B. Middleton, pp. 63-64).

114. The memorandum goes on to state: "Everyone knew that JB did not help and it sent a strong message to the staff."  This refers to the totality of both not contributing money and not engaging in the political dirty work. (Exhibit 3, p. 3; Tr. B. Middleton, pp. 63-64).

115. It also acknowledges Bradley's popularity.  The clear message is "If we let him get away with not contributing others will stop." (Exhibit 3, 1-3; Tr. B. Middleton, pp. 63-64).

116. The Defendants take position that that attached memorandum is not a smoking gun.  (See Defendant's L.R. 56.1, ¶64).  They say it refers only to Bradley and Karen O'Sullivan sitting out in the hall at a staff meeting.  This is an incorrect reading of the euphemistic language. (Tr. B. Middleton, pp. 63-64).

117. The writer of the document (Bridget Middleton) acknowledged that it referred to the political campaign.  (Tr. B. Middleton, pp. 63-64).

      Q.  So you asked me about the third page.

      A.  Okay.

Q.  If you look at that phrase there –

A.  Yes.

Q.  It says, "KO and JB purposely sat out." Do you see that?

A. It is well-known that -- it reads, "It is well-known that JB and KO sat out purposely." Did this not send a positive message to the rest of the staff?

Q. Yes.

A. Yes.

Q. What does that phrase "sat out" mean?

A. That is what was said to me.

Q. But what did it mean?

A. I am not sure what you -- I am not sure what you mean.

Q. I am asking you, you said you typed it, right?

A. Right.

**Q. Your intention was to give that document to Mr. Cruz?**

**A. I did give it to him.**

**Q. What did you mean… sat out the campaign?**

**A. That they were referring to the campaign in this, yes.**

**Q. But what did it mean?**

**A. What it meant was, to me -- you are asking my opinion of what it meant?**

**Q. Sure.**

**A. This is the words that were used, but I think what was being conveyed to me is that John and Karen, I want to say more so John, let it be known to the**

**staff that he did not support Tim to the people, particularly to the people that he supervised.**

**Q. Exhibit W3 --**

(Tr. B. Middleton, pp. 63-64).

### V.        HORAN STATEMENTS TO MIKE O'CONNELL

118.   Michael O'Connell was a career prosecutor with a stellar professional reputation. <u>See</u> (Exhibit 2, p. 1).

119.   At the inception of the case, he submitted a signed affidavit.  The affidavit is attached hereto and incorporated herein.  O'Connell stated that back in 2003; he attended a meeting with Horan to discuss employee compensation.  Horan made statements linking employee compensation with campaign contributions.  This made O'Connell uncomfortable. (Exhibit 2, p. 1).

### VI.       MARY GLAVIN AFFIDAVIT

120.   In Defendant's L.R. 56.1, ¶60, they cite a woman named Mary Glavin as an example of a person who refused to contribute to the campaigns but was treated evenly and fairly.

121.   Attached hereto is an affidavit executed by Ms. Glavin; the same Ms. Glavin referred to in Defendant's L.R. 56.1 statement. *See*, (Exhibit 4, p. 1-2).

122.   She states that the "culture" of the office requires contributions. (Exhibit 4, p. 1).

123.   Glavin asserts that she was not treated fairly as a result of her decision not to contribute or participate in Cruz's political campaign. (Exhibit 4, pp. 1-2).

## VII.    BRADLEY WAS FROZEN OUT OF THE OFFICE

124.  Shortly after the 2010 election, Bradley's duties were marginalized and he was cut out of the loop within the office. (Tr. Bradley Vol. I, pp. 87-89, 120).

125.  Prior to 2010, Superior Court prosecutors would consult with Bradley on issues arising in their cases. (Tr. Bradley Vol. I, p. 122-123).

126.  Bradley was advised that he would be utilized in this capacity in 2003. (Tr. Bradley Vol. I, p. 124-125).

127.  Within months of the 2010 election, the Superior Court prosecutors were informed that they could no longer consult with Bradley. (Tr. Bradley Vol. I, p.121).

128.  In January of 2012, Bradley was discharged from his position as District Court Chief. (Tr. Bradley Vol. I, 86).

129.  The removal of Bradley's duty to consult with the Superior Court prosecutors regarding dispositions and issues in their respective cases commenced the process of marginalizing Bradley's participation in the office, including his removal as District Court Chief, and eventually culminated with his termination on September 28, 2012. (Tr. Bradley Vol. I, pp. 86-89, 120-125).


