UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN BRADLEY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:13-cv-12927-IT |
| | * | |
| TIMOTHY J. CRUZ, et al., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

March 30, 2017

TALWANI, D.J.

Plaintiff John Bradley brings this action against Defendants Timothy Cruz, Michael Horan, Frank Middleton, and the Plymouth County District Attorney's Office for claims arising out of Bradley's employment, and termination of employment, as the Deputy First Assistant District Attorney and Chief District Court Prosecutor in the Plymouth County District Attorney's Office ("D.A.'s Office"). Bradley alleges violation of 42 U.S.C. § 1983 (Count I against Cruz, Horan, and Middleton); violation of the Massachusetts Civil Rights Act (Count II against Cruz, Horan, and Middleton); tortious interference with an advantageous contractual, business, or employment relationship (Count III against Horan and Middleton); wrongful termination in violation of public policy (Count V against the D.A.'s Office); and violation of the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 184 (Count VI against the D.A.'s Office).

Pending before the court are Defendants' Motion for Summary Judgment [#131] and Defendants' Amended Motion to Strike Portions of Plaintiff's Omnibus Statement [#163]. For the reasons set forth in this order, the summary judgment motion is ALLOWED IN PART and DENIED IN PART, and the motion to strike is DENIED.

I. Motion to Strike

Defendants have moved to strike certain portions of Bradley's Local Rule 56.1 statement, asserting that certain responses do not properly controvert Defendants' corresponding statement of undisputed fact and that other responses do not contain record citations. Each response by Bradley in his Local Rule 56.1 statement that Defendants contest includes citations to the record. Whether the record evidence is sufficient to controvert Defendants' corresponding statements is an issue for summary judgment but is not a basis for striking the responses.

Defendants also assert that certain responses include "inappropriate argument and innuendo." The court declines to strike these responses but relies only upon facts supported by the summary judgment record. See Ferring Pharms., Inc. v. Braintree Labs., Inc., No. 13-12553-NMG, 2016 WL 6078287, at *8 (D. Mass. Oct. 14, 2016); Shervin v. Partners Healthcare Sys., Inc., 2 F. Supp. 3d 50, 60 (D. Mass. 2014), aff'd, 804 F.3d 23 (1st Cir. 2015).

II. Motion for Summary Judgment

   A. Standard

A moving party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of fact exists if an issue can be resolved in favor of either party. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). A fact is material if it has the potential to affect the outcome of the case. Id. In passing on a motion for summary judgment, the court construes all properly supported evidence in the light most favorable to the non-moving party

and draws all reasonable inferences in its favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The burden falls on the moving party to demonstrate an "absence of evidence to support the non[-]moving party's case." Celotex Corp. v. Cattret, 477 U.S. 317, 325 (1986). When the moving party satisfies that burden, the non-moving party "must adduce specific facts showing that a trier of fact reasonably could find in his favor." Murray v. Warren Pumps, LLC, 821 F.3d 77, 83 (1st Cir. 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

### B. Summary Judgment Record

Although many facts are strongly disputed and a jury may well reach a different conclusion, the record is recited here in the light most favorable to Bradley, the non-moving party, as required on summary judgment. Griggs-Ryan, 904 F.2d at 115. Based on the summary judgment record, a jury finding Bradley's evidence credible and resolving factual disputes in his favor could find the following chronology of events:

Bradley began his career in the D.A.'s Office in 1991, where he served until 2001, when he joined the U.S. Attorney's Office.

In November 2001, Cruz was appointed the Plymouth County District Attorney. He was elected to a four-year term in 2002.

In 2003, Bradley returned to the D.A.'s Office, and shortly after his return, was named Deputy First Assistant District Attorney.

Bradley has presented evidence that, at a 2003 meeting about salary increases, the D.A.'s Office's Chief Legal Counsel, Michael Horan, commented to another assistant district attorney about the extent to which individual employees had supported Cruz's 2002 campaign. According to Bradley, Horan also told him "on many occasions" in 2004 or 2005 that individual contributions from employees "were important to Mr. Cruz" and that political contributions were

3

tied to decisions about raises.

In 2005, and again in 2006, Bradley contributed $500 to Cruz's 2006 re-election campaign. Also in 2005 or 2006, Bradley became Chief District Court Prosecutor, supervising attorneys that practiced in the county's district courts. As such, he was the fourth highest paid attorney in the D.A.'s Office. Although advising assistant district attorneys practicing in the county's superior courts was never among Bradley's official responsibilities, Horan and Cruz informally tasked Bradley with this additional role when First Assistant District Attorney Frank Middleton was unavailable.