## CORE "WHISTLE BLOWER FACTS"


130.  In 2009, at the behest of Horan, Bradley met privately with Cruz to express concern about what they perceived to be problematic issues in the office.  Chief among them was Middleton's malfeasance as a supervisor of the Superior Court prosecutors.  At that meeting, Bradley broached, for the first time, the issue of what he thought was a reckless

manner in which cooperating witnesses in homicide cases were being dealt with. (Exhibit 18, p. 1, ¶¶ 3-4).

131. Middleton was in the office less than fifty percent of the time during work hours- he was inaccessible to the very people he was ostensibly supervising.  Moreover, Bradley was starting to receive complaints that Middleton was making troubling decisions concerning cooperating witnesses in homicide cases. (Exhibit 18, p. 2, ¶ 5).

132.  Bradley relayed these concerns to Cruz in their 2009 meeting.  Cruz informed Bradley that he would look into them.  Bradley later learned that not only did Cruz do nothing about the issues Bradley had raised, but Cruz also told Middleton that Bradley had complained to him.  (Exhibit 18, p. 2, ¶ 6).

133. In late November or early December of 2010, Bradley learned from another prosecutor in the office that Middleton had authorized state police detective assigned to the office to post bail for a defendant ("Cooperator 1") in Bristol County. (Exhibit 18, p. 2, ¶ 7).

134. On information and belief, this process is illegal and constitutes a fraud upon the court and public.  The legal reasons for this information and belief will be argued in the memorandum of law.  (Exhibit 18, p. 2, ¶ 8).

135. Bradley voiced his concern about Cooperator 1 to Horan, who agreed that the issue was deeply troubling, and promised to discuss it with Cruz.  A few days later, Horan told Bradley that he had raised the issue with Cruz, and that Cruz had no problem at all with the decision to post bail for Cooperator 1. (Exhibit 18, p. 2, ¶ 9).

136. Bradley later learned that the state police detective had threatened to have the co-operator held without bail if he did not cooperate with them; only after he agreed to cooperate was his bail set at an amount of $350.  (Exhibit 18, p. 2, ¶ 10).

137. Cruz would subsequently testify falsely at his deposition that this particular cooperator's bail had already been set at the time he agreed to cooperate. (Tr. Cruz, p. 281); (Exhibit 18, p. 2, ¶ 11).

138. Also in 2010, a second cooperator ("Cooperator 2") became a topic of great controversy within the office.  Bradley learned of this from other prosecutors who had cases in which Cooperator 2 was a witness.  They complained to Bradley because they felt Cooperator 2 was such a liability that he could kill someone after receiving charge concessions from Middleton. (Exhibit 18, p. 3, ¶ 15).

139. Bradley told Horan about the concerns shared by several prosecutors in the office regarding the second cooperator. Horan told Bradley that he had already been made aware of the issue, and would speak to Cruz about it.  Days later, Horan came into Bradley's office and told him that Cruz had complete faith in Middleton's decisions. (Exhibit 18, p. 3, ¶ 16).

140. In January 2011, Cruz, aware that several superior court prosecutors, along with Horan and Bradley, were disgruntled at Middleton's decision making, held a mandatory staff meeting.  At this meeting, he read from a speech that had been written for him by Middleton's wife.  He railed at those who disagreed and told them that if they didn't like his policies, "there's the door."  Cruz admonished them all that Middleton was merely carrying out his polices.  (Exhibit 18, p. 3, ¶ 19).

141. Bradley received yet another complaint about a third cooperator ("Cooperator 3") sometime in late 2011.  This prosecutor complained that she had grave reservations about both this third cooperator's credibility as a witness and the fact that he was on the street as a result of another agreement authorized by Middleton. (Exhibit 18, p. 4, ¶ 23).

142. Bradley told this prosecutor that he had by then voiced his concerns on this issue several times to Horan and Cruz, and that Cruz had told Horan that he had complete faith in whatever Middleton decided.  Nevertheless, Bradley told her the prosecutor that he would talk to Horan about Cooperator 3.  (Exhibit 18, p. 4, ¶ 24).

143. Yet again, Bradley raised the cooperating witness issue with Horan.  Once again, Horan promised to speak to Cruz about Cooperator 3.  He later told Bradley that Cruz told him he was "done" discussing issues concerning cooperating witnesses. (Exhibit 18, p. 4, ¶ 26).