In 2006, Cruz was re-elected to a second four-year term, and in both 2007 and 2009, Bradley again contributed $500 to Cruz's re-election campaign.

In 2009, Bradley met with Cruz to discuss, among other things, Bradley's concerns about Frank Middleton's decisions as to the handling of cooperating witnesses in homicide cases. Cruz advised Bradley he would look into these concerns but did not. Cruz did tell Middleton that Bradley had complained about Middleton.

In 2010, Bradley shared with Horan his concerns about a particular cooperating witness' potential for violence. Horan later reported to Bradley that Horan had spoken with Cruz, who had professed "complete faith" in Frank Middleton's decisions regarding this witness.

Eventually, a rift developed among D.A.'s Office employees over the direction the office was taking, particularly with respect to a series of administrative decisions made by Frank Middleton. On one side of the schism sat Middleton and a group of employees that included Middleton's wife, Bridget Middleton. On the other side was Bradley, Horan, and a group of assistant district attorneys, including Karen O'Sullivan.

Bradley did not contribute to Cruz's re-election campaign in 2010. Bradley contends that,

4

after he stopped contributing to the campaign, Horan told him "several times" that the Middletons had tried to persuade Cruz to fire him for this reason. According to Bradley, Horan told Bradley that the Middletons had told Horan, "Well, Tim's not quite there yet. But they're still working on it."

In or around 2010, according to Bradley, Horan instructed him to transfer an assistant district attorney to an office far from his home, because that attorney had not contributed to or participated in Cruz's campaign. Bradley complied. Bradley further has presented evidence that, in 2010, Horan told O'Sullivan that Cruz and Frank Middleton were displeased with O'Sullivan's lack of participation in the campaign, and he advised her to participate. According to Bradley, Horan told Bradley that Horan was present at a meeting in which Frank Middleton tried to persuade Cruz to determine O'Sullivan's pay raise based on her lack of participation in the campaign. Additionally, Bradley has submitted an affidavit from a former D.A.'s Office employee who asserts that, during Cruz's tenure, she was "pressured to participate and/or contribute to his political campaign" and that this expectation "was part of the office culture."

Cruz was re-elected for a second full term as Plymouth County District Attorney in November 2010. After the election, in late November or early December 2010, Bradley raised concerns to Horan about Middleton's decisions regarding yet another cooperating witness. A few days later, Horan told Bradley that he had addressed the matter with Cruz, who was not concerned.

By December 2010, the rift in the D.A.'s Office had come to a head. A group of assistant district attorneys, including Bradley, planned to approach Cruz with concerns about Frank Middleton's leadership decisions while the Middletons were away on vacation. Bridget

5

Middleton learned about their plans and, on her own initiative, met separately with three assistant district attorneys to discuss their colleagues' grievances and plans.

The meetings were memorialized in Bridget Middleton's typed notes. Summarizing what one of the assistant district attorneys told her, she wrote:

> [The assistant district attorney] feels that they are undermining Tim [Cruz] politically outside the office . . . JB [John Bradley] and KO [Karen O'Sullivan] made a purposeful determination to do nothing for Tim because they don't like how the office is run. Everyone knew that JB did not help and it sent a strong message to the staff. This undermined Tim during a critical period.

In her notes documenting statements made by another of the three assistant district attorneys, Bridget Middleton wrote: "It is well know[n] that JB and KO sat out purposefully. This did not send a positive message to the rest of the staff." Although that assistant district attorney testified that the notes may have been referring to statements she may have made about Bradley and O'Sullivan's attendance at an office meeting, Bridget Middleton testified that it was her understanding that the comments concerned their participation in the recent campaign. Bridget Middleton gave her notes to Cruz.

According to Bradley, in late 2010 or early 2011, assistant district attorneys assigned to the superior courts were instructed that they no longer should consult him about their cases.

In January 2011, Cruz held a mandatory staff meeting in which he stated that if employees disagreed with his office policies, they should find other employment.

Toward the end of 2011, Bradley again spoke with Horan about concerns regarding a third cooperating witness. After relaying this to Cruz, Horan told Bradley that Cruz had said he was "done" discussing such matters.