144. Bradley believes and asserts that his multiple complaints on this issue, which were critically important to their prosecutorial obligation to maintain public safety, was a significant factor in his termination and that Cruz himself foreshadowed as much in his 2011 speech to the Superior Court Staff.  (Exhibit 18, p. 5, ¶¶ 31-32).

145. In late 2005 or early 2006, Bradley was asked by Cruz and Horan to become the supervisor of the District Courts.  This involved the supervision of all four district courts in the county and approximately 20-25 new or relatively new prosecutors.  (Exhibit 18, p. 5, ¶ 33).

146. Bradley held this role until January 2012, when Cruz sent out an office-wide email explaining that Bradley was going to focus on other work and that Tim Shyne would be taking over as District Court supervisor.  Cruz's email said nothing about the ostensibly mutual agreement made in November 2011 that Bradley had agreed to resign following the completion of his last homicide trial. (Exhibit 18, p. 5, ¶ 34).

## THE REASONS PROFFERED FOR TERMINATION
## ARE PRETEXTUAL

147. Cruz testified that he decided to terminate Bradley as a result of Bradley's November 2011 email in response to Cruz's directive to stop speaking to the media concerning OUI's in the District Court. (Tr. Cruz, pp. 149, 234).

148. He stated that he decided "pretty much the moment that [he] got the 'I'm not your child' email." (Tr. Cruz, pp. 149, 234).

149. Nonetheless, Bradley was not terminated until September 28, 2012, nearly ten (10) months later. (Tr. Bradley, Vol I. p. 169-170).

150. On October 16, 2012, more than two weeks after Bradley was terminated, Cruz asked Kendra Salvatore to find and forward emails to him including the "I am not your child" email identified as Defendant's "Exhibit 8," and an email entitled "Memo from Tim," that identifies Bradley's job duties as of January 2011. (Tr. Salvatore, p. 66).

151. Cruz also claims that he decided to terminate Bradley's employment when Bradley did not resign as he allegedly agreed. (Tr. Cruz, pp. 150-152, 398).

152. On November 21, 2011, Cruz and Bradley had a meeting regarding the earlier email exchange. (Tr. Cruz, pp. 150, 168).

153. According to Cruz, Bradley was upset during the meeting, unapologetic, and hostile. (Tr. Cruz, pp. 168-169).

154. Nonetheless, Cruz testified that Bradley agreed to resign after the completion of two homicide trials. (Tr. Cruz, pp. 168-169).

155. Cruz claims that Bradley agreed to resign without discussing future employment, severance, his pension, or "any such things" although his pension was set to vest in approximately one year. (Tr. Cruz, pp. 168-172).

156. Cruz failed to ever memorialize Bradley's alleged agreement to resign in writing. (Tr. Cruz, p. 68).

157. Pursuant to M.G.L. c. 149, §52C, an employer is required to keep personnel records. Such records "shall include" among other things "employee performance evaluations... written warnings of substandard performance; lists of probationary periods; waivers signed by the employee, copies of dated termination notices; [and] any other documents relating to disciplinary action." (M.G.L. c. 149, §52C- Exhibit 16).

158. Cruz failed to include any notation of Bradley's alleged agreement to resign or pending termination in Bradley's personnel file. (Bradley Personnel File) [1]

159. Despite a litany of alleged transgressions by Bradley, his personnel file is devoid of any documents relating to termination, substandard performance, or disciplinary action. (Tr. Cruz, p. 61-70; Tr. Cruz, p. 314; Bradley Personnel File)

160. Cruz did not inform Horan of Bradley's alleged agreement to resign until September 28, 2012. (Tr. Cruz, p. 236).

161. When confronted with this fact, Cruz changed his story, claiming that he informed Horan of Bradley's alleged resignation in January of 2012. (Tr. Cruz, p. 247).

162. Cruz changed his story concerning Bradley's alleged agreement to resign a second time, claiming the he informed Horan soon after the conversation. (Tr. Cruz, p. 397).

163. Cruz did not inform Frank Middleton of Bradley's alleged agreement to resign for a month or more. (Tr. Cruz, p. 240).

---

[1] Undersigned counsel does not believe it is appropriate to paper the record with entire personnel file to prove the absence of a document at this stage. Nonetheless, a copy of John Bradley's personnel file can be made available if the Defendants do not stipulate.

164. Cruz later changed his story, claiming that he informed Horan of Bradley's alleged agreement to resign within a week. (Tr. Cruz, p. 397).