Also that year, on November 17, 2011, a Boston Globe reporter contacted Bradley about acquittals in jury-waived trials in operating-under-the-influence ("OUI") cases. Bradley

6

previously had met the reporter to discuss this topic, with Cruz's blessing. After communicating with the reporter on November 17, Bradley sent the following e-mail to Cruz:

> Got a call from the Globe asking what we are going to do, moving forward, on the jury waived/[OUI] issue. I mentioned that we were considering asking for declination on all [OUI] jury waivers in cases involving [four specific judges]. If you agree to this, they will run a front page story. Personally, I feel we are remiss if we don't do this, press coverage notwithstanding.

Cruz, who was out of the office, responded: "I am deciding what I will do with this when I get back. No more contact with [the G]lobe until I say so." Bradley wrote back: "I am not your child. I have done a lot of important work in this office both before and after you became DA. You can start showing a little more respect in the future."

On November 21, 2011, Bradley and Cruz met in Cruz's office. At the meeting, Cruz said something to the effect of: "You're obviously not happy here." Bradley testified that he responded that he was unhappy in the D.A.'s Office but that he enjoyed his work, and he told Cruz about his two longstanding homicide cases—Commonwealth v. Caswell and Commonwealth v. Winquist—that were scheduled for trial soon. Caswell would be tried in December, and, at that time, the Winquist trial was set for February 2012. Bradley also informed Cruz that his pension would vest in the next year.

On December 21, 2011, a jury returned with a guilty verdict in Caswell.

On January 4, 2012, Bradley e-mailed Cruz's assistant: "Could you tell DA that I've already given myself a congratulatory pat on the back for the Caswell conviction; so he need not expend extra energy by offering any kind words! I know how busy and important he is . . ." Also that month, Cruz relieved Bradley of his duties and title as Chief District Court Prosecutor, although Bradley's salary remained the same. Bradley's only remaining responsibility was prosecuting Commonwealth v. Winquist. According to Bradley, he complained about the release

7

of his responsibilities to Horan, who told him that the Middletons were trying to marginalize him.

In February 2012, Cruz formally retained the services of William Gary Kilzer, an independent human resources consultant to address the management of the office. Kilzer's evaluation focused on the employees who directly reported to Cruz (the Middletons and Horan), and he did not speak with Bradley. Cruz testified at his deposition that, at the time he was determining which employees Kilzer should confer with, he had not yet made the decision to fire Bradley. According to Kilzer, Cruz told him about Bradley's e-mail, and Kilzer suggested that Cruz fire Bradley. Kilzer recalled Cruz saying that he "didn't want to fire him now" because Bradley was in the middle of a murder trial. Kilzer completed the consulting assignment in or around March.

<u>Winquist</u> was tried later in 2012, and on September 25, 2012, the jury reached a guilty verdict. A few days later, Horan was informed for the first time by Cruz that Cruz had decided to fire Bradley, and on September 28, Horan summoned Bradley to his office at Cruz's behest and asked Bradley to resign. When Bradley refused, Horan said he was fired. Bradley testified that, when asked if there was a reason why he was being let go, Horan "kind of shrugged his shoulders and smirked and said, 'Of course not.'" Bradley's pension had been set to vest the following May.[1]

At the time of the termination, Bradley's personnel file contained no notation about an agreement to resign or pending termination. Nor was Bradley ever placed on a performance improvement plan.

---

[1] Bradley's affidavit states that the pension would have vested in May 2012, as opposed to May 2013, but this appears to be a typographical error.

*A. Analysis*

Defendants move for summary judgment as to all counts.

1. Massachusetts Civil Rights Act

Bradley alleges that Cruz, Horan, and Middleton violated the Massachusetts Civil Rights Act ("MCRA").[2] The MCRA "creates remedies for '[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with [by any person, whether or not acting under color of law, by threats, intimidation or coercion].'" Currier v. Nat'l Bd. of Med. Examiners, 965 N.E.2d 829, 837 (Mass. 2012) (quoting Mass. Gen. Laws ch. 12, §§ 11I, 11H). To succeed on an MCRA claim, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." Id. at 837-38.

Defendants argue, *inter alia*, that Bradley's MCRA claim cannot survive summary judgment because he has failed to establish interference with his First Amendment rights through threats, intimidation, or coercion. Bradley counters that he has produced sufficient evidence for a jury to find that his termination constituted economic coercion. Within the context of the MCRA, "actionable coercion is 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.'" Buster v. George W. Moore, Inc., 783 N.E.2d 399, 410 (Mass. 2003) (emphasis omitted) (quoting Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994)). "It is 'the active

---

[2] The Complaint [#1] alleges violation of Mass. Gen. Laws ch. 12, § 11H, but that section authorizes actions brought by the Massachusetts Attorney General. Section 11I provides for a private cause of action.