165. Cruz did not inform his management consultant, Gary Kilzer, of Bradley's alleged agreement to resign.  In fact, Cruz testified that the decision to terminate Bradley had not yet been made. (Tr. Cruz, p. 57).

166. Cruz never informed Sharon Donatelle, Christine Kiggen, or Tom Flanagan of Bradley's alleged agreement to resign.  In fact, they were shocked to hear that Bradley was fired. (Tr. Donatelle, p. 40; Tr. Kiggen, p. 8; Tr. Flanagan, p. 78).

167. Despite a culture of "rumor, scuttlebutt, and surmise that floats around the office," none of the Superior Court staff, O'Sullivan, Donatelle, Kiggen, or Flanagan, had any idea that Bradley had allegedly resigned. (Tr. Cruz, 336; Tr. Donatelle, p. 40; Tr. Kiggen, p. 8; Tr. Flanagan, p. 78).

168. When Horan asked for Bradley's resignation on September 28, 2012, Horan testified that Bradley seemed shocked. (Tr. Horan, p. 160).

169. Cruz was unsure whether the Plymouth County District Attorney's Office operates under a progressive disciplinary policy. (Tr. Cruz, p. 218-219).

170. Gary Kilzer testified that insubordination most often leads to the employee being placed on a performance improvement plan, where if the employee's "performance doesn't improve, remedial action can be taken, up to and including, termination." (Tr. Kilzer, pp. 64-65).

171. Bradley was not placed on a performance improvement plan. (Tr. Cruz, p. 61-70; Bradley Personnel File).

172. Bradley's conduct did not violate any written policy of the Plymouth county District Attorney's Office. (Tr. Cruz, p. 217; Exhibit 17).

173. Kilzer testified that there is some behavior that is too egregious to correct with a performance improvement plan and requires termination. (Tr. Kilzer, pp. 79-80).

174. Kilzer testified that termination is required where, for example: "somebody gets drunk and does something crazy at a company event or a blatant sexual harassment... or things like that." (Tr. Kilzer, p. 80).

175. Frank and his wife, Bridget Middleton, consistently contributed to Cruz's campaign. (Tr. B. Middleton, p. 48; Tr. F. Middleton, p. 91).

176. Frank Middleton's father is a major real estate broker in Plymouth County who supported Cruz. (Tr. Cruz, p. 124, 141).

177. Cruz witnessed Frank Middleton intoxicated at an MDAA conference and believed that Middleton was voicing his displeasure to District Attorney Joseph Early about hiring Bradley. (Tr. Cruz, pp. 188-189, 281).

178. Shortly after the MDAA conference very serious allegations were brought to Cruz's attention. [2]

179. These very serious allegations concerned an employee who strongly supported Cruz.

180. The employee was not investigated or questioned about the matter for seven to eight months after Cruz learned of the allegations.

181. Cruz retained Attorney Walter Sullivan to investigate the matter, but never read the report that Sullivan prepared as a result of that very investigation; the report is sitting in an envelope in Cruz's house. (Tr. Cruz, p. 306-308).

---

[2] Pursuant to the Court's May 12, 2016 Order [No. 147], paragraphs 178-180 are accepted as undisputed by the Defendants exclusively for the purposes of summary judgment.

182. In April of 2015 Frank Middleton was asked to resign. (Tr. Cruz, p. 298).

183. According to both Frank and Bridget Middleton, Cruz asked Frank to resign because he

   believed that Frank had become a political liability due to Bradley's lawsuit.

   (Tr. F. Middleton, p. 44; Tr. B. Middleton, p. 30).

184. Cruz only asked Middleton to resign once he realized that Middleton's continued

   employment would impact Cruz's political future. (Tr. B. Middleton, p. 27-30).


RESPECTFULLY SUBMITTED:
PLAINTIFF

John Bradley
By and through his attorneys,

*/s/ Robert S. Sinsheimer*_____
Robert S. Sinsheimer, BBO# 464940
Wesley B. Stoker, BBO# 692159
SINSHEIMER & ASSOCIATES
92 State Street, 9th Floor
Boston, MA 02109
T: (617) 722-9954

Dated: May 31, 2016


**CERTIFICATE OF SERVICE**


   I hereby certify that I served a true copy of this document by electronic filing, on May 31, 2016, to all parties that participate in the ECF system and by first class mail to all parties not listed on the ECF system.


*/s/ Wesley B. Stoker*___
Wesley B. Stoker