9

domination of another's will.'" Id. (quoting Planned Parenthood, 631 N.E.2d at 990). Indeed, "in certain circumstances, economic coercion, standing alone, may be actionable under the [MCRA]." Id. at 411. The applicable standard for determining the existence of economic coercion is that of an objective, reasonable person. Currier, 965 N.E.2d at 838.

Bradley likens the termination of his employment to the cancellation of a contract. In certain circumstances, one party may be liable under the MCRA for depriving another of its rights under a contract. Buster, 783 N.E.2d at 410 & n.17 (citing Redgrave v. Bos. Symphony Orchestra, Inc., 502 N.E.2d 1375 (Mass. 1987)). However, this argument fails here because Bradley was an at-will employee. Mass. Gen. Laws ch. 12, § 16 ("Each district attorney shall, subject to appropriation and subject to the conditions of this section, appoint and may, at his pleasure, remove such assistant district attorneys as are necessary to the functioning of the office of the district attorney."). In Webster v. Motorola, Inc., 637 N.E.2d 203 (Mass. 1994), the Massachusetts Supreme Judicial Court held that an employer's threats to terminate the employment of at-will employees was not actionable under the MCRA because the employees did not possess contractual rights to continue in their positions. Id. at 206. Applying Webster, the First Circuit concluded in Nolan v. CN8, 656 F.3d 71 (1st Cir. 2011), that the dismissal of an at-will employee also does not amount to actionable coercion. Id. at 79. Bradley contends that such interpretation by federal courts is a misconstruction of Webster, which he claims merely upholds the rights of employers to require universal drug testing. However, this overly narrow reading of Webster overlooks its plain language. See Webster, 637 N.E.2d at 206 ("[T]he defendants allegedly attempted to interfere with the plaintiffs' rights by threatening the loss of their 'at-will' positions. *This is not actionable conduct.* No physical confrontation is alleged, and *because the plaintiffs were employed 'at will,' they had no contract right to their positions*." (emphases

10

added)).

Bradley urges this court to follow the decision in Cabi v. Boston Children's Hospital, 161 F. Supp. 3d 136 (D. Mass. 2016). However, the conduct alleged by the plaintiff post-doctoral fellows in Cabi included multiple, frequent, and explicit threats to harm the plaintiffs' future careers if they did not agree to the defendants' demands. Id. at 149-51. Here, Bradley has alleged no similar threats to his future job prospects and instead points only to Horan's statements that the Middletons sought to get him fired from his position at the D.A.'s Office for not contributing to Cruz's campaign. These "threats" are no more than the threats to an at-will position directly governed by Webster.

Bradley has not presented sufficient evidence of threats, coercion, or intimidation sufficient to withstand summary judgment on his MCRA claim.

2. Section 1983

Bradley brings a claim against Horan, Middleton, and Cruz for violation of Section 1983 by discriminating against Bradley because he did not contribute to or participate in the 2010 campaign. An employee alleging adverse action on the basis of First Amendment political discrimination in violation of Section 1983 carries the initial burden of establishing a prima facie case. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). To do so, he must present evidence to show that "(1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's . . . affiliation; (3) . . . a challenged employment action [occurred]; and (4) . . . political affiliation was a substantial or motivating factor behind it." Welch v. Ciampa, 542 F.3d 927, 938-39 (1st Cir. 2008) (quoting Martinez-Vélez v. Rey-Hernández, 506 F.3d 32, 39 (1st Cir. 2007)). In this context, "persons sued in their individual capacities . . . must be gauged in terms of their own actions." Id. at 936

11

(quoting Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)).

Once the plaintiff makes a prima facie showing, the burden of production shifts to the defendant to "show[] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287; see also Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir. 1993). The plaintiff "may discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor." Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 77 (1st Cir. 2000). "The evidence by which the plaintiff established [his or] her prima facie case may suffice for a factfinder to infer that the defendant's reason is pretextual and to effectively check summary judgment." Id. at 78.

### a. Claim Against Horan

When reasonably viewed in Bradley's favor, the facts as to Horan show at most that he conveyed the messages of others. There is nothing to suggest that he participated in the decision to terminate or otherwise acted against Bradley. As Bradley has not come forward with facts sufficient to support a prima facie claim against Horan, Bradley is unable to withstand Horan's summary judgment motion on the Section 1983 claim.

### b. Claims Against Cruz and Middleton

Defendants argue that Bradley cannot demonstrate that his decision not to support Cruz's campaign was a substantial or motivating factor behind his termination or the removal of his responsibilities and that the record demonstrates that Bradley's employment was terminated because of disrespectful and insubordinate behavior, not protected activities.

Bradley has presented enough evidence to establish a prima facie case, particularly as to the removal of his informal responsibilities. When reasonably viewed in his favor, the record

evidence shows that, on the heels of the 2010 campaign, Cruz received Bridget Middleton's typed notes which, when read in the light most favorable to Bradley, state that he did not support Cruz's most recent run and that this lack of support "undermined [Cruz] politically" and among employees. At about the same time, and for no reasons articulated in the record, Cruz was stripped of his informal role of advising assistant district attorneys about their superior court cases.

The removal of Bradley's duties as a Chief District Court Prosecutor in January 2012 and his eventual termination after the murder cases concluded pose a closer case, but the evidence does suffice for a prima facie case. Bradley has adduced evidence that, if believed, demonstrates that his lack of participation in Cruz's campaign was a substantial factor in Cruz's hostility toward him—despite the delayed action in effectuating the termination. And although Frank Middleton did not have the statutory authority to fire him, a jury reasonably could find that Middleton influenced the decision. In particular, a jury could find that Middleton allegedly told Horan that Middleton intended to get Bradley fired because Bradley did not provide sufficient political support.

The question remains as to whether Bradley's claims against Cruz and Middleton survive the remaining prongs of the Mt. Healthy burden-shifting test. Cruz testified at his deposition that when he spoke to Bradley after he sent the November 2011 e-mail, Bradley said he wanted to try the two aforementioned cases and then would leave the office after Winquist. According to Cruz, he informed Bradley at that time that he would appoint a new Chief District Court Prosecutor in January 2012. Cruz testified further that he decided to terminate Bradley's employment "[p]retty much the moment" he received the November 2011 e-mail, because "I knew he could no longer work in the office with that level of disrespect for me and for the office."

13

But despite this testimony, a genuine dispute exists as to whether the e-mail was the reason for the termination or an after-the-fact justification. Bradley's version of the November 2011 conversation differs from Cruz's, and there are no notations in Bradley's personnel file about his pending termination or an alleged agreement to resign. Bradley never was placed on a performance improvement plan, and Cruz did not tell Horan of Cruz's decision until on or about the day of Bradley's termination. Cruz also testified that he had not yet decided to dismiss Bradley by the time Kilzer was working with them, and Cruz did not hire Kilzer until February 2012 (although they had had an introductory meeting on an unknown date before that). Kilzer testified that he and Cruz discussed Bradley's conduct and that Cruz expressly declined to terminate his employment. Kilzer did not testify that a decision to terminate Bradley already had been made. Further, a reasonable juror could conclude that, had the November 2011 e-mail been viewed as so offensive as to warrant termination, Cruz would have terminated Bradley's employment immediately, issued a performance plan, or at least told the Chief Legal Counsel during the intervening months. In light of these wholly disputed material facts, Cruz and Middleton are not entitled to summary judgment on the Section 1983 claim.

3. Tortious Interference Claim

Bradley further alleges that Horan and Middleton tortiously interfered with Bradley's advantageous contractual, business, or employment relationship. A plaintiff alleging tortious interference must have evidence on which a jury could find

> that (1) he had an advantageous relationship with a third party (e.g., a present . . . employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

Blackstone v. Cashman, 860 N.E.2d 7, 12-13 (Mass. 2007). With respect to the third element,

14

when the defendant is an official of the employer and acting in the scope of his or her employment, the plaintiff must prove that the defendant acted with actual malice. Id. at 13. Actual malice exists when the defendant acts with "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." Id. (quoting Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241, 1246 (Mass. 1992)).

With respect to Horan, even when the summary judgment record is reasonably construed in a light most favorable to Bradley, the facts demonstrate that Horan at most acted as the harbinger of the messages of others. There is no evidence that Horan interfered with Bradley's employment relations and certainly no evidence that he acted with a spiteful purpose. Summary judgment in his favor therefore is proper.

With regard to Middleton, when all reasonable inferences are drawn in Bradley's favor, Middleton's efforts against Bradley as allegedly reported by Horan is sufficient evidence from which a jury could find that Middleton actively tried to interfere with Bradley's employment and ultimately succeeded. When considered in the light most advantageous to Bradley, a jury could find Horan's statements to show that Middleton acted with actual malice unrelated to the legitimate interests of the D.A.'s Office. For this reason, whether Middleton acted in the office's legitimate interest or with actual malice is a question of fact not amenable to summary judgment.

4.  Wrongful Termination in Violation of Public Policy

Bradley's claim that the D.A.'s Office wrongfully terminated him in violation of public policy is based on the same evidence offered in support of his Section 1983 claim against Cruz. Despite the "general rule" that an at-will employee may be terminated for any reason or no reason, "[l]iability may be imposed on an employer . . . if an at-will employee is terminated for a reason that violates a clearly established public policy." Upton v. JWP Businessland, 682 N.E.2d 1357, 1358 (Mass. 1997). The D.A.'s Office argues that Bradley has failed to adduce evidence

15

that his lack of political support was the reason for his termination. In so doing, the D.A.'s Office points to the nearly two years that elapsed between Bradley's decision not to contribute to the 2010 campaign and the termination of his employment in September 2012. They claim he was fired for insubordinate behavior. As discussed above, this is a question of fact.

Since a reasonable juror could accept Bradley's version of events, summary judgment on this count must fail.

5. Violation of the Massachusetts Whistleblower Act

Finally, Bradley charges that the D.A.'s Office violated the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185. The Massachusetts Whistleblower Act states, in pertinent part:

> An employer shall not take any retaliatory action against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

Mass. Gen. Laws ch. 149, § 185(b)(1). To succeed on a claim under the Act, the employee must demonstrate "that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 303 (1st Cir. 2014) (quoting Welch, 542 F.3d at 943). Upon a prima facie showing, the burden shifts to the employer to "proffer[] a legitimate, nonretaliatory reason for the [adverse action]." Id. (quoting Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 262 (1st Cir. 1999)). The burden then returns to the employee "to 'adduce some significantly probative evidence showing both that the proffered reason is pretextual and that a retaliatory animus sparked his dismissal.'" Id. (quoting Higgins, 194 F.3d at 262).

Bradley argues that his multiple complaints about the handling of cooperating witnesses was a substantial or motivating factor in his termination.[3] In support of its motion for summary judgment, the D.A.'s Office argues that Bradley did not directly disclose his concerns about cooperating witnesses to Cruz. However, in addition to presenting evidence of a direct disclosure to Cruz in 2009, Bradley has adduced evidence that he disclosed these concerns to Horan, who relayed them to Cruz as late as the end of 2011. A reasonable juror could conclude that the disclosure was made.

The D.A.'s Office further argues that Bradley was terminated for insubordinate behavior, not his complaints regarding cooperating witnesses. This is a factual issue that cannot be resolved on summary judgment. Viewing the record in the light most favorable to Bradley, a jury reasonably could find that Bradley raised concerns to Cruz, either directly or through Horan as an intermediary, about the handling of cooperating witnesses multiple times between 2009 and 2011. When Bradley last raised the matter at the end of 2011, Cruz responded that he would not discuss it further. By Cruz's testimony, he made the decision in late 2011 to terminate Bradley's employment when he finished his homicide trials. Shortly thereafter, in January 2012, Cruz did strip Bradley of his title of Chief District Court Prosecutor. As discussed above, it is disputed as to when the decision to terminate Bradley was made, and a reasonable juror could determine that the reason for termination proffered by the D.A.'s Office—the November 2011 e-mail—is pretextual. Though the matter is hotly contested, the court cannot conclude that a reasonable jury could not find on this record that the D.A.'s Office terminated Bradley's employment because he complained about practices related to confidential witnesses. For this reason, the motion for

---

[3] As an additional basis for relief under the Act, Bradley alleged in his Complaint [#1] that his objections to certain judges' handling of OUI cases played a significant role in his termination. However, he has abandoned this theory at the summary judgment stage.

summary judgment as to this count must fail.

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [#131] is ALLOWED IN PART and DENIED IN PART. Specifically, Horan is entitled to summary judgment on all counts, and Cruz and Middleton are entitled to summary judgment on Count II (MCRA). Summary judgment is denied as to all remaining counts and defendants. Defendants' Amended Motion to Strike Portions of Plaintiff's Omnibus Statement [#163] is DENIED.

IT IS SO ORDERED.

Date: March 30, 2017                                  /s/ Indira Talwani
                                                      United States District Judge